IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FORSYTH MEMORIAL HOSPITAL, INC.    *
3333 Silas Creek Parkway
Winston-Salem, North Carolina 27103    *

MEDICAL PARK HOSPITAL, INC.    *
1950 South Hawthorne Road
Winston-Salem, North Carolina 27103    *

    and    *

FOUNDATION HEALTH SYSTEMS CORP.    *
D/B/A THE OAKS AT FORSYTH and
as successor in interest to CAROLINA    *
MEDICORP ENTERPRISES, INC.
D/B/A EDWIN H. MARTINAT OUTPATIENT    *
  REHABILITATION CENTER
3333 Silas Creek Parkway    *
Winston-Salem, North Carolina 27103
    *
    Plaintiffs,
    *
    v.    CASE NO.:  1:07-CV-1828-RBW
    *
MICHAEL O. LEAVITT, as Secretary of
Health and Human Services,    *
200 Independence Avenue, S.W., Room 615F
Washington, D.C. 20202    *

    Defendant.    *

    *   *   *

**CORRECTED AMENDED COMPLAINT FOR JUDICIAL REVIEW OF
FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT**

Plaintiffs Forsyth Memorial Hospital, Inc., Medical Park Hospital, Inc., and

Foundation Health Systems Corp. d/b/a The Oaks at Forsyth and as successor in interest to

Carolina Medicorp Enterprise, Inc. d/b/a Edwin H. Martinat Outpatient Rehabilitation Center,

by their undersigned attorneys, hereby file this Corrected Amended Complaint. The Amended Complaint previously filed with the Court has been corrected with the consent of Defendant's counsel to reflect the name and address of each of the parties in this matter. This action involves the failure of Defendant Michael O. Leavitt, Secretary of Health and Human Services, to reimburse Medicare providers for amounts to which they are entitled under the Medicare program, namely reimbursement for a loss incurred on the transfer of ownership of depreciable assets that each provider had used to furnish services to Medicare beneficiaries, resulting from the statutory merger of its related party "home office" with an unrelated entity.

PARTIES

1.      During the relevant time period, Forsyth Memorial Hospital, Inc. ("Forsyth Memorial Hospital") was a non-profit hospital located in Winston-Salem, North Carolina. Forsyth Memorial Hospital was certified as a "provider of services" participating in the Medicare Program within the meaning of 42 U.S.C. § 1395x(u).

2.      During the relevant time period, Medical Park Hospital, Inc. ("Medical Park Hospital") was a non-profit hospital located in Winston-Salem, North Carolina. Medical Park Hospital was certified as a "provider of services" participating in the Medicare Program within the meaning of 42 U.S.C. § 1395x(u).

3.      During the relevant time period, Foundation Health Systems Corp d/b/a The Oaks at Forsyth, was a non-profit skilled nursing facility located in Winston-Salem, North Carolina  ("Oaks at Forsyth").  Oaks at Forsyth was certified as a "provider of services" participating in the Medicare Program within the meaning of 42 U.S.C. § 1395x(u).

4.      During the relevant time period, Carolina Medicorp Enterprises, d/b/a Edwin H. Martinat Outpatient Rehabilitation Center ("Martinat") was a non-profit comprehensive

outpatient rehabilitation facility located in Winston-Salem, North Carolina. Martinat was certified as a "provider of services" participating in the Medicare Program within the meaning of 42 U.S.C. § 1395x(u). Foundation Health Systems Corp. is the successor in interest to Martinat as described further in paragraph 30 of this Complaint.

5.      Defendant Michael O. Leavitt, Secretary of Health and Human Services (hereinafter, "Secretary" and "HHS"), is responsible for the administration of the Medicare Program under Title XVIII of the Social Security Act, as amended.  42 U.S.C. §§ 1395-1395ggg (hereinafter, the "Act").  Pursuant to Medicare regulations, the Secretary is the real party in interest in the administration of the Medicare Program.  42 C.F.R. § 421.5(b).  The Centers for Medicare and Medicaid Services ("CMS") is the operating component of HHS charged with the administration of the Medicare Program.  During the cost reporting period at issue, CMS was known as the Health Care Financing Administration ("HCFA").

<u>JURISDICTION AND VENUE</u>

6.      This action arises under the Medicare statute (Title XVIII of the Act), 42 U.S.C. §§ 1395-1395ggg; the Administrative Procedure Act, 5 U.S.C. §§ 553-808 (hereinafter, the "APA"); and the Declaratory Judgment Act, 28 U.S.C. § 2201.  The action is based upon the failure of the Secretary to reimburse Forsyth Memorial Hospital, Medical Park Hospital, Oaks at Forsyth, and Martinat (referred to individually as "Carolina Medicorp Provider" and collectively as "Carolina Medicorp Providers"), for certain costs related to their provision of health care services to Medicare beneficiaries, namely, compensation for the loss incurred by their Medicare "home office" on a statutory merger with an unrelated party related to depreciable assets used by each Carolina Medicorp Provider.

7.      This court has jurisdiction under 42 U.S.C. § 1395oo(f)(1).

8.      Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1391.

MEDICARE STATUTORY AND REGULATORY FRAMEWORK

9.      Title XVIII of the Act establishes a program of health insurance for the aged and disabled commonly known as "Medicare."  42 U.S.C. §§ 1395-1395ggg.  The Medicare program is divided into four parts, Part A through Part D.  Part A and Part B of the Medicare program are the only parts that are relevant to this proceeding.  Part A (the hospital insurance program) provides for reimbursement of inpatient hospital services.  42 U.S.C. §§ 1395c-1395i-5.  Part B (the supplemental medical insurance program) pays for various health services not covered by Part A, including physician services and hospital outpatient services. 42 U.S.C. §§ 1395j-1395w-4j.

10.     To participate in the Medicare program, a hospital or other "provider of services" must file a "provider agreement" with the Secretary.  42 U.S.C. § 1395cc.

11.     Payment to providers of services is made through fiscal intermediaries pursuant to contracts with the Secretary.  42 U.S.C. § 1395h.

12.     The fiscal intermediary for each Carolina Medicorp Provider during the period at issue was Blue Cross and Blue Shield of North Carolina ("BCBSNC").  Palmetto Government Benefit Administrator ("Palmetto") and Cahaba Safeguard Administrators ("Cahaba") replaced BCBSNC as the fiscal intermediary responsible for each Carolina Medicorp Provider subsequent to completion of the Medicare cost year at issue (BCBSNC, Palmetto, and Cahaba will be referred to individually and collectively as the "Intermediary"). The Intermediary was responsible for Medicare audit of, and payment to each Carolina Medicorp Provider.

13.    Historically, the Medicare program reimbursed hospitals and other providers of services on a "reasonable cost" basis.  42 U.S.C. § 1395f(b).  The Medicare statute requires that the reasonable cost of services reimbursed under the Medicare program be determined in accordance with regulations promulgated by the Secretary.  42 U.S.C. § 1395x(v)(1)(A). During the relevant time period, the Medicare statute also required the Secretary to provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984.  42 U.S.C. § 1395x(v)(1)(O).

14.    Since the program's inception, Medicare regulations have provided that costs of services, facilities and supplies that are furnished to a provider by an entity related to the provider by common ownership or control are included in the provider's allowable cost at the cost to the provider's related organization in furnishing those services, facilities, or supplies.  42 C.F.R. § 413.17(a).  Under these regulations, an entity is considered to be "related to the provider" if the provider to a significant extent is associated or affiliated with, has control of, or is controlled by the organization furnishing the services, facilities, or supplies.  42 C.F.R. § 413.17(b). Medicare regulations further provide that control exists if an individual or an organization has the power, directly or indirectly, to influence or direct the actions or policies of an organization or institution significantly.  42 C.F.R. § 413.17(c).

15.    Since the program's inception, Medicare regulations have recognized that depreciation represents a reasonable cost of services required to be reimbursed under the Medicare statute.  *See* 42 C.F.R. § 413.134.  Recognition of depreciation compensates a provider for an asset's loss of value resulting from its use in furnishing services to Medicare beneficiaries.  Medicare reimburses depreciation costs to a provider on an annual basis, based on the historical cost of each depreciable asset divided by its estimated useful life.

16.    Under Medicare regulations, if, upon the change of ownership of a depreciable asset, a Medicare provider receives more than the asset's historic cost less previously recognized depreciation allowances ("Medicare book value"), then a gain occurs.  In that event, Medicare recognizes the gain in the determination of the provider's allowable cost and recoups previously paid reimbursement for depreciation.  If, upon the change of ownership of a depreciable asset, a provider receives less than the asset's Medicare book value, then Medicare recognizes the loss in the determination of the provider's allowable cost and pays additional reimbursement to compensate the provider for the previously unrecognized depreciation.

17.    Medicare depreciation regulations require that, upon the statutory merger of two or more corporations that are unrelated, assets of the merged corporations be "revalued." Each merged corporation, if a Medicare provider, is required to recognize any gain or loss incurred on the transaction.  42 C.F.R. § 413.134(*l*).  The merged entity's gain or loss is determined based on a comparison of the consideration received for its depreciable assets and their Medicare book value.

18.    The Secretary has published interpretations of Medicare regulations which require reimbursement of a Medicare provider that uses depreciable assets owned by a related entity as if the Medicare provider owned the assets directly.  A Medicare provider is required to include in its Medicare allowable costs the cost of ownership incurred by a related organization related to assets used by the provider to render services to Medicare beneficiaries, including depreciation costs.  Provider Reimbursement Manual, §§ 1011.3, 1503.12.  Under the Secretary's interpretations, a provider is required to recognize any gain or

loss realized by the related party upon the a change of ownership of assets that the provider had used to furnish services, and for which it had been reimbursed depreciation costs.

19.     The Social Security Amendments of 1983, Pub. L. 98-21, 97 Stat. 65 (1983), created a new method for payment of hospital inpatient services based upon a prospective payment system.  Effective for cost reporting periods beginning on or after October 1, 1983, Medicare began paying hospitals for certain inpatient operating costs based on a beneficiary's diagnosis at the time of discharge.  The amount per discharge varies according to the diagnosis-related group into which the patient's treatment falls.  42 U.S.C. § 1395ww(d).

20.     The Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4006(b), 101 Stat. 1330, 1330-52 (1987), required payments for certain capital-related costs of hospitals to be made in accordance with a capital prospective payment system established by the Secretary, effective for cost reporting periods beginning on or after October 1, 1991. Medicare regulations implementing the statutory directive are at 42 C.F.R. § 412.300, *et. seq.*

21.     The statutory and regulatory amendments providing for use of a prospective payment methodology to pay for hospital inpatient operating costs and capital-related costs did not, however, result in a change to Medicare regulations addressing depreciation and gains and losses from statutory mergers.  The Medicare statute continued to require the Secretary to recapture depreciation in the manner provided for as of June 1, 1984.  42 U.S.C. § 1395x(v)(1)(O).

22.     Medicare providers are required to file annual cost reports with their fiscal intermediaries.  Within twelve (12) months following the receipt of a cost report, the intermediary is required to send the provider a notice of amount of program reimbursement ("NPR") setting forth the amount of payment due to the provider by Medicare.  42 C.F.R.

§§ 405.1803(a), 405.1835(c). The NPR is considered the intermediary's final determination of total Medicare reimbursement due to the provider for the Medicare cost year to which the NPR relates.

23.    A provider that is dissatisfied with the determination reflected in its NPR may, provided that the amount in controversy exceeds $10,000, request a hearing before the Provider Reimbursement Review Board ("PRRB"), by filing an appeal within one hundred eighty (180) calendar days from the date of receipt of its NPR. 42 U.S.C. §1395oo(a); 42 C.F.R. §§ 405.1801-405.1889. Any appeal involving a common issue that is filed by providers that are under common ownership or control must be brought by the providers as a "group appeal" if the aggregate amount in controversy is equal to or in excess of $50,000. 42 C.F.R. § 405.1837. The PRRB has the authority to affirm, modify, or reverse an intermediary's determination reflected in the NPR. A PRRB decision becomes final sixty (60) days after the receipt of the PRRB's decision unless, within that time, the provider requests judicial review or the CMS Administrator reverses, affirms or modifies the PRRB decision. 42 U.S.C. § 1395oo(f)(1).

24.    A provider may obtain judicial review of a final decision of the PRRB, or of the reversal, affirmation, or modification by the CMS Administrator of a PRRB decision, by filing a civil action within sixty (60) days of the date on which the provider receives notice of (1) a final decision by the PRRB or (2) any reversal, affirmation, or modification by the CMS Administrator. *Id*. A provider that seeks judicial review and is the prevailing party in such litigation is entitled to interest on the amount in controversy from the first day of the first month beginning after the end of the one hundred eighty (180) day appeal period referenced above. 42 U.S.C. § 1395oo(f)(2).

### FACTS OF THE DISPUTE

25.    Prior to the statutory merger described below, each of the Carolina Medicorp Providers was subject to the control of Carolina Medicorp, Inc. ("Carolina Medicorp"). Carolina Medicorp was subject to the control of the Forsyth County Board of County Commissioners.  Carolina Medicorp and the Carolina Medicorp Providers were part of a single health system and, under Medicare payment principles, were considered a "chain organization."  Carolina Medicorp was considered the chain organization's "home office" by Medicare.

26.    Prior to the statutory merger described below, each of the Carolina Medicorp Providers owned its own movable equipment.  However, Carolina Medicorp owned the real property used by each of the Carolina Medicorp Providers, including land, buildings, land improvements and fixed equipment.  These assets were provided to each Carolina Medicorp Provider under a written lease agreement with Carolina Medicorp.

27.    Prior to the statutory merger described below, each Carolina Medicorp Provider was considered "related" to Carolina Medicorp because it was subject to Carolina Medicorp's control.  Pursuant to Medicare "related party" principles, each Carolina Medicorp Provider was reimbursed for ownership costs of real property that it used in the provision of patient care, including depreciation, based on costs incurred by Carolina Medicorp, which held legal title to the assets.  Depreciation costs reimbursed to each Carolina Medicorp Provider reflected the historic cost of each asset, its estimated useful life, and the Medicare utilization rate of the particular Carolina Medicorp Provider.

28.    Effective July 1, 1997, Carolina Medicorp statutorily merged into Presbyterian Health Services Corporation ("Presbyterian").  The transaction was a statutory merger under

North Carolina law, and was between Carolina Medicorp and Presbyterian. As a result of the statutory merger transaction, and pursuant to state law, (i) Carolina Medicorp, the merged entity, ceased to exist; (ii) Presbyterian assumed Carolina Medicorp's liabilities; and (iii) Presbyterian obtained all of Carolina Medicorp's assets. Legal title to the assets previously owned by Carolina Medicorp, including the buildings and other real property that had been used by the Carolina Medicorp Providers, transferred to Presbyterian as the surviving entity in the merger. Carolina Medicorp's leases with the Carolina Medicorp Providers also transferred to Presbyterian.

29.    Upon completion of the transaction, Presbyterian changed its name to Novant Health, Inc. ("Novant"). Novant controlled the Carolina Medicorp Providers after the statutory merger transaction. Novant was controlled by its own governing board; it was not subject to the control of the Forsyth County Board of County Commissioners.

30.    No individual or organization controlled Carolina Medicorp before the statutory merger and Novant after the transaction.

31.    Effective January 1, 2001, assets and liabilities of Martinat, including Martinat's Medicare claim described in paragraph 34 of this Complaint, were transferred to Foundation Health Systems Corp. Foundation Health Systems Corp. became the successor in interest to Martinat's Medicare claim.

32.    At all times prior to completion of the statutory merger described in paragraph 28 of this Complaint, including, but not limited to, when the transaction was negotiated and when the transaction documents were executed, Presbyterian and Carolina Medicorp were unrelated entities without any common ownership or common control. There were no

common governing board members or officers between Presbyterian and Carolina Medicorp. Accordingly, the transaction was a statutory merger between two unrelated parties.

33.    Carolina Medicorp incurred a loss on its statutory merger transaction with Presbyterian.  The loss reflected the fact that Medicare's net book value of the assets that transferred to Presbyterian exceeded the related consideration – Presbyterian's assumption of Carolina Medicorp's liabilities.    Carolina Medicorp received total consideration of $230,631,000, the amount of  its known liabilities that were assumed by Presbyterian, of which $36,701,429 related to its depreciable assets.  Carolina Medicorp's depreciable assets had a Medicare book value of $122,060,429.  Accordingly, Carolina Medicorp incurred a loss related to those assets of $85,359,000.

34.    In completing their cost reports for the cost year ending June 30, 1997, each Carolina Medicorp Provider claimed a loss on the statutory merger transaction, reflecting its historic Medicare utilization rate and the portion of the loss incurred by Carolina Medicorp that was related to depreciable assets that had been used by the Carolina Medicorp Provider to furnish services to Medicare beneficiaries, i.e., the assets for which Medicare had previously reimbursed the provider depreciation costs.  The loss claim of each of the Carolina Medicorp Providers was as follows: Forsyth Memorial Hospital – $9,726,143; Medical Park Hospital – $909,241; Martinet – $118,833; and Oaks at Forsyth – $315,536.  The aggregate Medicare loss claim was $11,069,753.  The Carolina Medicorp Providers did not claim a loss on movable equipment which they owned individually, and which did not change ownership.

35.    The Intermediary disallowed the Carolina Medicorp Providers' loss claims on the grounds that there was no change of ownership for Medicare certification purposes.  The Intermediary's determination was based on advice from a Blue Cross Blue Shield Association

consultant who had been advised by the Intermediary that two Medicare "home offices" had merged. The BCBSA consultant had not been made aware that one of the home offices, Carolina Medicorp, had owned the depreciable assets that had been used by related Medicare providers to furnish services, and that the Medicare providers using those assets, including the Carolina Medicorp Provider whose cost report claim was being audited by the Intermediary, had received Medicare depreciation payments based on Carolina Medicorp's ownership costs.

<u>ADMINISTRATIVE APPEAL PROCESS</u>

36.    On March 7, 2000, the Carolina Medicorp Providers filed a notice of appeal and request for hearing with the Provider Reimbursement Review Board ("PRRB") challenging disallowance of their loss claims pursuant to 42 C.F.R. §§ 405.1835-.1841. The amount of Medicare program funds in controversy for each Carolina Medicorp Provider was as follows: Forsyth Memorial Hospital – $9,726,143; Medical Park Hospital – $909,241; Martinet – $118,833; and Oaks at Forsyth – $315,536. The Carolina Medicorp Providers satisfied the jurisdictional requirements set forth in applicable Medicare regulations.

37.    On October 19, 2000, while the Carolina Medicorp Providers' appeal was pending before the PRRB, CMS issued a Program Memorandum to its fiscal intermediaries requiring disallowance of loss claims resulting from mergers and consolidations involving non-profit providers based on "continuity of control," and where consideration paid for the assets was considered unreasonable. The Program Memorandum required the related party determination to be based on a comparison of control over the merging entity prior to the transaction with control over the surviving entity subsequent to the transaction. The Program Memorandum reversed longstanding agency policy related to recognition of gains and losses from statutory mergers, reflected in section 4502.6 of the Medicare Intermediary Manual and

in correspondence from senior agency officials that had interpreted the applicable regulation to require the related party determination to be based on the relationship of the merging entities immediately prior to the transaction. The Program Memorandum also required a statutory merger between unrelated parties to be a "*bona fide* sale" before recognition of any related gain or loss, and, based on a definition of that term added to the Provider Reimbursement Manual in May 2000, required related consideration to be "reasonable." The agency had previously interpreted Medicare regulations to require recognition of a gain or loss if it was incurred on a transaction that was a statutory merger and the transaction was between unrelated parties. The agency had not previously applied regulations addressing *bona fide* sales of assets to statutory mergers, or required that the consideration for the merged entity's assets – its liabilities that were assumed by the surviving entity – be considered "reasonable" or reflects the assets' fair market value.

38.    On June 15, 2007, the PRRB issued its decision reversing the Intermediary's determination disallowing the Carolina Medicorp Providers' claimed losses. A copy of the PRRB's decision is attached as Attachment A. The PRRB concluded that the transaction from which the loss claims arose was a statutory merger between unrelated parties because, prior to the merger, Carolina Medicorp and Presbyterian were unrelated corporations. Therefore, each Carolina Medicorp Provider was entitled to reimbursement for Medicare's share of the loss on statutory merger incurred by Carolina Medicorp that related to assets that the particular Carolina Medicorp Provider had used to furnish health care services. The PRRB's determination requiring recognition of the Carolina Medicorp Providers' losses reflected the terms of Medicare regulations to which it was bound, interpretations required to be afforded great weight, and long-standing Medicare program policies. The PRRB

remanded the action to the Intermediary for calculation of the loss, instructing the Intermediary to ensure that all intercompany transactions were eliminated and that no consideration was allocated to land.

39.    By letter dated July 2, 2007, the CMS Office of the Attorney Advisor advised the Carolina Medicorp Providers that the CMS Administrator would review the PRRB's decision and determine whether that decision should be reversed, affirmed, modified or remanded.  The Carolina Medicorp Providers were advised of their right to submit comments.

40.    By letter dated July 17, 2007, the Carolina Medicorp Providers advised the CMS Office of the Attorney Advisor that the PRRB had correctly determined that the Intermediary's disallowance of the loss on statutory merger claims of the Carolina Medicorp Providers was contrary to regulatory requirements.  The Carolina Medicorp Providers also asserted that their loss claims were appropriately computed.  The Carolina Medicorp Providers nevertheless provided revised loss computations reflecting elimination of all intercompany transactions as required by the PRRB.  The revised Medicare loss claim for each Carolina Medicorp Provider was as follows:  Forsyth Memorial Hospital – $9,629,765; Medical Park Hospital – $900,235; Martinet – $117,656; and Oaks at Forsyth – $312,411.

41.    On August 10, 2007, the CMS Administrator reversed the PRRB's decision.  A copy of the CMS Administrator's decision, that was received on August 13, 2007, is attached as Attachment B.  The CMS Administrator found that the statutory merger was between related parties because Carolina Medicorp and Presbyterian had created Novant Health Management prior to the transaction, and because there was "continuity of control" between Carolina Medicorp, the merging entity as it existed prior to the transaction, and Novant, the surviving entity, as it existed afterwards.  Notwithstanding the fact that Carolina Medicorp

ceased to exist as a result of the statutory merger, relying on the Program Memorandum, the CMS Administrator stated that Carolina Medicorp had the power to significantly influence Novant, the surviving entity after the statutory merger, because former members of Carolina Medicorp's governing board and former senior management/executive officers became members of the governing board of Novant or accepted positions with Novant similar to the positions that they had held with Carolina Medicorp. The CMS Administrator found that the transaction was between Carolina Medicorp and Presbyterian, and that those two entities were related parties because of "continuity of control."

42.     In reversing the PRRB, the CMS Administrator also relied on the Secretary's *bona fide* sale requirements. The CMS Administrator stated that "[s]ince the parties to this transaction are found to be related," the transaction was not an arm's-length transaction. Relying on the Provider Reimbursement Manual's definition of *bona fide* sale that was reflected in the Program Memorandum, the CMS Administrator stated that a "*bona fide* sale contemplates an arm's length transaction, between unrelated parties for reasonable consideration, with each party acting in its own self interest." According to the CMS Administrator, the consideration transferred – the value of Carolina Medicorp's liabilities that were assumed by Novant – did not reflect reasonable consideration for Carolina Medicorp's assets or "support a finding that [Carolina Medicorp] transferred assets for reasonable consideration and as a result of a *bona fide* sale." Finally, the CMS Administrator stated "[a]s a loss cannot be allowed in this case, [he] does not reach the issue of how to calculate the loss."

43.     The CMS Administrator's decision reflected application of the Program Memorandum to the Carolina Medicorp Providers' loss claims. Neither the Program

Memorandum nor the CMS Administrator's decision acknowledged or explained the abrupt change in Medicare program policy from the policy that had been in effect when the loss on statutory merger was incurred.

44.     The CMS Administrator's decision, received on August 13, 2007, constitutes the final administrative decision of the Secretary with respect to the claims of the Carolina Medicorp Providers for reimbursement for the loss on statutory merger related to the depreciable assets that they had used to furnish care to Medicare beneficiaries, and for which they had received depreciation payments.  The Carolina Medicorp Providers have exhausted their administrative remedies with respect to their claims.

45.     This Complaint is filed within sixty (60) days of receipt of the CMS Administrator's decision, and is therefore timely.  42 U.S.C.A. § 1395oo(f)(1).

<u>COUNT I</u>

46.     Plaintiffs hereby incorporate by reference paragraphs 1 through 45 of this Complaint.

47.     Based upon the record developed before the PRRB and CMS Administrator in this case (hereinafter, "administrative record"), which will be certified by the CMS Administrator in accordance with 42 U.S.C. § 1395oo(f) and which is incorporated herein by reference, the Secretary's final administrative decision is contrary to the requirements of the Medicare statute because it fails to reimburse the Carolina Medicorp Providers for the loss in value of the depreciable assets they had used in the care of Medicare beneficiaries, which is a cost actually incurred in providing covered services to Medicare beneficiaries, as required by 42 U.S.C. §§ 1395d(a), 1395f(b) and 1395x(v).

<u>COUNT II</u>

48.    Plaintiffs hereby incorporate by reference paragraphs 1 through 47 of this Complaint.

49.    Based upon the administrative record, the Secretary's final administrative decision is contrary to the requirements of the Medicare statute because it fails to reimburse each Carolina Medicorp Provider in accordance with regulations promulgated by the Secretary.  42 U.S.C. § 1395x(v)(1)(A).

<u>COUNT III</u>

50.    Plaintiffs hereby incorporate by reference paragraphs 1 through 49 of this Complaint.

51.    Based upon the administrative record, the Secretary's final administrative determination is contrary to the requirements of the Medicare statute because it fails to reimburse each Carolina Medicorp Provider for the loss resulting from the transfer of depreciable assets that the Carolina Medicorp Provider had used to furnish services to Medicare beneficiaries based on the applicable policies in effect on June 1, 1984 which required recognition of its loss claim.  42 U.S.C. § 1395x(v)(1)(O).

<u>COUNT IV</u>

52.    Plaintiffs  hereby incorporate by reference paragraphs 1 through 51 of this Complaint.

53.    Based upon the administrative record, the Secretary's final administrative determination contrary to the Secretary's regulation and long-standing regulatory interpretations which require reimbursement of a provider's loss incurred on a statutory

merger with an unrelated corporation.  42 C.F.R. § 413.134(*l*); Medicare Intermediary Manual § 4502.6.

COUNT V

54.     Plaintiffs hereby incorporate by reference paragraphs 1 through 53 of this Complaint.

55.     Based upon the administrative record, the Secretary's final administrative determination is contrary to the Secretary's governing regulation and long-standing interpretations which require reimbursement of a provider for a loss incurred by a related entity on a statutory merger with an unrelated corporation related to assets that the provider had used to furnish services to Medicare beneficiaries.  42 C.F.R. §§ 413.17, 413.134(*l*); Medicare Intermediary Manual § 4502.6; Provider Reimbursement Manual §§ 1011.3, 1503.12.

COUNT VI

56.     Plaintiffs hereby incorporate by reference paragraphs 1 through 55 of this Complaint.

57.     Based upon the administrative record, the Secretary's administrative determination is arbitrary and capricious and an abuse of discretion within the meaning of the APA, 5 U.S.C. § 706(2)(A), (E), because it reflects application of Medicare requirements that were not in effect at the time of this transaction.

COUNT VII

58.     Plaintiffs hereby incorporate by reference paragraphs 1 through 57 of this Complaint.

59.    Based upon the administrative record, the Secretary's administrative determination is arbitrary and capricious and an abuse of discretion within the meaning of the APA, 5 U.S.C. § 706(2)(A), (E), because it reflects an abrupt and unexplained change in Medicare policy.

## COUNT VIII

60.    Plaintiffs hereby incorporate by reference paragraphs 1 through 59 of this Complaint.

61.    Based upon the administrative record, the Secretary's determination is otherwise arbitrary, capricious, an abuse of discretion, and not in accordance with the law, and is unsupported by substantial evidence in the record as a whole within the meaning of the APA, 5 U.S.C. § 706(2)(A), (E).  *See* 42 U.S.C. § 1395oo(f)(2).

## COUNT IX

62.    Plaintiffs hereby incorporate by reference paragraphs 1 through 61 of this Complaint.

63.    Based upon the administrative record, the Secretary's determination violates the APA, 5 U.S.C. §§ 553, 706(D), because it reflects a substantive determination not expressed in any statute or regulation and that was contrary to the Secretary's previous regulatory interpretation, and that is void based on the Secretary's failure to comply with notice and comment rulemaking procedures.  *See* 42 U.S.C. § 1395oo(f)(2).

## COUNT X

64.    Plaintiffs hereby incorporate by reference paragraphs 1 through 63 of this Complaint.

65.     Based upon the administrative record, the Secretary's determination violates the Medicare statute, 42 U.S.C. § 1395hh(a) – (b), because it relies on a rule, requirement, or other policy statement changing a legal standard governing Medicare payment for services furnished to program beneficiaries that is void based on the Secretary's failure to comply with notice and comment rulemaking procedures.

<u>COUNT XI</u>

66.     Plaintiffs hereby incorporate by reference paragraphs 1 through 65 of this Complaint.

67.     Based upon the administrative record, the Secretary's determination violates the requirements of the APA, 5 U.S.C. § 552, because it relies on a substantive rule or interpretation of general applicability or a statement of general policy that was not stated and published in the Federal Register.

<u>COUNT XII</u>

68.     Plaintiffs hereby incorporate by reference paragraphs 1 through 67 of this Complaint.

69.     Based upon the administrative record, the Secretary's determination is prohibited retroactive rulemaking because it reflects application of rules adopted after Carolina Medicorp's  loss was incurred, including a rule requiring that the related party determination be based on control of the statutory merger's surviving entity after the transaction, a rule requiring that a statutory merger satisfy requirements for *bona fide* sales of assets, and a regulatory amendment published on January 9, 1998, precluding recognition of gains or losses on transactions that occurred on or after December 1, 1997.  63 Fed. Reg. 1379, 1382 (Jan. 9, 1998).

<u>COUNT XIII</u>

70.    Plaintiffs hereby incorporate by reference paragraphs 1 through 69 of this Complaint.

71.    Based upon the administrative record, the Secretary's determination is contrary to the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, 1996 U.S.C.C.A.N. (110 Stat.) 847, 857 because it relies on a new rule that is void based on the Secretary's failure to adhere to procedures specified in that law.  5 U.S.C. § 801.  Before a rule can be put into effect, an agency must provide each House of Congress and the Comptroller General with a report, including a copy of the rule and related information.  A "major rule", such as that reflected in the Secretary's determination, cannot be put into effect earlier than sixty days after Congress receives the report, or the rule is published in the Federal Register.

<u>COUNT XIV</u>

72.    Plaintiffs hereby incorporate by reference paragraphs 1 through 71 of this Complaint.

73.    Based upon the administrative record, the Secretary's retroactive determination constitutes an uncompensated taking of each Carolina Medicorp Provider's property without due process of law in violation of the Fifth Amendment of the United States Constitution.

<u>COUNT XV</u>

74.    Plaintiffs hereby incorporate by reference paragraphs 1 through 73 of this Complaint.

75.    The Medicare statute requires the Secretary to publish a list of all manual instructions, interpretative rules, statements of policy, and guidelines of general applicability in the Federal Register at least every three months.  *See* 42 U.S.C. § 1395hh(c)(1).

76.    The Program Memorandum was an interpretative rule, statement of policy, or guideline of general applicability.

77.    Although the Program Memorandum was issued on October 20, 2000, it was not listed in the Federal Register until June 28, 2002.  *See* "Medicare and Medicaid Programs; Quarterly Listing of Program Issuances – Fourth Quarter, 1999 through First Quarter, 2002." 67 Fed. Reg. 43,762, 43,784 (June 28, 2002).

78.    Based upon the administrative record, the Secretary's determination violates the Medicare statute, 42 U.S.C. § 1395hh(c)(1), because it relies on interpretative rule, statement of policy, or guideline of general applicability that was not timely listed in the Federal Register.

<u>PRAYERS FOR RELIEF</u>

WHEREFORE, Plaintiffs pray:

(a)    For an order reversing and setting aside the decision of the Secretary;

(b)    For an order declaring that Forsyth Memorial Hospital, Inc. is entitled to $9,629,765 or such other amount of Medicare reimbursement determined to be due for the loss  incurred by Carolina Medicorp on its statutory merger with Presbyterian that related to depreciable assets that had been used by Forsyth Memorial Hospital, Inc. in furnishing services to Medicare beneficiaries;

(c)    For an order declaring that Memorial Park Hospital, Inc. is entitled to $900,235 or such other amount of Medicare reimbursement determined to be due for the

loss incurred by Carolina Medicorp on its statutory merger with Presbyterian that related to depreciable assets that had been used by Memorial Park Hospital, Inc. in furnishing services to Medicare beneficiaries;

(d)     For an order declaring that Foundation Health System Corp. is entitled to $117,656 or such other amount of Medicare reimbursement determined to be due for the loss incurred by Carolina Medicorp on its statutory merger with Presbyterian that related to depreciable assets that had been used by its predecessor in interest, Carolina Medicorp Enterprises, Inc. d/b/a Edwin H. Martinat Outpatient Rehabilitation Center, in furnishing services to Medicare beneficiaries;

(e)     For an order declaring that Foundation Health System Corp. is entitled to $312,411 or such other amount of Medicare reimbursement determined to be due for the loss incurred by Carolina Medicorp on its statutory merger with Presbyterian that related to depreciable assets that had been used by Oaks at Forsyth in furnishing services to Medicare beneficiaries;

(f)     For an order remanding the case to the Secretary with directions that the loss on statutory merger incurred by each Carolina Medicorp Provider be reimbursed;

(g)     For interest on the amount in controversy in this appeal, as provided by 42 U.S.C. § 1395oo(f)(2);

(h)     For the costs of this suit incurred by the Plaintiffs; and

(i)     For such other and further relief as the Court may deem just and proper under the circumstances.

Respectfully submitted,


*/s/ Harold G. Belkowitz*
Harold G. Belkowitz (D.C. Bar #449800)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005-3324
(202) 408-8400
Fax: (202) 408-0640
E-mail: hgbelkowitz@ober.com

Robert E. Mazer
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120
Fax: (410) 547-0699
E-mail: remazer@ober.com

Dated in Washington, D.C.
This 3rd day of June, 2008

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3d day of June, 2008, I caused this document to be filed in this Court's electronic filing system, and that that filing constituted service of the document on the attorney listed below:

> Joel McElvain
> United States Department of Justice
> Civil Division, Federal Programs Branch
> Room 7130
> 20 Massachusetts Avenue, N.W.
> Washington, D. C. 20001

> */s/ Harold G. Belkowitz*
> Harold G. Belkowitz

**ATTACHMENT A**



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**

2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670

Phone: 410-786-2671        FAX: 410-786-5298
Internet: www.cms.hhs.gov/PRRBReview

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

Refer to:    Case No.:  00-1862G                JUN 1 5 2007        *received*
             Decision No.:  2007-D42                                *6/18/07*
                                                                   *REM*

**CERTIFIED MAIL**

Mr. Robert E. Mazer, Esquire
Ober Kaler Grimes & Shriver
120 East Baltimore Street
Baltimore, MD  21202-1643

RE:   Carolina Medicorp '97 Claimed Loss Disallowance Group
      Provider Nos.:  Various
      FYE - 06/30/1997

Dear Mr. Mazer:

A copy of the Provider Reimbursement Review Board's decision on
the above-referenced appeal is enclosed.  Please see enclosure
for review and appeal information.

If you have any questions, please call (410) 786-2671.

Sincerely,

Paul J. Crofton, Director
Division of Hearings and Decisions

5 Enclosures
    Final Decision Review and Appeal Information
    Decision
    42 USC 139500(f)
    42 CFR 405.1875 and 405.1877

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

## 2007-D42

**PROVIDER -**
Carolina Medicorp '97 Claimed Loss
Disallowance Group

Provider Nos.: See Appendix I

**vs.**

**INTERMEDIARY -**
BlueCross BlueShield Association/
Cahaba Safeguard Administrators, LLC

**DATE OF HEARING -**
May 26-27, 2004

Cost Reporting Period Ended -
June 30, 1997

**CASE NO:** 00-1862G

## INDEX

| | Page No. |
|---|---|
| Issue........................................................................................................ | 2 |
| Medicare Statutory and Regulatory Background................................................ | 2 |
| Statement of the Case and Procedural History................................................ | 3 |
| Background of the Merger.............................................................................. | 4 |
| Parties' Contentions...................................................................................... | 5 |
| Findings of Fact, Conclusions of Law and Discussion........................................ | 7 |
| Decision and Order........................................................................................ | 10 |
| Appendix I - Schedule of Providers................................................................. | 11 |

ISSUE:

Whether the Intermediary's adjustments disallowing the loss claimed by Medicare Providers on the disposition of assets resulting from the statutory merger of Carolina Medicorp into Presbyterian Health Services Corporation were proper.

## MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare reimbursement due a health care provider.

The Medicare program provides health insurance to the aged and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare & Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services (DHHS) charged with the program's administration. CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due providers under Medicare law and interpretative guidelines published by CMS. See, 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

At the close of its fiscal year, a provider must submit a cost report to the fiscal intermediary showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal intermediary reviews the cost report, determines the total amount of Medicare reimbursement due the provider, and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R. §405.1803. A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the Provider Reimbursement Review Board (Board) within 180 days of the NPR. 42 U.S.C. §1395oo; 42 C.F.R. §405.1835.

Medicare reimbursement is governed by 42 U.S.C §1395x(v)(1)(A) of the Social Security Act. In part, the statute provides that the "reasonable cost" of any service shall be the actual cost incurred but excluding any part of such costs found to be unnecessary in the efficient delivery of needed health services. The implementing regulation at 42 C.F.R §413.9 provides that reasonable cost includes all "necessary and proper" costs incurred in furnishing healthcare services.

Under the Medicare statute, a provider is entitled to claim as a reimbursable cost the depreciation (i.e., the loss of value over time) of property, plant and equipment used to provide health care to Medicare patients. An asset's depreciable value is set initially at its "historical cost," generally equal to the purchase price. 42 C.F.R. §413.134(a)(2)(b)(1). To determine annual depreciation, the historical cost is prorated over the asset's estimated useful life in accordance with one of several methods. 42 C.F.R. §413.134(a)(3). Providers are then reimbursed on an annual basis for a percentage of the yearly depreciation equal to the percentage of the asset used for the care of Medicare patients.

The calculated annual depreciation is only an estimate of the asset's declining value. If an

asset is ultimately sold by the provider for less than the depreciated basis calculated under Medicare (equivalent to the "net book value" and equal to the historical cost minus the depreciation previously paid, see 42 C.F.R. §413.134(b)(9)), then a "loss" has occurred, since the sales price was less than the estimated remaining value. In that event, the Secretary of DHHS (Secretary) assumes that more depreciation has occurred than was originally estimated and, accordingly, provides additional reimbursement to the provider. Conversely, if the asset is sold for more than its depreciated basis, then a "gain" has occurred, and the Secretary takes back or "recaptures" previously paid reimbursement. 42 C.F.R. §413.134(f)(1).

Where a provider sells several assets for a lump sum sales price, the regulation at 42 C.F.R. §413.134(f)(2)(iv) requires the determination of the gain or loss (depreciation adjustment) for each depreciable asset by allocating the lump sum sales price among all of the assets sold in accordance with the fair market value of each asset as it was used by the provider at the time of sale. An appropriate part of the purchase price is allocated to "all of the assets sold" regardless of whether they are depreciable (and thus Medicare-reimbursable) or non-depreciable. The allocation of the lump sum sales price to non-depreciable assets results in a smaller amount being allocated to the Medicare - reimbursable assets and, thus, a higher loss.

The regulation providing for gains or losses originally dealt with the disposition of assets through sale, scrapping, trade-in, exchange, donation, demolition, abandonment, condemnation, fire, theft or other casualty. In 1979 CMS extended the depreciation adjustment to "complex financial transactions" not previously addressed in subsection 42 C.F.R. § 413.134(f) by including mergers and consolidations. A statutory merger between unrelated parties was treated as a disposition of assets that would trigger: (1) the revaluation of assets in accordance with 42 C.F.R. §413.134(g), and (2) the realization of gains and losses under the provisions of 42 C.F.R. §413.134(f). However, a statutory merger between related parties would not trigger a gain or loss computation. Likewise, a consolidation between two or more corporations that were unrelated resulted in a depreciation adjustment. No revaluation was allowed if related corporations consolidated. 42 C.F.R. §413.134(l)(3).

## STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Forsyth Memorial Hospital, Medical Park Hospital, Carolina Medical Enterprises (d/b/a The Oaks at Forsyth) and Edwin H. Martin Comprehensive Outpatient Rehabilitation Center (Providers) were all non-profit Medicare certified facilities that were components of a chain organization. Carolina Medicorp, Inc. was the home office for the chain organization and owned the buildings, land, and fixed equipment which it furnished for the Providers' use under written lease agreements. On June 30, 1997 Carolina Medicorp, Inc. merged into Presbyterian Health Services Corporation (Presbyterian), which then became Novant Health, Inc.  Prior to the merger, both home offices operated as non-profit corporations with separate boards. There is no dispute that the transaction was a merger under North Carolina law; that Carolina Medicorp ceased to exist; that Presbyterian assumed Carolina Medicorp's liabilities; and that Presbyterian obtained all

of Carolina Medicorp's assets. Legal title to the assets previously owned by Carolina Medicorp was transferred to Presbyterian, as were Carolina Medicorp's leases with the Providers. Control of the Providers passed to Novant, but the Providers remained intact and there was no change in the ownership of their assets. Control over Carolina Medicorp's assets passed to Novant which was then controlled by its own governing board. Providers claimed a loss on the transaction related to land improvements, buildings and fixed equipment owned by Carolina Medicorp. Because the leased assets were owned by a related party, the Providers had received Medicare depreciation reimbursement under Medicare related party principles.[1] The Providers did not claim losses on the movable equipment that they owned individually because the ownership of these assets did not change. In October 1997 the North Carolina Department of Health and Human Services (NCDHHS) determined that the individual Providers had not undergone a change in ownership (CHOW) due to the merger of Carolina Medicorp, Inc. into Presbyterian to form Novant.[2] The NCDHHS also noted that each of the Providers maintained its same Medicare number after the transaction and filed its individual cost report under its respective provider number. Based upon the NCDHHS determination, the Intermediary denied the Providers' claims for losses on the transaction that related to land improvements, buildings and fixed equipment.

The Providers appealed the Intermediary's disallowances to the Board and met the jurisdictional requirements of 42 C.F.R. §§405.1835-405.1841. The estimated amount of Medicare reimbursement in controversy is $11,069,753.[3]

The Providers were represented by Robert E. Mazer, Esquire, of Ober, Kaler, Grimes & Shriver. The Intermediary was represented by Bernard M. Talbert, Esquire, Associate Counsel, Blue Cross Blue Shield Association.

## BACKGROUND OF THE MERGER:

Carolina Medicorp was created in 1993 to receive title to the assets of Forsyth Memorial Hospital as a part of the hospital's conversion of ownership to a private non-profit entity. Prior to that time, Forsyth County owned the hospital's assets. As a part of the conversion, the Forsyth County Board of Commissioners (Commissioners) retained ultimate control over the Forsyth Memorial Hospital facility and, as a condition of the transaction, appointed 12 of the Carolina Medicorp's 19-member board of trustees. The deed transferring the hospital's assets from Forsyth County to Carolina Medicorp included restrictions on their use that required that the property be maintained as a community general hospital open to the public, that Carolina Medicorp supply services to county residents regardless of their ability to pay, and that Carolina Medicorp not encumber the property with a mortgage or deed of trust without the County's approval. If Carolina Medicorp failed to meet these conditions, ownership in the assets would revert to Forsyth County.

---

[1] 42 C.F.R. §413.17.
[2] See, Provider's Final Position Paper and Exhibits. Exhibit P-11, pg. 2.
[3] Provider's Post-Hearing Brief at p.5.

Carolina Medicorp subsequently acquired Medical Park Hospital, developed The Oaks at Forsyth and created the Edwin H. Martin Comprehensive Outpatient Rehabilitation Center, so that by the mid 1990's it was the parent of a number of subsidiaries that comprised an integrated health system. Carolina Medicorp owned the land, buildings and fixed equipment that was used by each Provider in the provision of patient care services pursuant to a lease arrangement. However, movable equipment and other assets, such as supplies and inventory, were separately owned by each provider. Carolina Medicorp and each of the Providers were subject to the control of the Commissioners.

The Medicare program considered Carolina Medicorp and the entities under its control a "chain organization" for which Carolina Medicorp was the "home office." For Medicare reimbursement purposes the Intermediary therefore applied the related organization principles at 42 C.F.R. §413.17. It reimbursed each Provider for claimed ownership costs incurred by Carolina Medicorp related to the assets used by the particular Provider to furnish patient care services, including depreciation on buildings, land improvements and fixed equipment owned by Carolina Medicorp

Prior to the merger, Presbyterian served as the parent corporation for a health care delivery system that included the Presbyterian Hospital, Presbyterian Medical Care Corporation, a specialty hospital and a long-term care facility.

In 1996 Presbyterian and Carolina Medicorp began negotiations to merge the two health systems, and both parties agreed that a merger was in the best interest of their respective organizations. However, Presbyterian would not entertain an arrangement under which the Commissioners would hold substantial control over the system. Since the Commissioners held control over Carolina Medicorp, their consent was required to approve any transaction that diminished or relinquished their control. The Commissioners gave their approval conditioned upon the agreement that the Commissioners be allowed to select one member of the newly merged entity's governing board from among its own members. Additionally, the Commissioners retained the right to approve a majority of the governing board of Forsyth Memorial Hospital which, in turn, would be required to continue to abide by the restrictions that had been initially imposed when Carolina Medicorp was established. Also, at the suggestion of the Commissioners, Carolina Medicorp agreed to contribute $10 million for the Commissioners' use to enhance health care in the county.

PARTIES' CONTENTIONS:

The Intermediary argues that the merger did not produce a change of ownership among the Providers for Medicare certification or reimbursement purposes. The NCDHHS conducted the initial development of the facts for Medicare certification of the merged entities. The NCDHHS considered the transaction to have been a merger of the two home office corporations that did not affect the operation of the Providers and, therefore, it did not constitute a change of ownership for these Providers. Based upon the Commitment Agreements entered into by Carolina Medicorp,[4] the Intermediary contends

---

[4] See, Provider Exhibits P-77, P-78 and P-79.

that the subject merger is a related party transaction pursuant to 42 C.F.R. §413.17. The Intermediary argues that Carolina Medicorp had negotiated sufficient continuity through Presbyterian into Novant (including a right to participate on Novant's governing board and a continuing reversionary interest in the assets of Forsyth Memorial Hospital to Forsyth County) to preclude any characterization of the transaction as a bargained for exchange of assets for consideration.[5] Accordingly, the Intermediary contends that any change of ownership rights of the hospital's depreciable assets was between related parties. 42 C.F.R. §413.134 precludes providers from claiming losses upon mergers of related parties, and the Intermediary concludes that no losses may be claimed in this transaction.

The Intermediary also contends that the loss claimed by the Provider is not allowable for program reimbursement because the merger with Presbyterian was not a bona fide sale. The Intermediary explains that pursuant to 42 C.F.R. §413.134(l)(2)(i), mergers between two or more unrelated corporations, where a merged corporation is a provider, are subject to the provisions of 42 C.F.R. §413.134(f). This rule, entitled <u>Gains and losses on disposal of assets</u>, addresses different ways in which a gain or loss determination may be generated from the disposal of assets. The Intermediary asserts that the "way" applicable to a merger is via a "bona fide" sale. Moreover, the Intermediary argues that the subject merger was not a bona fide sale, as the Providers did not put their assets into the open marketplace to see what they were worth, and there was no good faith, arms-length bargaining between the parties to establish the fair market value of the Providers' assets to evaluate the adequacy of the consideration given.[6]

The Providers contend that pursuant to 42 C.F.R. §413.134(l)(2)(i), a statutory merger between unrelated corporations occurs if the parties are unrelated prior to the transaction, as in the instant case. The Provider asserts its position is supported by section 4502.6 of Medicare's Part A Intermediary Manual (HCFA Pub. 13-4). In part, the manual provides an example of merging entities, unrelated through common ownership or control prior to the merger, that results in a gain or loss calculation to the seller.

The Providers contend that even if the Intermediary's continuity of control argument were valid (i.e., the Intermediary's reliance upon HCFA Pub. 15-1 §1004.1), it does not exist in the instant case. According to 42 C.F.R. §413.17(b), related party principles apply where there is "common ownership or control," and "control" exists where an individual or organization has the power to significantly influence or direct the actions or policies of an organization or institution. Here, no single individual or organization previously associated with the Providers has any significant power to influence the operations of Novant.

The Providers also disagree with the Intermediary's argument that the merger does not meet the requirements of a bona fide sale because reasonable compensation was not given for the Providers' assets. The Providers argue that the transaction was a statutory

---

[5] See Intermediary's Post-Hearing Summary at 11.

[6] 42 C.F.R. §413.134(b)(2).

merger under state law and was not a purchase of assets. The Intermediary relies upon 42 C.F.R. §413.134(l)(2)(i), which subjects mergers involving providers to the requirements of 42 C.F.R. §413.134(f). However, there is nothing in section (f) that requires mergers to specifically comply with section (f)(2) regarding bona fide sales.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

After consideration of the Medicare law and guidelines, the parties' contentions and the evidence presented, the Board finds and concludes that the Providers and Presbyterian were unrelated parties as that term is defined and applied under the regulatory provisions of 42 C.F.R. §413.17 and 42 C.F.R. §413.134. Accordingly, a revaluation of assets and recognition of the loss incurred as a result of the merger is required under the specific and plain meaning of 42 C.F.R. §413.134(l)(2)(i).

The parties agree that the transaction at issue was a statutory merger under North Carolina law, and that 42 C.F.R. §413.134, entitled Depreciation: Allowance for depreciation based on asset costs, is applicable. Section 413.134(l)(2) defines a statutory merger as "a combination of two or more corporations under the corporation laws of the State, with one of the corporations surviving." It is undisputed that in June of 1996, Carolina Medicorp merged into Presbyterian Health Services Corporation (Presbyterian), which then became known as Novant Health, Inc., with the Carolina Medicorp entity ceasing to exist. Under the terms of the transaction, Presbyterian acquired all of the assets and assumed all of the liabilities associated with the operations of Carolina Medicorp.

The Medicare regulation at 42 C.F.R. §413.134(l)(2) provides for the reimbursement effect of a statutory merger as follows:

(i)   *Statutory merger between unrelated parties.* If the statutory merger is between two or more corporations that are unrelated (as specified in §413.17), the assets of the merged corporation(s) acquired by the surviving corporation may be revalued in accordance with paragraph (g) of this section. If the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and realization of gains and losses . . . .

(ii)  *Statutory merger between related parties.* If the statutory merger is between two or more related corporations (as specified in §413.17), no revaluation of assets is permitted for those assets acquired by the surviving corporation.

Accordingly, the initial question to be decided by the Board is whether the subject merger was between related or unrelated parties. While it is undisputed that the Providers and Presbyterian were unrelated prior to the merger, the Intermediary argues that the phrase

"between related parties" requires that the merger transaction be examined for relationships after the transaction as well. The Intermediary refers to the related party regulation at 42 C.F.R. §413.17, which states in pertinent part:

> (b) *Definitions.* (1) *Related to the provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.
>
> (2) *Common Ownership.* Common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.
>
> (3) *Control.* Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

In particular, the Intermediary relies on the tests for common ownership or control that are provided in HCFA Pub. 15-1 §1004.1. The section states, in pertinent part:

> A determination as to whether an individual (or individuals) or organization possesses significant ownership or equity in the provider organization and the supplying organization, so as to consider the organizations related by common ownership, will be made on the basis of the facts and circumstances in each case. This rule applies whether the provider organization or supplying organization is a sole proprietorship, partnership, corporation, trust or estate, or any other form of business organization, propriety or nonprofit. In the case of a nonprofit organization, ownership or equity interest will be determined by reference to the interest in the assets of the organization (e.g., a reversionary interest provided for in the articles of incorporation of a nonprofit organization).

The Intermediary asserts that such reversionary interest exists in the Articles of Incorporation of Novant and, therefore, there is a "continuity of ownership" that results in the parties being related. The Intermediary contends that this relationship between the old and new entities disqualifies the merger transaction from a revaluation of assets. In support of its position, the Intermediary cites section 1011.1 of Medicare's Provider Reimbursement Manual, Part I (HCFA Pub. 15-1), which states:

> [i]f a provider and a supplying organization are not related before the execution of a contract, but common ownership or control is created at the time of execution by any means, the supply contract will be treated as having been made between related organizations.

The Board finds the plain language of the merger regulation dispositive of the Intermediary's argument. The meaning of the text at 42 C.F.R. §413.134(l)(2)(i) which states: "[i]f the statutory merger is between two or more corporations that are unrelated . . . ." is crystal clear - the related party concept will be applied to the entities that are merging as they existed prior to the transaction.

The Board, therefore, concludes that the plain language of the regulation bars the application of the related party principle to the merging parties' relationship to the surviving entity. The construction of the regulation mandates a determination that only the relationship of the parties participating in the merger before it was completed is relevant to whether the assets would be revalued and a gain or loss recognized. The Board's conclusion is further buttressed by the Secretary's interpretive guidelines published in section 4502.6 of Medicare's Intermediary Manual (HCFA Pub. 13-4), which states in part: "Medicare program policy permits a revaluation of assets acquired in a statutory merger between unrelated parties, when the surviving corporation is a provider."

The Board finds that the transaction that resulted in the merger of Carolina Medicorp into Presbyterian was a bona fide transaction under North Carolina corporation law. The completed transaction merged one independent chain organization (Carolina Medicorp) into another such entity (Presbyterian), with the merged entity ceasing to exist. Contrary to the Intermediary's "continuity of control" assertions, the Board finds that such an interpretation of the related party regulation is not only inconsistent with the regulation governing statutory mergers, but it also flies in the face of reality with respect to corporate mergers. The very nature of a statutory merger being a combination of entities would likely result in some overlap of membership on the boards of trustees of the merging corporations and the surviving entity, as well as a continuation of other operations and personnel of the merging organizations. The fact that this occurs does not disqualify a statutory merger from revaluation of assets and recognition of any gain or loss under 42 C.F.R §413.134(l).

With respect to the Intermediary's argument that the relationship between Carolina Medicorp and Novant does not meet the traditional test of "bona fide" and "arm's-length" bargaining, the Board finds that the application of such criteria also fails to consider the distinctive features of a statutory merger transaction. By definition, Novant Health, Inc., (formerly known as Presbyterian Health Services Corporation) is nothing more than a combination of Presbyterian with Carolina Medicorp. That concept simply forecloses the type of bargaining between the pre- and post-transaction entities the Intermediary contends is necessary. Requiring "bargaining" between the merging and surviving entity to be "arm's-length" would effectively nullify the regulation's directive to permit revaluation of assets and recognition of gains or losses where unrelated parties merge. The Intermediary's imposition of additional requirements is not supported by the plain meaning of the statutory merger regulation and the Agency's own previous interpretation set forth in the manual instructions and informal written advice.

CN: 00-1862G

The Board also finds that the Providers ultimately agreed that the loss calculation should be based upon the proportionate share methodology prescribed by 42 C.F.R. §413.134(f)(2)(iv). Pursuant to this methodology, the consideration at issue is allocated among all the assets acquired based upon the relationship of each individual asset's fair market value to the total fair market value of all of the assets in aggregate.

## DECISION AND ORDER:

The Intermediary's adjustment disallowing the Providers' claimed losses on disposal of assets due to a change of ownership resulting from a statutory merger was contrary to the regulatory requirements of 42 C.F.R. §413.134(l)(2)(i) and is reversed. The matter is hereby remanded to the Intermediary for the proper calculation of the loss pursuant to the governing regulations. In addition, Intermediary is instructed to ensure that all intercompany transactions are eliminated and that no consideration be allocated to land, a non-depreciable asset.

## BOARD MEMBERS PARTICIPATING:

Suzanne Cochran, Esq.
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, C.P.A.
Yvette C. Hayes

FOR THE BOARD:

JUN 1 5 2007

Suzanne Cochran, Esq.
Chairman

Carolina Medicorp
Group Appeal
Case Number 00-1862G

Appendix 1

Schedule of Providers Participating in Group

| Provider Name | Provider Numbers |
|---|---|
| 1. Forsyth Memorial Hospital | 34-0014 |
| | 34-S014 |
| | 34-T014 |
| | 34-5476 |
| | 34-7005 |
| 2. Medical Park Hospital | 34-0148 |
| 3. Edwin H. Martinat Comprehensive Outpatient Rehabilitation Center | 34-4504 |
| 4. The Oaks at Forsyth | 34-5284 |

**ATTACHMENT B**

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



_Received 8/13/67 AA_

**Office of the Attorney Advisor**

AUG 1 0 2007

**VIA CERTIFIED MAIL**

Robert E. Mazer, Esquire
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD 21202-1643

Re: <u>Carolina Medicorp '97 Claimed Loss Disallowance Group</u>, PRRB Decision No. 2007-D42

Dear Mr. Mazer:

Enclosed is a copy of the Administrator's decision in the above case reversing the decision of the

Provider Reimbursement Review Board. This constitutes the final administrative decision of the

Secretary of the Health and Human Services. Pursuant to Section 1878(f) of the Social Security

Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within

60 days of receipt of this decision.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc: Bernard M. Talbert, Esquire, Intermediary's Representative

## CENTERS FOR MEDICARE AND MEDICAID SERVICES

*Decision of the Administrator*

| | |
|---|---|
| **In the case of:** | **Claim for:** |
| **Carolina Medicorp '97 Claimed Loss Disallowance Group** | **Provider Cost Reimbursement Determination for Cost Reporting Period Ending: 07/30/97** |
| **Providers** | |
| **vs.** | |
| **Blue Cross Blue Shield Association/ Cahaba Safeguard Administrators, LLC** | **Review of: PRRB Dec. No. 2007-D42 Dated: June 15, 2007** |
| **Intermediary** | |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in § 1878(f) (1) of the Social Security Act (Act), as amended (42 USC 1395oo (f)). The parties were notified of the Administrator's intention to review the Board's decision. The Center for Medicare Management (CMM) submitted comments, requesting reversal of the Board's decision. The Intermediary also submitted comments requesting that the Administrator reverse the Board's decision. Comments were received from the Providers requesting that the Administrator affirm the Board's decision. All comments were timely received. Accordingly, this case is now before the Administrator for final agency review.

## <u>ISSUE AND BOARD'S DECISION</u>

The issue is whether the Intermediary's adjustment disallowing the loss claimed by the Carolina Medicorp (CMI) Providers after the merger of CMI and Presbyterian Health Services (renamed Novant Health) was proper.[1]

---

[1] Section 4404 of the Balanced Budget Act of 1997 (Pub. Law 105-33) amended §1861(v)(1)(O)(i) of the Social Security Act to terminate Medicare recognition of gains and losses for depreciable assets resulting from either their sale or scrapping.

The Board held that the Intermediary's adjustment disallowing the CMI Providers' claimed losses on the disposal of assets was improper.  The Board remanded the matter to the Intermediary to ensure that all inter-company transactions were eliminated and that no consideration was allocated to land in calculating the CMI Providers' claimed losses.  In reaching this determination, the Board disagreed with the Intermediary's argument that the phrase "between related parties" required that the transaction be examined for relationships before, as well as, after the transaction.  The Board concluded that the plain language of the regulations barred the application of the related party principles to merging parties' relationship to the surviving entity.  The Board concluded that only the relationship of the parties before the merger was relevant to whether the assets would be revalued and a gain or loss recognized.

The Board also concluded that the merger was a bona fide transaction under the State of North Carolina corporation laws. The Board emphasized that the merger was a result of arms-length bargaining. The Board found that the completed transaction merged one independent chain organization (CMI) into another such entity (Presbyterian), with the merged entity (CMI) ceasing to exist. Therefore, contrary to the Intermediary's "continuity of control" assertion, the Board held that the Intermediary's interpretation of the related party regulation was not only inconsistent with the regulations governing statutory mergers, but also flied in the face of reality with respect to corporate mergers.  The Board noted that the very nature of a statutory merger was a combination of entities that more than likely would result in some overlap of membership on the board of directors.  Therefore, the fact that this occurred did not disqualify a statutory merger from revaluation of assets and recognition of any gain or loss under 42 C.F.R. § 413.134(I).

Finally, the Board turned to CMI Providers' claim that they qualified for Medicare reimbursement of the loss, after revaluation.   The Board noted that the CMI Providers' agreed that the loss calculation should be based upon the proportionate share methodology of 42 C.F.R. § 413.134(f) (2) (iv). Pursuant to this methodology, the Board concluded that the consideration at issue should be allocated among all the assets acquired based upon the relationship of each individual asset's fair market value to the total market value of all the assets in the aggregate.

---

Conforming modifications to the applicable regulation made December 1, 1997 the effective date for implementing the new rule.

## SUMMARY OF COMMENTS

CMM submitted comments requesting that the Administrator reverse the Board's decision. CMM noted that CMI was not a provider but was the home office for the chain organization. Because CMI was the home office for the chain, and not a provider itself, its cost cannot be directly reimbursed by the program. Therefore, CMI cannot claim a loss. Furthermore, the CMI Providers can not claim a loss on the disposition of assets that they lease but do not own.

CMM also disagreed with the Board's rejection of the Intermediary's argument that the transaction was a statutory merger between related parties. CMM agreed with the Intermediary's contention that the merger was a related party transaction because there was sufficient continuity of control over the CMI's assets transferred to Novant to prevent the recognition of a gain or loss. Finally, CMM argued that the Board erred in finding that the recognized gain or loss after the merger was not subject to the bona fide requirements of to 42 C.F.R. § 413.134(f)(2). CMI did not place its assets for sale in the open market to determine their worth, nor was there good faith arm's length bargaining between CMI and Presbyterian to establish the fair market value of CMI's assets as a going concern. Therefore, since the transaction was not a bona fide sale, the Intermediary's disallowance should be upheld.

The Intermediary commented requesting that the Administrator reverse the Board's decision. The Intermediary concurred with CMM's comments and incorporated them by reference.

The CMI Providers commented, requesting that the Administrator affirm the Board's decision. The CMI Providers incorporated by reference their comments set forth in the Providers' Post-Hearing Brief. In the Providers' Post Hearing Brief, the CMI Providers' argued that a revaluation of assets and recognition of the loss incurred was required under the regulations because the transaction from which the loss arose was a statutory merger between unrelated parties.

The CMI Providers maintained that a statutory merger cannot be considered a related party transaction based on a comparison of control of the merging entity prior to the transaction with the control over the surviving entity after completion of the transaction. The CMI Providers asserted that a reading of the regulation and the manual provisions required only that the parties prior to the transaction be unrelated. To support this position the CMI Providers relied on § 4502.6 of the Medicare's Part A Intermediary Manual (MIM). This section of the MIM provides an example of

merging entities, unrelated through common ownership or control prior to the merger that resulted in a gain or loss calculation.

Furthermore, CMI Providers' contended that, even if the concept of continuity of control was valid, CMI's assets were not controlled by the same individuals, or organization, before or after the merger. Prior to the merger, CMI's assets were controlled by the Commissioners, which controlled CMI's board of trustees. After the merger, CMI terminated and the assets transferred were controlled by Novant. Therefore, the Commissioners had no ability to control the assets transferred to Novant. Thus, there was no continuity of control.

The CMI Providers also argued that the disallowance of the loss claimed could not be sustained based on assertions that the consideration given was unreasonable or that there was insufficient evidence of an arm's length bargaining. The CMI Providers argued that a statutory merger need not satisfy the requirements of a bona fide sale before a related loss is recognized. The CMI Providers maintained that neither the regulation, nor the MIM, require that the consideration (i.e., the assumed liability) reflect the fair market value of the assets transferred before a related gain or loss is recognized. The term "bona fide sale" means a "sale made by a seller in good faith for valuable consideration, and without notice of a defect in title or any other reason not to hold the sale."[2] In this case, the parties were represented by separate attorneys who performed due diligence on their clients' behalf. As a result CMI received "valuable consideration" of over $230 million, including approximately $36.7 million for its depreciable assets.[3] The Board has said a bona fide sale required "valuable consideration."[4] Therefore, "valuable consideration" cannot be clarified to mean "reasonable" or "fair market value" consideration as the Intermediary suggest. There is nothing in 42 C.F.R. § 413.134(f) that requires mergers to specifically comply with 42 C.F.R. § 413.134(l) (2) (i) regarding bona fide sales. Furthermore, the fact that the consideration given was less than the assets' appraised reproduction cost cannot support the disallowance of the loss claimed by the CMI Providers'.

---

[2] Black's Law Dictionary (7th ed. 1999).

[3] Provider's Exhibit P-1. Provider's Post Hearing Brief at 51.

[4] See Ashland Reg'l Med. Ctr. v. Blue Cross and Blue Shield Ass'n, PRRB Hearing Dec. No. 98-D32 [1998-1 Transfer Binder] Medicare and Medicaid Guide (CCH) ¶ 46,109 (02/27/98).

## DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits. The Administrator has reviewed the Board's decision. All comments received timely are included in the record and have been considered.

## I.    Medicare Law and Policy -- Reasonable Costs.

Section 1861(v)(1)(A) of the Social Security Act establishes that Medicare pays for the reasonable cost of furnishing covered services to program beneficiaries, subject to certain limitations. This section of the Act also defines reasonable cost as "the cost actually incurred, excluding there from any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." The Act further authorizes the Secretary to promulgate regulations establishing the methods to be used and the items to be included in determining such costs. Consistent with the statute, the regulation at 42 C.F.R. § 413.9 states that all payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries.

### A. Capital Related Costs.

Reasonable costs include capital-related costs. Consistent with the Secretary's rulemaking authority, the Secretary promulgated 42 C.F.R. § 413.130, which lists capital-related costs that are reimbursable under Medicare. Capital-related costs under Medicare include depreciation, interest, taxes, insurance, and similar expenses (defined further in 42 C.F.R. § 413.130) for plant and fixed equipment, and for movable equipment.

Title VI of the Social Security Amendments of 1983[5] added §1886(d) to the Act and established the prospective payment system (PPS) for reimbursement of inpatient hospital services provided to Medicare beneficiaries. Under this system, hospitals are reimbursed their inpatient operating costs on the basis of prospectively determined national and regional rates for each discharge according to a list of diagnosis-related groups. Reimbursement under the prospective payment rate is limited to inpatient operating costs. The Social Security Amendments of 1983[6] amended subsection (a)(4) of §1886 of the Act to add a last sentence which specifies that the term "operating costs of inpatient hospital services" does not include

---

[5] Pub. Law 98-21.
[6] Section 601(a) (2) of Pub. Law 98-21.

"capital-related costs (as defined by the Secretary for periods before October 1, 1986)... ." That provision was subsequently amended until finally, §4006(b) of OBRA 1987 revised §1886(g)(1) of the Act to require the Secretary to establish a prospective payment system for the capital-related costs of PPS hospitals for cost reporting periods beginning in fiscal year (FY) 1992.

### 1. Depreciation.

For cost years prior to the implementation of capital PPS, pursuant to the reasonable cost provision of §1861(v)(1)(A) of the Act, the Secretary promulgated regulations on the payment of capital costs, including depreciation Generally, the payment of depreciation is based on the valuation of the depreciable assets used for rendering patient care as specified by the regulation. The Secretary explained, regarding the computation of gains and losses on disposal of assets, that:

> Medicare reimburses providers for the direct and indirect costs necessary to the provision of patient care, including the cost of using assets for inpatient care. Thus, depreciation of those assets has always been an allowable cost under Medicare. The allowance is computed on the depreciable basis and estimated useful life of the assets. When an asset is disposed of, no further depreciation may be taken on it. However, if a gain or loss is realized from the disposition, reimbursement for depreciation must be adjusted so that Medicare pays the actual cost the provider incurred in using the asset for patient care.[7]

Basically, when there is a gain or loss, it means either that too much depreciation was recognized by the Medicare program resulting in a gain to be shared by Medicare, or insufficient depreciation was recognized by the Medicare program resulting in a loss to be shared by the Medicare program. An adjustment is made so that Medicare pays the actual cost the provider incurred in using the asset for patient care.

Although a gain or loss is recognized in the year of the disposal of the asset, the determination of Medicare's share of that gain or loss is attributable to the cost reporting periods in which the asset was used to render patient care under the Medicare program. Accordingly, although the event of the disposal of the asset may occur after the implementation of capital–PPS, a portion of the loss or gain may be attributable to cost years paid under reasonable costs and prior to the implementation of capital-PPS.

---

[7] 44 Fed. Reg. 3980 (Jan 19, 1979).

The regulation at 42 C.F.R. § 413.130 (1997) explains, inter alia, that:

> (a) *General rule.*    Capital related costs ... are limited to:
>
> (1) Net depreciation expense as determined under §§ 413.134,
> 413.144, and 413.149, adjusted by gains and losses realized
> from the disposal of depreciable assets under 413.134(f)....
> (Emphasis added.)

The regulation specifies that only certain events will result in the recognition of a gain or loss in the disposal of depreciable assets.    The Secretary explained in proposed amendments to the regulation clarifying and expanding existing policy on the recognition of gains and losses, in 1976, that:

> The revision would describe the various types of disposal recognized
> under the Medicare program, and would provide for the proper
> computation    and treatment of gains and losses in determining
> reasonable costs.[8]

In adopting the final rule, the Secretary again explained that:

> Existing regulations contain a requirement that any gain or loss
> realized on the disposal of a depreciable asset must be included in
> Medicare allowable costs computations... The regulations, however,
> specify neither the procedures for computation of the gain or loss nor
> the methods for making adjustment to depreciation.    These
> amendments provide the rules for the treatment of gain or loss
> depending upon the manner of disposition of the assets.[9] (Emphasis
> added.)

These rules have been set forth at 42 C.F.R. § 413.134(f)(1997), which explains the specific conditions under which the disposal of depreciable assets may result in a gain or loss under the Medicare program.    This section of the regulation states:

---

[8] 41 Fed. Reg. 35197 (August 20,1976) "Principles of Reimbursement for Provider Costs: Depreciation: Allowance for the Depreciation Based on Asset Costs." (Proposed rule.)

[9]    44 Fed.Reg. 3980. (1979), "Principles of Reimbursement for Provider Costs."(Final rule.)

(1) *General.* Depreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty. If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost. The amount of a gain included in the determination of allowable cost is limited to the amount of depreciation previously included in Medicare allowable costs. The amount of a loss to be included is limited to the undepreciated basis of the asset permitted under the program. The treatment of the gain or loss depends upon the manner of disposition of the asset, as specified in paragraphs (f)(2) through (6) of this section ....(Emphasis added.)

The method of disposal of assets set forth at paragraphs (f)(2) through (6) is as follows. Paragraph (f) (2) addresses gain and losses realized from the bona fide sale of depreciable assets and states:

*Bona fide sale or scrapping.* (i) Except as specified in paragraph (f)(3) of this section, gains and losses realized from the bona fide sale or scrapping of depreciable assets are included in the determination of allowable cost only if the sale or scrapping occurs while the provider is participating in Medicare.... (Emphasis added).

With respect to paragraph (f) (2) and the bona fide sale of a depreciable asset, § 104.24 of the PRM states that:

A bona fide sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's length transaction is ... negotiated by unrelated parties, each acting in its own self interest.[10]

With respect to assets sold for lump sum, paragraph (f) (2) (iv) specifies:

If a provider sells more than one asset for a lump sum sales price, the gain or loss on the sale of each depreciable asset must be determined by allocating the lump sum sales price among all the assets sold, in accordance with the fair market value of each asset as it was used by the provider at the time of sale. If the buyer and seller cannot agree on an allocation of the sales price, or if they do agree but there is insufficient documentation of the current fair market value of each

---

[10] Trans. No. 415 (May 2000) (clarification of existing policy).

asset, the intermediary for the selling provider will require an appraisal by an independent appraisal expert to establish the fair market value of each asset and will make an allocation of the sale price in accordance with the appraisal.

Paragraph (f)(3) addresses gains or losses realized from sales within 1 year after the provider terminates from the program, while 42 C.F.R. § 413.134(f)(4) addresses exchange trade-in or donation[11] of the asset stating that: "[g]ains or losses realized from the exchange, trade-in, or donation of depreciable assets are not included in the determination of allowable cost." Finally, paragraph (f)(5) explains that the treatment of gains and losses when there has been an abandonment (permanent retirement) of the asset, and paragraph (f)(6) explains the treatment when there has been an involuntary conversion, such as condemnation, fire, theft or other casualty.

## 2. Revaluation of Assets.

Historically, as reflected in the regulation, the disposal of a depreciable asset used to render patient care may result in two separate and distinct reimbursement events: 1) the calculation of a gain or loss for the prior owner; and 2) a revaluation of the depreciable basis for the new owner. While the determination of gains and losses is generally only of interest to the prior owner,[12] the new owner in the same transaction is interested in the determination of when Medicare will allow the revaluation of depreciation for purposes of calculating the new owner's depreciation expense.

This latter issue, on the revaluation of assets, was the subject of significant litigation for the Medicare program regarding complex transactions and resulted in agency rulemaking on the subject. In response to litigation, the regulations at 42 C.F.R. §413.134(*l*)[13](1997) were promulgated to address longstanding Medicare policy regarding depreciable assets exchanged for capital stock, statutory mergers

---

[11] A donation is defined in 42 C.F.R. § 413.134((b)(8). An asset is considered donated when the provider acquires the assets without making payment in the form of cash, new debt, assumed debt, property or services. Section 4502.12 of the Intermediary Manual states that, when a provider is donated as an ongoing facility to an unrelated party, there is no gain/loss allowed to the donor. The valuation of the assets to the donor depends upon use of the assets prior to the donation.

[12] While this is the general rule, the new owner can also have an interest in the gain or loss, when the new owner is to acquire the Medicare receivables for the terminating cost report along with the depreciable assets.

[13] Originally codified at 42 C.F.R. § 405.415(*l*).

and consolidation. Concerning the valuation of assets, the regulation at paragraph (*l*)(2) states that:

> *Statutory merger.* A statutory merger is a combination of two or more corporations under the corporation laws of the State, with one of the corporations surviving. The surviving corporation acquires the assets and liabilities of the merged corporation(s) by operation of State law. The effect of a statutory merger upon Medicare reimbursement is as follows:
>
> (i)   *Statutory merger between unrelated parties.* If the statutory merger is between two or more corporations that are unrelated (as specified in §413.17), the assets of the merged corporation(s) acquired by the surviving corporation may be revalued in accordance with paragraph (g) of this section. If the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses. The basis of the assets owned by the surviving corporation are unaffected by the transaction....
>
> (ii)   *Statutory merger between related parties.* If the statutory merger is between two or more related corporations (as specified in §413.17), no revaluation of assets is permitted for those assets acquired by the surviving corporation.... Under these circumstances, at the time of the merger the transaction is one between related parties and is not a basis for revaluation of the provider's assets.

## B. Related Organizations

Finally, 42 C.F.R. § 413.134 references the related organization rules at 42 C.F.R. § 413.17(1997). The regulation at 42 C.F.R. § 413.17 states, in pertinent part, that:

> (b) *Definitions. (1) Related to the provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.
>
> (2) *Common ownership.* Common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

(3) *Control.* Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

With respect to items and services obtained from a related organization, paragraph (c) (2) of 42 C.F.R. § 413.17 states:

> If the provider obtains items of services, facilities, or supplies from an organization, even though it is a separate legal entity, and the organization is owned or controlled by the owner(s) of the provider, in effect the items are obtained from itself. An example would be a corporation building a hospital or another corporation controlled by the owner. Therefore, reimbursable cost should include the costs for these items at the cost to the supplying organization. However, if the price in the open market for comparable services, facilities, or supplies is lower than the cost to the supplier, the allowable cost to the provider may not exceed the market price.

> However, there is an exception to this rule. Set forth at 413.17(d) (1), provides that the charge made by the related supplier to the Provider is allowable as "cost" provided the following criteria are met.

Consistent with the Act and the regulations, the above principles are set forth in the Provider Reimbursement Manual (PRM), which provides guidelines and policies to implement Medicare regulations for determining the reasonable cost of provider services. In determining whether the parties to a transaction are related, the PRM at § 1004 et seq., establishes that the tests of common ownership and control are to be applied separately, based on the facts and circumstances in each case. With respect to common ownership, the PRM at § 1004.1 states:

> This rule applies whether the provider organization or supplying organization is a sole proprietorship, partnership, corporation, trust or estate, or any other form of business organization, proprietary or nonprofit. In the case of nonprofit organization, ownership or equity interest will be determined by reference to the interest in the assets of the organization (e.g., a reversionary interest provided for in the articles of incorporation of a nonprofit corporation).[14]

---

[14] Trans. No. 272 (Dec. 1982) (clarifying certain ambiguous language relating to the determination of ownership or equity interest in nonprofit organizations).

Concerning the definition of control, the PRM at § 1004.3 states: "[t]he term 'control' includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised." The concept of "continuity of control" is illustrated at § 1011.4 of the PRM, in Example 2 which reads as follow:

> The owners of a 200-bed hospital convert their facility to a nonprofit corporation. The owners sell the hospital to a non-profit corporation under the direction of a board of trustees made up of former owners of the proprietary corporation. Both corporations are considered related organizations; therefore, the asset bases to the nonprofit corporations remain the same as contained in the proprietary corporation's records, and there can be no increase in the book value of such assets.

The related party organization was further explained in HCFA Ruling 80-4 which adopted the Eighth Circuit Court of Appeals' decision in Medical Center of Independence v. Harris, (CCH) Para. 30,656 (8th Cir. 1980) The Ruling pointed out that the applicability of the related organization rule is not necessarily determined by the absence of a relationship between the parties prior to their initial contracting, although those factors are to be considered. The applicability of the rule is determined by also considering the relationship between the parties according to the rights created by their contract. The terms of the contracts and events which occurred subsequent to the execution of the contract in that case had the effect of placing the provider under the control of the supplier.

Regarding the treatment, under the related organization rules, of home office costs allocated from the chain organization to components in the chain, PRM § 2150.3 B states:

> The initial step in the allocation process is the direct assignment of costs to the chain components. Allowable costs incurred for the benefit of, or directly attributable to, a specific provider or non-provider activity must be allocated directly to the chain entity for which they were incurred. For example, where such costs are paid by the home office, interest expense is allocated to the facility for which the loan was made; salaries are allocated to the facility to whose employees they apply, etc. The home office may simplify the allocation of costs to the chain components in the cost finding process by transferring the costs which are directly allocable to the components through the inter-company accounts. The transfers should be made at the time the costs are incurred.

With respect to assets leased from a related organization, PRM § 1011.5 states:

> A provider may lease a facility from a related organization within the meaning of the principles of reimbursement. In such case, the rent paid to the lessor by the provider is not allowable as cost. The provider, however, would include in its costs the cost of ownership of the facility. Generally, these would be costs such as depreciation (subject to the principles in Chapter 1), interest on the mortgage, real estate taxes, and other expenses attributable to the lease facility. The effect is to treat the facility as though it were owned by the provider ....

Likewise, § 1212 of the PRM states:

> Generally, reimbursement to any provider leasing facilities or equipment from a "related organization" is limited to the costs of ownership of the leased facilities, (depreciation, taxes, interest expenses, etc.) in accordance with Chapter 10, as if the provider owned the facilities....

Finally, consistent with the foregoing, § 1011.3 of the PRM explains the "special application" of the related organization rules with respect to the disposal of assets used in the program but owned by a related organization. That provision states that:

> Under the cost to related organizations principle, the cost of ownership (depreciation, interest, taxes, etc.) of an asset which is used in the program is includable in the allowable cost of a provider even though it is owned by a related party. Where such an asset is sold or otherwise disposed of (see section 130) by a related organization, any gain or loss realized by the related party must be included in the provider's cost. (See section 132ff.) .....

## C. Interaction of the Various Regulations.

The Administrator also notes the interaction of the various regulations with 42 CFR §413.134(l).[15] The Administrator finds that, as the issue under appeal involves the

---

[15] While not dispositive to this case, the CMS policy on consolidation revaluations in the final rule published on Febuary 5, 1979 was not a change from the proposed rule published in April 1, 1977. The final rule states that it does not differ in substance from the proposed rule (44 Fed Reg. 6913) and it was made effective on the date published, an act consistent with that statement. An immediate effective date for

recognition of depreciation losses on the transfers of assets from a merger between non-profit entities, he cannot limit his review to the specific merger requirements of 42 CFR §412.134(l). Paragraph (l) was initially drafted to address the *revaluation* of assets for proprietary corporations, while paragraph (f) specifically addresses circumstances under which a gain or loss will be recognized. Paragraph (l) did not modify or limit the general related party rules at §413.17 and does not address or modify the criteria for the payment of gains or losses at paragraph §413.134(f). Instead, the Secretary explicitly stated that this provision was being promulgated consistent with both the related party rules and the disposal of depreciable asset rules set forth at paragraph (f).[16]

---

any substantive change would have required a good cause exception under the APA published in the final rule. The final rule also stresses that the policy that the rule clarifies on the revaluation of assets is longstanding policy Medicare policy and does not note any changes on consolidations as a result of comments. The change referenced from the proposed rule is that the final rule dedicates separate paragraphs to related and unrelated transactions involving consolidations, similar to that provided for statutory mergers. Thus, based on the foregoing, one could conclude that this change was to clarify the proposed language, rather than to promulgate a substantive change from the proposed rule.

[16] See, e.g., 44 Fed. Reg. 6912 (Feb 5, 1979)("Although no single provision of the Medicare regulations explicitly set forth these policies, our position has been based on the interaction of three regulations: 42 CFR 405.415, concerning the allowance for depreciation based on asset costs; 42 CFR 405.427, concerning cost related organizations; and 42 CFR 405.626, concerning change of ownership. We continue to believe that our interpretation and application of these regulations are reasonable and consistent with our statutory mandate to determine the scope of the reasonable costs for Medicare providers." (Emphasis added.)); 42 Fed. Reg. 6912 ("Our intent is not to change existing Medicare policy, but merely to state explicitly in the Code of Federal Regulations that which has been stated in the past in less formal settings."); 42 Fed. Reg. 17486(1977)("The proposed revision of paragraph (l) of 405.415 is also consistent with paragraph (f). When a provider's assets are sold the transaction causes adjustments to the seller's health insurance program allowance for the depreciation based upon the gain or loss on the sale of the asset. Because a sale of corporate stock is not a sale of the corporate assets, the provisions of paragraph (f) of 405.415 are not applicable to the seller after such a transaction."); 44 Fed. Reg. 6913 ("Only if the assets are transferred by means of a bona fide transaction between unrelated parties would revaluation be proper.")

**D.    Non-Profit Corporations and the Related Parties and Disposal of Depreciable Asset Regulations.**

### 1. Program Memorandum A-00-76.

To clarify the application of 42 CFR §413.134(l) to non-profit providers with respect to the related party rules and the rules on the disposal of depreciable assets, CMS issued Program Memorandum (PM) A-00-76, dated October 19, 2000. This PM applies the foregoing regulations to the situation of non-profit corporations. In particular, this PM noted that non-profits organizations differ in significant ways from for–profit organizations. Non-profit organizations typically do not have equity interests (i.e., shareholders, partners), exist for reasons other than to provide goods and services for a profit, and may obtain significant resources from donors who do not expect to receive monetary repayment of, or return on, the resources they provide. These differences, among others, cause non-profit organizations to associate or affiliate through mergers or consolidations for reasons that may differ from the traditional for-profit merger or consolidations. In contrast, the regulations at 42 C.F.R. § 413.134(l) were written to address only for-profit mergers and consolidations.

The PM also noted that, unlike for-profit mergers or consolidations, which often involve a dispatching of the former governing body and/or management team, many non-profit mergers and consolidations involve the continuation, in whole or part, of the former governing board and/or management team. Thus, in applying the related organization principles of 42 C.F.R. § 413.17, CMS stated that consideration must be given to whether the composition of the new board of directors, or other governing body and/or management team include significant representation from the previous board or management team. If that is the case, no real change of control of the assets has occurred and no gain and loss may be recognized as a result of the transaction. This PM A-00-76 recognized that, <u>inter alia</u>, certain relationships formed as a result of the consolidation of two entities constituted a related party transaction for which a loss on the disposal of assets could not be recognized. The PM A-00-76 stressed that "between two or more corporations that are unrelated" should include the relationship between the constituent hospitals and the consolidating entity. Consequently, the PM A-00-76 states that:

> [W]hether the constituent corporations in a merger or consolidation are or are not related is irrelevant; rather the focus of the inquiry is whether significant ownership or control exists between a corporation that transfers assets and the corporation that receives them.

PM A-00-76 stated that the term significant, as used in PM A-00-76 has the same meaning as the term significant or significantly, in the regulations at 42 CFR 413.17 and the PRM at Chapter 10. Important considerations in this regard include that the determination of common control is subjective; each situation stands on its own merits and unique facts; a finding of common control does not require 50 percent or more representation; and there is no need to look behind the numbers to see if control is actually being exercised, rather the mere potential to control is sufficient.

In addition, PM A-00-76 stated that many non-profit mergers and consolidations have only the interests of the community at large to drive the transaction. This community interest does not always involve engaging in a bona fide sale or seeking fair market value of assets given. Rather, the assets and liabilities are simply combined on the merger/consolidated entities books. The merged/consolidated entity may, or may not, record a gain or loss resulting from such a transaction for financial reporting purposes. However, notwithstanding the treatment of the transaction for financial accounting purposes, no gain or loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted from a *bona fide* sale as required by the regulation at 42 C.F.R. § 413.134(l) and as defined in the PRM at section 104.24. The PM stated that the regulation at 42 C.F.R. § 413.134(l) does not permit a gain or loss resulting from the combining of multiple entities' assets and liabilities without regard to whether a bona fide sale occurred. The PM stressed that a bona fide sale requires an arm's length business transaction between a willing and well-informed buyer and seller. This also requires the analysis of the comparison of the sales price with the fair market value of the assets acquired as reasonable consideration is a required element of a bona fide sale.

Notably, the Administrator finds that the requirement that the term "between related organizations" include an examination of the relationship before and after a transaction of assets under 42 CFR §413.417[17] was applied as early as 1977 by the agency in evaluating whether accelerated depreciation would be recaptured. The agency decided that "when the termination of the provider agreement results from a transaction between related organizations and the successor provider remains in the health insurance program and its asset bases are the same as those of the terminated providers, health insurances reimbursement is equitable to all parties": thus, the depreciation recovery provisions would not be applied.[18] The agency looked specifically at whether, in a related party transaction, the control and extent of the financial interest remained the same for the owners of the provider before and after

---

[17] Originally codified at 42 C.F.R. § 405.427
[18] 42 Fed. Reg. 45897 (1977).

the termination.[19] Thus, PM A-00-76 interpretation of the related party rules as requiring an examination of the relationship before and after the transfer of assets is consistent with early Medicare policy and HCFAR 80-4.

This interpretation, that "between related organizations" must include an examination of all parties to the transaction, both before and after, is also consistent with the reality of a transaction involving the merging of two or more entities. For example:

> Corporation A and Corporation B, both non-profit providers, are combined by statutory merger with Corporation A surviving. Corporations A and B were unrelated prior to the transaction, each being controlled by its respective Board of ten Directors. After the merger, Corporation A's new ten member Board of Directors includes five individuals that served on Corporation B's pre-merger board. Thus, Corporation A's new Board of Directors includes a significant number of individual from both of the former entities' boards. Because no significant change of control of the assets of former Corporation B has occurred, the transaction as between Corporation A and Corporation B is deemed to be between related parties and no gain or loss will be recognized as a result of the transaction. Hence, Medicare reasonably examines the relationship between the merging corporations and the surviving corporation and recipient of the Medicare depreciable assets to determine whether the transfer involved a related party transaction.[20]

## 2. The Intermediary CHOW Manual and APB No. 16.

The Intermediary Manual, Chapter 4000, et seq., also addresses changes of ownership (CHOW) for purposes of Medicare certification and reimbursement. These sections provide guidelines based on Medicare law, regulations and implementing instructions for use by the Medicare intermediaries and providers on the reimbursement implications of various types of changes of provider organizations transactions or CHOWs. Section 4502 explains that the first review of a CHOW transaction is to determine the type of transaction which occurred as the Medicare program has developed specific policies on the reimbursement effect of various types of CHOW transactions which may be different from treatment under

---

[19] 42 Fed. Reg. 45897, 45898 (September 15, 1977) (Recovery of excess cost resulting from the use of accelerated depreciation when termination of provider agreement results from transaction between related organizations).

[20] Program Memorandum A-00-76 at 3.

generally accepted accounting principles or GAAP. Section 4502.1 lists the various types of provider organizational structures and includes, as one possible type of provider organization, Corporations.

In defining a Corporation, § 4502.1 explains that a corporation is a legal entity which enjoys the rights, privileges and responsibilities of an individual under the law. An interest in a corporation is represented by shares of stock in proprietary situations (stockholders) or membership certificates in non-stock entities (members).

Among the various types of provider structures and transactions recognized by Medicare are mergers, consolidations, and corporate reorganizations at § 4502. Section 4502.6 describes a statutory merger as the combination of two or more corporations pursuant to the law of the state involved, with one of the corporations surviving the transaction. Medicare permits a revaluation of the assets acquired in a statutory merger between unrelated parties, when the surviving corporation is a provider. If the surviving corporation is a provider or a related organization to the provider – such as a chain home office, the assets acquired can be revaluated. However, the merger of a non-provider corporation into a provider corporation is not a change in ownership for the provider corporation and as such does not result in the revaluation of the assets of the provider corporation. In the instance of reorganization, CMS examines, inter alia, the parties before and after the transaction in determining that the transfer of assets involved a related party transaction.

Section 4508.11 of the Intermediary Manual,[21] in addressing stock corporations states that, Medicare program policy places reliance on the generally accepted accounting principles or GAAP, as expressed in Accounting Principles Bulletin (APB) No. 16 in the reevaluation of assets and gain/loss computation processes for Medicare reimbursement purposes. While in certain areas, Medicare program policy deviates from that set forth in GAAP,[22] intermediaries are instructed to refer to the principles outlined in the CHOW manual which specify when reference to APB No. 16 is in accordance with the current Medicare policy.[23]

---

[21] Section 4504.1 states that: "where Medicare instructions are silent as to the valuation of consideration given in an acquisition, rely upon generally accepted accounting principles. APB No. 16 discusses valuation methods of consideration given for assets acquired in business combinations."

[22] For example, Medicare will not recognize a revaluation/gain or loss due to a transfer of stock or in the case of a "two-step" transaction (i.e., the transfer of stock, then the transfer of the depreciable assets).

[23] FASB superseded APB No. 16 effective June 2001. However, not-for-profit (NFP) organizations were excluded from the scope of FASB No. 141.

Generally, APB No. 16 suggests two approaches to the treatment of assets when there is a business combination involving stock corporations: the pooling method and the purchase method. Historically, a combination of business interest was characterized as either a "continuation of the former ownership" or "new ownership." A continuation of ownership was accounted for as a pooling of interest. The pooling of interest method accounts for business combinations as the uniting of the ownership interests of two or more companies. No acquisition is recognized because the combination is accomplished without disbursing resources of the constituents and ownership interests continue. The pooling of interests method results in no revaluation of assets or recording of gains or losses. In contrast, "new ownership" is accounted for as a purchase. The purchase method accounts for a business combination as the acquisition of one company by another and is treated as purchase or sale. Thus, APB No. 16 is similar to the PM, in that both recognize and treat the pooling of interests in a business combination as an event resulting in no gain or loss, while recognizing and treating a bona fide purchase or sale in a business combination as an event resulting in a gain or loss.

E. **Similarities of Internal Revenue Service Principles and Medicare Reimbursement Principles When Entities Consolidate.**

This policy of not recognizing a gain or loss when the transaction is between related parties, whether it constitutes a reorganization, merger, or consolidation, is also consistent with Internal Revenue Service (IRS) rules on the non-recognition of a gain or loss when a statutory reorganization has been determined to have occurred. Relevant to this case, while the Medicare rules may diverge from IRS rules and Medicare policy is not bound by IRS policy, IRS policy often reflects rationale underlying the establishment of similar policies under Medicare.[24] In fact, in setting forth principles applicable to the recognition of the gain or a loss, CMS has in the past recognized the similarity of the Medicare principles and the IRS principles and has often explicitly stated when such Medicare policy agrees or diverges from IRS treatment.[25]

---

[24] See, e. g., Guernsey v. Shalala, 115 S. Ct. 1232 (1995), analogizing Medicare rules to IRS rules in citing to Thor Power Tools v. Commissioner, 439 U.S. 522 (1979).

[25] See, e.g., 44 Fed. Reg. 3980 (January 19, 1979) ("If a provider trades in or exchanges an asset, no gain or loss is included in the computation of allowable cost. Instead, consistent with the Internal Revenue Service (IRS), the undepreciated value of the traded asset, plus any additional assets transferred to acquire the new assets, are used as the basis for depreciation of the new asset under Medicare"; 48 Fed. Reg. 37408 (Aug. 18, 1983) (finding that it was not appropriate for the Medicare program to use IRS accelerated costs recovery system for Medicare purposes and deleting IRS useful life guidelines).

Under IRS rules, some consolidations or mergers are considered statutory reorganizations and subject to the non-recognition of a gain or loss. The terms reorganization, merger and consolidation are not mutually exclusive terms under IRS rules. Medicare policy similarly indicates that they are not mutually exclusive terms under Medicare rules. That is, consolidations and mergers may in fact constitute in essence, reorganizations and reorganizations may involve more than one corporation.[26] For example, a consolidation or merger where the predecessor corporation board continues significant control in the new corporation board is treated the same as a reorganization for Medicare reimbursement purposes and no gain or loss is recognized. However, for example, where the predecessor corporation board does not continue significant control in the new corporation board, a gain or loss will be recognized for Medicare reimbursement purposes.

Similar to Medicare rules, the IRS does not allow the recognition of the gain or loss when there is a reorganization, inter alia, because no gain or loss has in fact been realized. As the courts have noted:

> The principle under which statutory reorganizations are not considered taxable events is that no substantial change has been affected either in the nature or the substance of the taxpayer's capital position, and no capital gain or loss has actually been realized. Such a reorganization contemplates a continuity of business enterprise and a continuity of interest and control accomplished [in this instance] by an exchange of stock for stock.[27] (Emphasis added.)

Similarly, the courts have stated that the underlying purpose of the IRS provisions that find no gain or loss when there is a reorganization was twofold: "1) to relieve certain types of corporate reorganizations from taxation which seemed oppressively

---

[26] See also Black's Law Dictionary definition of a reorganization used interchangeably with merger and consolidation("A reorganization that involves a merger or consolidation under a specific State statute.")

[27] Commissioners of IRS v. Webster Estates, 131 F. 2d 426, 429 (2nd Cir.1942) citing Helvering v. Schoellkopf, 100 F. 2d 415 (2d Cir ) While the foregoing IRS cases illustrate the continuity of interest, the Administrator notes that the Medicare program does not recognize a loss on sale as a result of a stock transfer regardless of the relationship between the parties. Case law also shows that term "continuity of interest" as provided in the IRS regulation is at times used interchangeably with the term "continuity of control." See, e.g., New Jersey Mortgage and Title Co. v. Commissioner of the IRS, 3 T. C. 1277 (1944); Detroit–Michigan Stove Company v. U.S., 128 Ct. Cl. 585 (1954).

premature and 2) to prevent taxpayer's from taking losses on account of wash sales and other fictitious exchanges."[28] Finally, as the Supreme Court found in <u>Groman v. Commissioners</u>, 302 U.S 82, 87 (1937) certain transactions speak for themselves, regardless of how they might be cast. As the Supreme Court observed: "If corporate A and B transfer assets to C, a new corporation, in exchange for all of C's stock, the stock received is not a basis for calculation of a gain on the exchange... A and B are so evidently parties to the reorganization that we do not need [the IRS code] to inform us of the fact." In sum, the purpose of these provisions is "to free from the imposition of an income tax purely 'paper profits or losses' wherein there is no realization of gain or loss in the business sense but merely the recasting of the same interests in a different form."[29]

The IRS rules also deny gains or losses from the sale or exchange of property between related parties. In explaining the rationale for this tax law provision, the court in <u>Unionbancal Corporation v. Commissioner</u>, 305 F. 2d 976 (2001), explained that:

> This limitation on deductions for transfers between related parties, protects the fisc against sham transactions and manipulations without economic substance. Not infrequently though, there are honest and important non-tax reasons for sales between related parties, so it's important to fairness to preserve the pre-sale basis where loss on the sale itself isn't recognized for tax purposes. Otherwise the statute would be a heads-I-win, tails-you-lose provision for the IRS: the seller can't take the loss, but the IRS calculates the buyer's gain on resale using the lower basis.

Consequently, one purpose of the IRS policy is to prevent the claiming of a gain or loss when no such event has in fact occurred. Similarly, the related party rules under Medicare, in holding that there is no recognition of a gain or loss when there is a reorganization, merger, or consolidation between related parties, is to avoid the payment of costs not actually incurred by the parties. An overarching principle applicable under the Medicare statute and regulation, with which all reasonable cost regulations must be in accord, is the principle that Medicare will only share in costs actually incurred by the provider. Consistent with IRS rules which recognize that no

---

[28] <u>C.H. Mead Coal Co. v. Commissioners of IRS</u>, 72 F. 2d 22, 27-28 (4th Cir. 1934) (analyzing early sections of the code).

[29] <u>Paulsen ET UX v. Commissioner</u>, 469 U.S. 131 (1985) citing <u>Southwest Natural Gas Co. v. Commissioner</u>, 189 F. 2d 332, 334 (CA 5), cert. denied, 342 U.S. 860 (1951) (quoting <u>Commissioner v. Gilmore's Estate</u>, 130 F. 2d 791, 794 (CA 3 1942)).

cost has been incurred under the foregoing facts. Medicare similarly does not find that the provider has incurred an actual cost for purposes of Medicare reimbursement under such facts.

## II. Finding of Facts and Conclusion of Law.

This particular case involves the CMI Providers' claim for a loss on the disposal of assets resulting from the merger of CMI the parent corporation or home office and Presbyterian health Services (renamed Novant Health), the surviving corporation.

Carolina Medicorp, Inc. (CMI) was created in 1983 to receive title to the assets of Forsyth Memorial Hospital as a part of the hospital's conversion of ownership to a private non-profit entity.[30] Prior to that time, Forsyth Memorial Hospital assets had been owed by Forsyth County Government. As part of the conversion, the Forsyth County Board of Commissioners (Commissioners) retained ultimate control over the Forsyth Memorial Hospital facility and, as a condition of the transaction, appointed 12 of the CMI's 19-member board of trustees.[31] Subsequently, CMI acquired Medical Park Hospital, Inc. (Medical Park Hospital), developed Carolina Medicorp Enterprises, Inc. d/b/a/ The Oaks at Forsyth (Oaks at Forsyth), and created the Edwin H. Martinat Comprehensive Outpatient Rehabilitation Center Martinat (referred to collectively as CMI Providers). CMI appointed the board of trustees of Forsyth Memorial Hospital, Oaks at Forsyth, and Martinat. As Medical Park Hospital's sole corporate member, CMI was entitled to adopt policies for that entity, which were required to be implemented by Medical Park's governing board. CMI owned the land, buildings, and land improvements and fixed equipment used by each of the CMI Providers.[32] These assets were provided to the CMI Providers

---

[30] See Provider's Exhibit P-72 Resolution Approving The Forsyth Memorial Hospital Corporate Restructuring.

[31] Provider's Exhibit P-72. The deed, dated January 1984, transferring the hospital's assets from Forsyth County to CMI included restrictions on their use that required that the property be maintained as a community general hospital open to the public, that CMI supply services to county residents regardless of their ability to pay, and that CMI not encumber the property with a mortgage or deed of trust without the County's approval. (See Provider's Exhibit P-70). If CMI failed to meet these conditions, ownership in the assets would revert to Forsyth County. The record shows a lease dated January 1984, with the Forsyth County as the owner/lessor and CMI as the lessee of the assets and land, but that lease was amended at that time to show CMI as the owner of the buildings and land etc. consistent with the deed.

[32] Provider's Exhibit P-72.

under written lease agreements with CMI.[33]  Each of the CMI Providers owned its own movable equipment.[34]

In December 1996, Presbyterian Health Services Corporation (Presbyterian) and CMI began negotiations to merge the two health systems.[35]  In April 1997, CMI and Presbyterian signed a letter of intent to enter into a formal agreement for the merger of the two entities.  Each determined that such a merger would be mutually beneficial, was consistent with and a furtherance of their respective strategic plans and would be of substantial public benefit to the communities particularly as it would be a continuation of a nonprofit health care delivery system.[36]  In May of 1997, prior to the merger, CMI and Presbyterian formed a limited liability company, Novant Health Management Company, LLC.[37]    Novant Health Management Company, LCC was created as a vehicle to enter into letter(s) of intent or confidentiality agreement(s) with other parties interested in becoming part of the new health system created by the merger of CMI and Presbyterian.  Novant Health Management Company, LLC was dissolved on December 31, 1998.

Due to restrictions that were placed on CMI at the time of its establishment that included the County Commissioners' power to control CMI governing board, the Commissioners consent was required for the merger.[38]  The Commissioners agreed to approve the transaction based on CMI's commitment to various undertakings reflected in the Community Benefits Commitment Agreement.[39]    The agreement, inter alia, required that one member of Novant's governing board be selected by the Commissioners from among its members.[40] In addition, the Commissioners retained

---

[33] Id.

[34] Id.

[35] Provider's Post Hearing Brief at 10. SeeTranscript of Oral Hearing (Tr.) at p 207. Prior to the merger, Presbyterian served as the parent corporation for a health care delivery system that included the Presbyterian Hospital, Presbyterian Medical Care Corporation (operating as Presbyterian Hospital Mathews), a specialty hospital that performed ENT surgery, and a long-term care facility.  Presbyterian also had a 50 percent ownership in an orthopedic hospital.

[36] See Intermediary's Hearing Book (HB)-16.

[37] See Intermediary's Hearing Book (HB)-12.

[38] Provider's Post Hearing Brief at 11; see also Tr. 94-95; 141-143; 160-161.

[39] Provider's Exhibit P-79.

[40] Provider's Exhibit P-78, Letter of Intent between CMI and Presbyterian.  See also Provider's Exhibit P-82, Bylaws of Novant Health, Inc.  Initially, the Board of Trustees consisted of eight (8) appointed members plus the Chief Executive Officer who served as ex-officio with vote. Of the eight (8) initial appointed members, three (3) were appointed by CMI, one (1) was appointed by the Country Commissioners

the right to approve a majority of the governing board of Forsyth Memorial Hospital which, in turn, would be required to continue to abide by the restrictions that had been initially imposed when CMI was established.[41] Finally, at the suggestion of the Commissioners, CMI would contribute $10 million for their use to enhance health care in the County.[42]

On June 30, 1997, CMI merged into Presbyterian.[43] Presbyterian assumed CMI's liabilities and Presbyterian obtained all of CMI's assets. Legal title to the assets previously owned by CMI, including the buildings and other real property that had been used by the CMI Providers was transferred to Presbyterian as the surviving entity in the merger. CMI leases with the CMI Providers also transferred to Presbyterian.[44] Subsequent to the merger, Presbyterian changed its name to Novant Health, Inc. (Novant).[45] Prior to the transaction, both CMI and Presbyterian home offices operated as not-for-profit corporations with separate boards. CMI, as the home office for the CMI Providers allocated the loss incurred as a result of the merger to each of the four CMI Providers.

Each of the CMI Providers filed separate cost reports[46] for fiscal year ending June 30, 1997 and were issued separate notices of program reimbursement (NPRs) on those cost reports.[47] No terminating cost reports were filed for any of the Providers.[48] CMI and Presbyterian each filed home office cost statements for the fiscal year ending June 30, 1997. CMI terminated as a home office on June 30, 1997.

---

and four (4) were appointed by Presbyterian. The Chairman of the Board of Trustees was appointed by Presbyterian and the Vice Chairman of the Board was appointed by CMI.

[41] Id. See also Provider's Post Hearing Brief at 11, Tr. 94-96, 165-169, 256-257.

[42] Id.

[43] See Intermediary's Exhibit I-1A through I-1E for the Articles of Merger and other related corporate documents.

[44] Provider's Post Hearing Brief at 12. See also, Tr. 85-87.

[45] Intermediary's Exhibit I-1A at p. 6.

[46] See PRM § 2414.5. Filing of cost Reports by Providers of a Chain Organization or Other Group of Providers.

[47] Intermediary's Exhibit I-2A-2D. See also Intermediary's Exhibit I-3.

[48] The Administrator notes that each of the Providers maintained their same Medicare provider number after the transaction and filed individual cost reports under their respective provider numbers. The State determined that no change of ownership had occurred.

In their June 30, 1997, cost reports each of the CMI Providers claimed a loss on disposal of depreciable assets, reflecting the portion of the loss incurred by CMI that was attributable to the depreciable assets used by each provider.[49] After reviewing the transaction, related financial records, other documents and the Medicare reimbursement and certification provision during the audit process, the Intermediary determined for Medicare reimbursement purposes, a recognizable loss for disposal of assets related to the transaction between the two home offices was not permitted. As a result the Intermediary denied the four CMI Providers claimed loss on the disposal of assets allocated to them by CMI. The Providers requested a group hearing before the Board for the issue stated above.

Initially, the Administrator finds that § 1011.3 of the PRM explains the "special application" of the related organization rules with respect to the disposal of assets used in the program but owned by a related organization. That provision states that the cost of ownership (depreciation, interest, taxes, etc.) of an asset which is used in the program is includable in the allowable cost of a provider even though it is owned by a related party. Where such an asset is sold or otherwise disposed of (see section 130) by a related organization, any gain or loss realized by the related party must be included in the provider's cost. Therefore, to the extent the assets of a related organization conforms to the disposal of asset rules set forth in § 130 of the PRM (reflecting the policy set forth at 42 CFR 413.134), the provider may claim the gain or loss.

In determining whether the Providers will be reimbursed for depreciation expenses under Medicare in this case, the Administrator must first determine whether the parties to the transaction are "related" or "unrelated." The Administrator finds that in this case, the record shows that, prior to the merger date, CMI and Presbyterian were related through the creation of the corporation Novant Health Management. In May of 1997, CMI and Presbyterian formed this limited liability company to enter into letter(s) of intent or confidentiality agreement(s) with other parties interested in becoming part of the new health system created by the merger.

However, in applying the related party principles the Administrator further finds that in determining whether or not the parties are related the Administrator must also analyze the relationship between the merging corporations not only at the time of the merger, but also the relationship between the merging corporations and the surviving corporation. Accordingly, the Administrator finds that consideration must be given

---

[49] The Administrator notes that the loss claimed included assets owned by CMI only; it did not include assets held by the CMI Providers themselves or other entities that were part of CMI. The Providers explained that those moveable assets continued to be owned by the Providers.

as to whether the composition of the new board of trustees and management team at the surviving corporation, included significant representation from the non-surviving corporation's board or management team.

This involves determining whether former board members of CMI had the power, to directly or indirectly, influence or direct the actions or policies of the surviving corporation. If such is the case, then no real change of control of assets has occurred and no gain or loss will be recognized as a result of this transaction. As stated above, the term "control" includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised.

Moreover, the record further shows that after the merger four of CMI's controlled board members or 44 percent was appointed to the board of the surviving corporation.[50] In addition, a significant number of executive officers and senior management of CMI were similarly positioned in the surviving corporation.[51] Thus, inter alia, because a significant number of CMI's board members and senior management/executive officers were appointed to the surviving corporation's board and executive management positions, the Administrator finds that CMI possessed the power to significantly influence the actions or policies of the surviving corporation.[52] Accordingly, the Administrator finds that the Intermediary in this case correctly determined that the transaction involved parties that were related and that a loss on the disposal of assets cannot be recognized under Medicare because of the continuity of control between CMI and the surviving corporation.

The Administrator finds that the rationale for finding that this entire transaction constitutes a related party transaction under the Medicare policy is supported by the record. An overarching principle of Medicare reimbursement, which serves as the basis for the prophylactic related party rule, is that the costs actually incurred are reimbursable under Medicare. Thus, it is reasonable to find in this case, the Providers' interests have been but recast in a different form only and thus a loss has not actually been incurred by the Providers that can be recognized by Medicare under §1861 (v)(1)(a) of the Act.[53]

---

[50] Intermediary Exhibit HB-18.

[51] Intermediary Exhibit HB-18.

[52] Further, there was a reversionary interest provided for in the article of incorporation of the surviving corporation.

[53] Consistent with that finding, although not dispositive, the Providers combined financial statements show that the transaction was treated as a pooling of interest. Intermediary Exhibit HB-24 and 25. Moreover, as the Providers' acknowledged, the Providers continued to operate unchanged after the merger and maintained ownership of all moveable assets, etc.

In addition, since the parties to this transaction are found to be related, the Administrator finds that the transaction was not consummated through an arm's length transaction. A *bona fide* sale contemplates an arm's length transaction, between unrelated parties for reasonable consideration, with each party acting in its own self interest. As outlined in PM A-00-76, in evaluating whether a *bona fide* sale has occurred with respect to a merger or consolidation between or among nonprofit entities, a comparison of the sale price with the fair market value of the assets acquired is required. A large disparity between the sale price (consideration) and the fair market value (FMV) of the assets sold or transferred indicates the lack of reasonable consideration and, hence, the lack of a *bona fide* sale. Examples of transactions that raise the issue of a bon fide sale are set forth in PM A-00-76:

> In some situations, the sale price of the assets may be barely in excess of, or less than, the market value of the current assets sold, leaving a minimal, or no, part of the sales price to be allocated to the fixed (including depreciable) assets. In such circumstance, effectively the current assets have been sold, and the fixed assets have been given over a minimal or no cost. If a minimal or no portion of the sales price is allocated to the fixed (including depreciable) assets a bona fide sale of those assets has not occurred.

The PMA-00-76 further states that:

> Non-monetary consideration, such as a seller's concession from a buyer that the buyer must continue to provide care for a period of time or to provide care to the indigent, may not be taken into account in evaluating the reasonableness of he overall consideration (even where such elements may be quantified in dollar terms). These factors are more akin to goodwill than to considerations.

In this case, the record shows that assets were transferred from CMI to the surviving entity for the assumption of liabilities totaling approximately $230 million.[54]   The net book value of the assets were listed as approximately $399,000,000. Of that amount, the net book value of the depreciable assets was listed as approximately $122 million and the land approximately $17 million.  The record further shows that at the time of the merger no appraisal of CMI's assets had been conducted to determine their FMV.[55]  The record shows that the appraisal of CMI's land and

---

[54] Intermediary's Exhibit I-31.
[55] Provider's Exhibit P-91. *See also* Provider's Post Hearing Brief at 52 acknowledging that the appraisal was received after the statutory merger of CMI and

realty assets was determined, on May 13, 1998, to be approximately $215 million.[56] After a dollar for dollar allocation to cash and land, the Providers proposed to allocated approximately $37 million of the consideration to the depreciable assets (buildings, land improvements, etc.) that had a net book value of $122 million. Likewise, $54 million of the consideration was proposed to be allocated to the depreciable assets (buildings, land improvements, etc.) and land with a net book value of $139 million and an appraised value of $215 million.[57] That is, based on the Provider's proposed allocation methodology, the land and depreciable assets were transferred 25 percent of the alleged appraised value and 38 percent of the net book value. The amount of consideration transferred and the value of the assets received does not, in the Administrator's view, support a finding that CMI transferred assets for reasonable consideration and as a result of a *bona fide* sale.

In addition, the fact that the parties did not secure an appraisal prior to the transaction is also an indication that the Providers were not concerned with receiving reasonable consideration for its depreciable assets. That the Providers also did not place their assets for sale in the open market to ascertain their worth, indicates that there was no good faith bargaining between the parties to establish the fair market value of the Providers' assets as an ongoing concern. The record does not show that receiving the best possible price for the facilities was a major factor in the negotiations. In addition, the record does not show the basis for determining that the assumption of debt was fair consideration for the Providers' assets.[58] Instead, other non-monetary factors appear to form the basis for the merger including the determination that the merger would be of substantial public benefit to the communities and would be a continuation of a nonprofit health care delivery system, along with the assurances that Presbyterian was not going to take over CMI.[59] Thus, the Administrator finds that, as the transaction did not involve an arm's length transaction, the transaction was not a *bona fide* sale as required under the regulations and PRM for the recognition of a loss on the disposal of assets.

---

Presbyterian/Novant. The accuracy, timeliness, or appropriateness of the appraisal was not at issue before the Board.

[56] Id.

[57] See , e.g., Intermediary Exhibit HB-26; Provider's comments with revised allocation, Provider's Exhibit 91 (appraisal).

[58] The record also does not show that the parties were engaged in arms length bargaining, reflective of a bona fide sale of the assets, over the potential Medicare loss on disposal of assets claim. The Medicare loss on disposal of assets claim if the providers were to be successful, is alleged to be worth in total approximately $11 million in Medicare reimbursement, which likewise is not alleged to be included in the calculation of the receivables.

[59] See, e.g., Intermediary's Exhibit HB-16 (Letter of Intent) and Tr. at 209.

As a loss cannot be allowed in this case, the Administrator does not reach the issue of how to calculate the loss. However, the issue of calculating a loss does point out certain anomalous results of finding that a loss is to be calculated in a case when there has been no bona fide sale. The Administrator concludes that this further supports a finding that no loss is to be calculated under these facts of this case.

Consequently, the Administrator finds that, not only was the transaction between related parties, but that there was no bona fide sale or other event required under 42 C.F.R. § 413.134(f) for a loss to be recognized in this case.

## DECISION

The decision of the Board is reversed in accordance with the foregoing opinion.


THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE
SECRETARY OF HEALTH AND HUMAN SERVICES


Date: 8|10|07

Herb B. Kuhn
Acting Deputy Administrator
Centers for Medicare & Medicaid Services