IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FORSYTH MEMORIAL HOSPITAL, INC., *et al.*    *

           Plaintiffs,    *

           v.    *    CASE NO.:  1:07-CV-1828-RBW

MICHAEL O. LEAVITT, as Secretary of    *
Health and Human Services,
                       *

           Defendant.    *

       *     *     *     *     *     *     *

PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT

Plaintiffs, Forsyth Memorial Hospital, Inc., Medical Park Hospital, Inc. and Foundation Health Systems Corp. d/b/a The Oaks at Forsyth and as successor in interest to Carolina Medicorp Enterprise, Inc. d/b/a Edwin H. Martinat Outpatient Rehabilitation Center, pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully moves this court for summary judgment in the above-captioned action awarding that relief prayed for in Plaintiffs' complaint for judicial review of final adverse agency decision on Medicare reimbursement. In support of said motion, Plaintiffs state that there are no genuine issues as to any material facts and that Plaintiffs are entitled to judgment as a matter of law.

The reasons supporting Plaintiffs' motion are more fully set forth in the memorandum of points and authorities in support of plaintiffs' motion for summary judgment and statement of material facts as to which there is no genuine issue which are enclosed herewith and incorporated herein by reference, and the certified administrative record previously filed with the court in this matter.

Respectfully submitted,


/s/   *Harold Belkowitz*

Harold Belkowitz (D.C. Bar #449800)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005-3324
(202) 408-8400
E-mail: hgbelkowitz@ober.com


OF COUNSEL:

Robert E. Mazer
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120



Dated at Washington, D.C.
this 8th day of August, 2008

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 8th day of August, 2008, I caused this document to

be filed in this Court's electronic filing system, and that the filing constituted service of the

document on the attorney listed below:

Joel McElvain
United States Department of Justice
Civil Division, Federal Programs Branch
Room 7130
20 Massachusetts Avenue, N.W.
Washington, D. C. 20001

/s/   *Harold Belkowitz*
Harold Belkowitz

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FORSYTH MEMORIAL HOSPITAL, INC., et al.  *

                    Plaintiffs,            *

          v.                               *    CASE NO.:  1:07-CV-1828-RBW

MICHAEL O. LEAVITT, as Secretary of        *
Health and Human Services,
                                           *
                    Defendant.             *

          *      *      *      *      *      *      *

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Harold Belkowitz (D.C. Bar #449800)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005-3324
(202) 408-8400
Fax: (202) 408-0640
E-mail: hgbelkowitz@ober.com

OF COUNSEL:

Robert E. Mazer                    Attorneys for Plaintiffs
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120

Dated at Washington, D.C.
this 8th day of August, 2008

I.    INTRODUCTION ................................................................................................ 1

II.   MEDICARE STATUTORY AND REGULATORY FRAMEWORK ................................. 3

      A.   General ................................................................................................ 3

      B.   Development Of Medicare Policy Regarding Statutory Mergers .................... 5

III.  FACTS OF THE DISPUTE .................................................................................. 10

      A.   Background ......................................................................................... 10

           1.   Process Leading to Statutory Merger ................................................ 11

           2.   Statutory Merger Transaction ......................................................... 11

IV.   ARGUMENT .................................................................................................... 13

      A.   The Administrator's Determination Was Contrary To The Medicare Statute,
           The Secretary's Regulations, Longstanding Interpretations Of Those
           Regulations, and Was Otherwise Arbitrary And Capricious ......................... 13

           1.   Standard Of Review ....................................................................... 13

           2.   The Carolina Medicorp Providers Satisfied Regulatory Requirements For
                Recognition Of A Loss On Statutory Merger ...................................... 13

           3.   Creation of Novant Health Management Did Not Make The Transaction A
                Statutory Merger Between Related Parties .......................................... 15

           4.   The Administrator Erred In Finding That The Statutory Merger Was
                Between Related Parties Based On Continuity Of Control ..................... 16

                a.   The Statutory Merger Regulation Unambiguously Refers To The
                     Parties Prior To The Merger, Not The Pre-Merger and Post-Merger
                     Corporations ........................................................................ 16

                b.   The Administrator's Related Party Determination Was Contrary To
                     Longstanding HCFA Interpretations ........................................... 18

                c.   Administrative And Judicial Case Law Do Not Permit A Statutory
                     Merger To Be Deemed A Related Party Transaction Based On Post-
                     Transaction Control Over The Surviving Entity ............................ 20

                d.   Even If Continuity Of Control Were A Valid Concept For Mergers, It
                     Did Not Exist In This Matter .................................................... 22

           5.   The Administrator Erred In Relying On Requirements Related To Bona
                Fide Sales Of Assets ..................................................................... 24

a.  A Statutory Merger Is Not Subject To Bona Fide Sale Requirements ........... 25

b.  Continuity of Control Can Not Serve As A Basis For Finding That The Statutory Merger Was Not A Bona Fide Sale ................................................. 29

c.  A Bona Fide Sale Does Not Include Requirements Used To Deny The Carolina Medicorp Providers' Loss Claims ..................................................... 29

d.  The Record Does Not Demonstrate That Carolina Medicorp Received Unreasonable Compensation For Its Assets .................................................... 33

6.  HCFA Failed To Explain Its Departure From Previous Agency Policy As Required, And The Administrator's Decision Was Otherwise Arbitrary And Capricious ............................................................................................................. 36

7.  The Administrator's Determination Was Contrary To Statutory Provisions Fixing Medicare Recapture Policy As Of June 1, 1984 ......................................... 38

B.  The Administrator's Determination Reflected An Impermissible Retroactive Application Of A New Payment Standard ........................................................................ 39

C.  The Administrator's Determination Was Contrary To Statutory Procedural Requirements ................................................................................................................... 40

1.  APA And Medicare Requirements .......................................................................... 40

2.  The Small Business Regulatory Enforcement Fairness Act of 1996 ...................... 42

V.  CONCLUSION ....................................................................................................................... 45

I.    <u>INTRODUCTION</u>

This case involves Medicare reimbursement for a loss incurred on the disposal of hospital buildings and fixed equipment that had been used by Forsyth Memorial Hospital, Inc., Medical Park Hospital, Inc., Foundation Health Systems Corp. d/b/a The Oaks at Forsyth ("Oaks at Forsyth") and Carolina Medicorp Enterprises, Inc. d/b/a Edwin H. Martinat Outpatient Rehabilitation Center ("Martinat") (collectively, Carolina Medicorp Providers").

Effective July 1, 1997, Carolina Medicorp, Inc. ("Carolina Medicorp"), the entity that controlled each of the Carolina Medicorp Providers, merged into an unrelated entity, Presbyterian Health Services Corporation ("Presbyterian").   Under Medicare related party principles, because Carolina Medicorp owned the buildings and fixed equipment used by the Carolina Medicorp Providers, each Carolina Medicorp Provider claimed reimbursement for a portion of the loss Carolina Medicorp incurred on the transaction.   The Medicare fiscal intermediary ("Intermediary") disallowed the losses contending that the transaction was not a change of ownership for Medicare certification purposes (Administrative Record ("A.R.") 384-85, 408).

The Carolina Medicorp Providers timely appealed the Intermediary's determination to the Provider Reimbursement Review Board ("PRRB") (A.R. 5502-5504, 5604-5606).   On June 15, 2007, the PRRB reversed the Intermediary's determination, and required payment of the Carolina Medicorp Providers loss claims (A.R. 219-29).   The PRRB rejected each of the assertions on which the Intermediary had relied at the hearing (the Intermediary abandoned its initial reliance on Medicare certification principles (A.R. 406, 421)).   The PRRB ruled that the parties to the statutory merger were not related prior to the transaction, and that the plain language of the Statutory Merger Regulation (42 C.F.R. § 413.134(l)(2)(i)) did not permit consideration of the relatedness of the parties following the merger (A.R. 225-27).   Similarly,

the PRRB determined that bona fide sale requirements did not apply to statutory mergers (A.R. 224, 227). The Administrator of the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"),[1] on August 10, 2007, reversed the PRRB's decision and disallowed the loss claims (A.R. 2-31). The Administrator found that the parties were related through control and that the transaction did not constitute a bona fide sale. The Administrator's decision is the final decision of the Secretary of Health and Human Services ("Secretary"). 42 U.S.C. § 1395oo(f)(1).

In disallowing the loss claims, HCFA relied on changes in its policy regarding when Medicare would recognize losses incurred by non-profit hospitals from statutory mergers. A principal element of the new policy was that such a loss would be considered to be between related entities, even if the parties to the statutory merger were unrelated prior to the transaction, if a significant number of the members of the governing board or management team of the merging entity became members of the board or assumed management positions with the merger's surviving entity after the transaction. Another principle element of the new policy was that HCFA began to require that statutory mergers satisfy requirements of a bona fide sale, applicable to transactions involving the purchase and sale of assets. In conjunction with this, HCFA changed the definition of bona fide sale from a transaction between unrelated parties for valuable consideration to a transaction where the seller received what HCFA determined to be fair market value consideration. The new policies were not announced by HCFA until 2000, but were used to disallow the claimed losses resulting from Carolina Medicorp's 1997 statutory merger.

As set forth below, HCFA's application of these new policies to the Carolina Medicorp Providers was unlawful and should be set aside. The new policies were

---

[1]   Effective July 1, 2001, the agency's name was changed from HCFA to CMS. This memorandum refers to HCFA even as to actions taken when the agency operated as CMS.

inconsistent with the plain terms of the regulation and represented a significant change in HCFA's longstanding regulatory interpretation, which required recognition of a loss that was incurred on a statutory merger if the merging entities were not subject to common ownership or common control prior to the transaction.  Additionally, the new policies were applied on a retrospective basis in disregard of well-established administrative law principles.

II.    MEDICARE STATUTORY AND REGULATORY FRAMEWORK

    A.    General

Title XVIII of the Social Security Act establishes a program of health insurance for the aged and disabled commonly known as "Medicare."   42 U.S.C. §§ 1395-1395hhh.  Payment to providers of Medicare services is made through intermediaries.  42 U.S.C. § 1395h.  Historically, the Medicare program reimbursed hospital services on a "reasonable cost" basis.  42 U.S.C. § 1395f(b).  The Medicare statute requires that the reasonable cost of services  be determined in accordance with regulations promulgated by the Secretary.  42 U.S.C.  § 1395x(v)(1)(A).   The Secretary has published extensive regulations addressing Medicare reimbursement issues, as well as various manuals intended to advise providers and intermediaries of the Secretary's interpretations of the Medicare statute and regulations, including the Provider Reimbursement Manual ("PRM") and Medicare Intermediary Manual ("MIM").  *See generally Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (PRM); *Battle Creek Health Sys. v. Leavitt*, 2007 Fed. App. 0314P (6th Cir. Aug. 14, 2007) (MIM).

Medicare reasonable cost regulations permit providers to claim as a reimbursable cost the depreciation of buildings and equipment used to care for Medicare patients.  42 C.F.R. § 413.134.[2]  Medicare regulations provide that an asset's depreciable basis is set

---

[2]  The depreciation regulation was initially codified at 20 C.F.R. § 405.415 (A.R. 1750-53).  At the time of the transaction, the regulatory provision addressing statutory mergers was

initially at its "historical cost," generally equal to the asset's purchase price. 42 C.F.R. §413.134(a)(2). To determine annual depreciation cost, the historical cost is prorated over the asset's estimated useful life. 42 C.F.R. § 413.134(a)(3). A provider then received Medicare payment for a portion of its annual depreciation, reflecting the proportionate use of each asset by Medicare patients.

The Medicare Program recognized that this formula-based depreciation calculation was only a "guesstimate" of depreciation (A.R. 1292-95). Therefore, when a depreciable asset was disposed of, Medicare regulations provided for an adjustment to reconcile the previous depreciation payments with the asset's change in value as reflected in the transaction. 42 C.F.R. § 413.134(f). The adjustment was based on the difference between the asset's "net book value" – its initial depreciable basis, less subsequently recognized depreciation (see 42 C.F.R. § 413.134(b)(9)) – and the consideration received for the asset. If the consideration was greater than the asset's net book value, then a "gain" had been realized and Medicare recovered previously reimbursed depreciation based on the assumption that the asset had suffered less depreciation than previously estimated. If a provider received less than the asset's net book value, then a "loss" was incurred and the provider received additional depreciation reimbursement. *See generally, Lake Med. Ctr. v. Thompson*, 243 F.3d 568, 569 (D.C. Cir. 2001).

Medicare regulations provide that the costs of services, facilities and supplies that are furnished to a provider by an entity related to the provider by common ownership or common control (a "related organization") are included in the provider's allowable cost at the cost to the related organization. 42 C.F.R. § 413.17(a). The Secretary's regulatory interpretations require reimbursement of a Medicare provider that used depreciable assets

---

codified at 42 C.F.R. § 413.134(*l*) (A.R. 1846-47). In subsequent periods, the provision was at 42 C.F.R. § 413.134(k) (A.R. 5321). The language of the provision remained unchanged.

which were owned by a related entity as if the provider owned the assets directly (A.R. 26; see also, PRM, §§ 1011.3, 1503.12 (A.R. 5356, 5360-A). A provider is required to recognize any gain or loss realized by the related entity upon the assets' change of ownership (A.R. 26; see generally, A.R. 507-08, 1851-53, 1928-30, 1932-39).

Medicare providers file annual cost reports with intermediaries. Following an audit, the intermediary issues a notice of amount of program reimbursement setting forth its final determination of Medicare reimbursement due the provider for that cost year. 42 C.F.R. §§ 405.1803(a), 405.1835(c). A provider that is dissatisfied with that determination may request a hearing before the PRRB. 42 U.S.C. §1395oo(a). Any appeal that is filed by providers that are under common ownership or control and that involves a common issue must be brought by the providers as a "group appeal" if the aggregate amount in controversy is at least $50,000. 42 C.F.R. § 405.1837. A PRRB decision becomes final sixty (60) days after its receipt by the provider unless, within that time, the provider requests judicial review or the HCFA Administrator ("Administrator") reverses, affirms or modifies the PRRB decision. 42 U.S.C. § 1395oo(f)(1). A provider may obtain judicial review of a final decision of the PRRB or of the Administrator by filing a civil action within sixty (60) days of its receipt of the decision. Id. A provider that prevails in such litigation receives interest on the amount in controversy. 42 U.S.C. § 1395oo(f)(2).

B.    Development Of Medicare Policy Regarding Statutory Mergers

Medicare regulations issued on November 22, 1966 stated that depreciation was an "allowable cost," and required that gains and losses from disposal of assets be included in the allowable cost determination. 31 Fed. Reg. 14,804, 14,810-11 (Nov. 22, 1966) (A.R. 1750-53).

On January 19, 1979, the regulations were amended to address particular "disposals," including "bona fide sales."  44 Fed. Reg. 3980 (Jan. 19, 1979) (A.R. 1779-81).

In February 1979, HCFA further amended Medicare regulations to provide for recognition of gains and losses from statutory mergers and consolidations.  The Statutory Merger Regulation provided that when two or more unrelated corporations merged, an adjustment (or "revaluation") to the Medicare cost basis of the merged corporation's assets was required for the surviving entity, and the merged corporation would be required to recognize any gain or loss incurred on the transaction.  44 Fed. Reg. 6912, 6915 (Feb. 5, 1979) (Addendum).  However, a statutory merger between related parties would not result in either adjustment.  Mr. Michael Maher, who, as the agency's Director of Reimbursement Policy, had been responsible for the regulation, testified that HCFA determined that a statutory merger between unrelated parties would provide the Medicare Program with an opportunity to replace the previous depreciation calculation based on estimates with a better depreciation determination (A.R. 328, 343, 347, 349, 504-09).  The February 1979 regulations made no mention of the bona fide sale rules published the previous month.

On January 18, 1984, Congress enacted Section 2314 of the Deficit Reduction Act of 1984 ("DEFRA") (Pub. L. No. 98-369), requiring Medicare regulations to "provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984" (A.R. 1958-59).

In April 1987, HCFA published an interpretation of the Statutory Merger Regulation in its MIM.  MIM § 4506.2 provided for recognition of any gain or loss resulting from a statutory merger between parties unrelated at the time of the merger (A.R. 1849), wth no mention of bona fide sale requirements.

In a letter dated May 11, 1987, William Goeller, HCFA's Director, Division of Payment and Reporting Policy, Office of Reimbursement Policy, Bureau of Eligibility, Reimbursement and Coverage, stated that Medicare regulations required recognition of a gain or loss when two unrelated non-profit hospitals merged or consolidated ("Goeller Letter") (A.R. 733-34).

By letter dated August 24, 1994, Charles R. Booth, HCFA's Director, Office of Payment Policy, Bureau of Policy Development, stated that when two independent hospitals consolidated, recognition of a gain or loss would be required, even where the resulting post-consolidation entity was controlled by former board members of the two consolidating entities ("Booth Letter") (A.R. 736-37).

From the start of Medicare until the early 1990s, hospitals frequently realized gains when they were sold, merged, or consolidated, and the Medicare program routinely recovered depreciation payments that had been made previously to the prior owner, relying on 42 C.F.R. § 413.134, including the Statutory Merger Regulation and the interpretations reflected in the Goeller and Booth Letters (A.R. 368, 383).  *See, e.g., St. Mark's Charities Liquidating Trust v. Shalala*, 141 F.3d 978 (10th Cir. 1998).  However, starting in the 1990s, managed care and other related factors resulted in significant reductions in hospital profitability (see generally, A.R. 344) and as a consequence, hospitals begin receiving less than net book value for their assets as part of change of ownership ("CHOW") transactions, resulting in frequent Medicare claims for losses (A.R. 628-30).

On May 29, 1996, HCFA's Philadelphia Regional Office provided HCFA's Central Office with an intermediary's communication questioning payments of losses being made under existing regulations (A.R. 665-71). The Regional Office stated that it "hope[d] attention to this matter can lead to action to remedy the increased Medicare cost exposure . . . ." (A.R.

666).  The response of HCFA's Central Office was reflected in a handwritten question asking: "Can we do anything via Manual, or do we need a reg?"  The handwritten reply states: "Bruce [Oliver] has per him | Chuck [Booth, Director, Officer of Payment Policy] — nothing to be done until next year," reflecting recognition that the Medicare policy could not be modified quickly through informal agency reinterpretations (Id.).

An ad hoc workgroup of HCFA and intermediary representatives, created to review Medicare authorities addressing change of ownership transactions and to recommend changes ("CHOW Workgroup"), provided HCFA with recommended, proposed revisions to HCFA's PRM (A.R. 645-63).  Proposed PRM § 1502.5 required disallowance of loss on statutory merger claims when there was "a continuity of control between the nonsurviving entity(ies) and the surviving (merged) entity," e.g., where the governing board of the surviving entity after the transaction included significant representation from the pre-transaction governing boards of the merging entities (A.R. 657-58).  The proposed PRM revisions also included a new definition of "bona fide sale" that would require "reasonable consideration" (A.R. 663). The CHOW Workgroup Chairman advised HCFA that if the proposed PRM changes were adopted "changes to Section 4500ff [the MIM] may also be required" (A.R. 646).

Shortly after the CHOW Workgroup made its recommendations, HCFA advised the agency's Office of Inspector General ("OIG"), which was then studying Medicare's recognition of gains and losses, that Medicare authorities required recognition of loss claims, but stated that the CHOW Workgroup's work product "might close this loop hole" (A.R. 679-80).  The OIG completed its study in June 1997 (A.R. 617-43).  The OIG confirmed that Medicare's payments for losses had increased in recent years, and warned that significant payments would continue to be required (A.R. 628-30).  The OIG noted that the CHOW Workgroup's proposals "are now under review by HCFA" (A.R. 623-24) and, like the CHOW

Workgroup, recommended legislation to eliminate the statutory provision requiring recognition of losses, a recommendation with which HCFA agreed (A.R. 611, 619-20, 640-41, 646, 661).

HCFA arranged for legislation that eliminated the statutory requirement that Medicare recapture depreciation based on policies in effect on June 1, 1984. Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4404. HCFA then amended Medicare regulations to eliminate reimbursement of losses as of December 1, 1997, the legislation's effective date. 63 Fed. Reg. 1379, 1380-82 (Jan. 9, 1998) (A.R. 2026-30). These legislative and regulatory changes would not affect losses that had occurred prior to that date, such as the losses for which the Carolina Medicorp Providers seek reimbursement.

To address earlier transactions, on October 19, 2000, HCFA issued a Program Memorandum ("2000 PM") requiring disallowance of loss claims resulting from mergers and consolidations involving non-profit providers based on new policies (A.R. 5386). In seeking internal clearance to publish the 2000 PM, HCFA staff stated that the issuance was necessary "to avoid misinterpretation of policy by the provider and the intermediary," it had implications that warranted attention of HCFA's Administrator or Deputy Administrator, and that the change would be applied prospectively (A.R. 683-85). In fact, however, the 2000 PM was made applicable to previously-concluded cost reporting periods. It was also contrary to HCFA's longstanding regulatory interpretations as reflected in the MIM and the Goeller and Booth Letters, by (1) imposing a "continuity of control" test to determine whether a merger (or consolidation) was between related parties by comparing governance and management before and after the transaction (A.R. 5387-5387-A); (2) requiring a statutory merger between unrelated parties to be a bona fide sale before recognition of any related gain or loss (A.R. 5387-A); and (3) requiring a bona fide sale to reflect reasonable consideration (A.R.5387-A-

5388), based on a definition that was added to the PRM (§ 104.24) in May 2000 (A.R. 9, 5262). Because recognition of gains and losses had been eliminated effective December 1, 1997, the 2000 PM was applicable solely to periods prior to December 1, 1997 that were subject to the DEFRA provision requiring recapture of depreciation based on 1984 Medicare policies.

III.    FACTS OF THE DISPUTE

    A.    Background

Carolina Medicorp was created in 1983 to accept ownership of Forsyth Memorial Hospital from Forsyth County (A.R. 23, 440, 458-59, 2048-52). Subsequently, Carolina Medicorp acquired Medical Park Hospital, developed The Oaks at Forsyth, and created Martinat (A.R. 23, 440). Carolina Medicorp owned the land, buildings and fixed equipment that was used by the Carolina Medicorp Providers to provide health care services pursuant to lease arrangements (A.R. 23-24, 221-22, 444, 446, 454-55). See Answer to Amended Complaint ("Answer") ¶ 26. Pursuant to Medicare related party principles, each Carolina Medicorp Provider received reimbursement for depreciation costs related to Carolina Medicorp's depreciable assets that it used to furnish services to Medicare patients (A.R. 222, 360, 491-92, 497-98, 503, 506).

The Carolina Medicorp health system was subject to the control of the Forsyth County Commissioners ("County Commissioners") who appointed twelve of Carolina Medicorp's nineteen-member governing board (A.R. 23, 222, 441-44, 457, 460, 467-68, 483, 889-93). See Answer ¶ 25. Carolina Medicorp controlled each of the Carolina Medicorp Providers, appointing the governing boards of Forsyth Memorial Hospital, Oaks at Forsyth and Martinat, and controlling the policies to which Medical Park's governing board was bound (A.R. 23, 441-43, 461-64, 902-09, 922-29, 931-36, 941-42). See Answer ¶ 25.

1.    Process Leading to Statutory Merger

Prior to the statutory merger discussed below, Presbyterian served as the "parent" corporation for a health care delivery system that included hospitals and a long-term care facility (A.R. 446-47, 476).  Presbyterian and Carolina Medicorp had separate governing boards and were not subject to common control or common ownership (A.R. 25, 221, 447, 451, 471, 476).  After approximately two months of meetings, the health systems reached consensus that a merger would benefit each health system and the communities that they served (A.R. 24, 475-79, 496-97, 950).  The parties recognized that the merger's surviving entity would be required to have extensive authority over each corporation that would be part of the system (A.R. 950-57).  Presbyterian would not agree to any arrangement under which the County Commissioners would have substantial control over the system (A.R. 457, 465).  Based on Carolina Medicorp's commitment to various undertakings reflected in a Community Benefits Commitment Agreement, the County Commissioners approved Carolina Medicorp's statutory merger with Presbyterian  (A.R. 24-25, 448, 460, 464-67, 488-89, 950, 956, 963).

2.    Statutory Merger Transaction

Effective July 1, 1997, Carolina Medicorp statutorily merged into Presbyterian (A.R. 25, 221, 448-49, 451; see A.R. 692-731, 1688-1700, 3666-80).  See Answer ¶¶ 28-29. This transaction eliminated Carolina Medicorp, the entity over which the County Commissioners had exercised control (A.R. 448-49).  As a result of the statutory merger, and pursuant to state law (i) Carolina Medicorp, the merged entity, ceased to exist; (ii) Presbyterian assumed Carolina Medicorp's liabilities; and (iii) Presbyterian obtained all of Carolina Medicorp's assets, including the buildings and other real property used by the Carolina Medicorp Providers  (A.R. 25, 221-22, 405, 445-46, 448-50, 453, 697).  See N.C. Gen. Stat. § 55A-11-05 (A.R. 1700).  Carolina Medicorp's leases with the Carolina Medicorp Providers

also transferred to Presbyterian (A.R. 25, 422, 446).  See Answer ¶ 28.  Upon completion of

the transaction, Presbyterian became known as Novant Health, Inc. ("Novant").  Answer ¶ 29

(A.R. 25, 449, 722, 728).

Control over Carolina Medicorp's assets passed to Novant (A.R. 222, 449, 462).  After

the transaction, Novant was controlled by its governing board (A.R. 450-52).  Novant was

required by financing documents to control each Carolina Medicorp Provider; such control

was provided for in Novant's bylaws and contractual agreements with those entities (A.R.

452-53, 462, 930-44, 1001-1006, 1020-29).  Novant was not subject to the control of the

County Commissioners (A.R. 464-65).

As a result of its merger into Presbyterian, Carolina Medicorp incurred a loss of

approximately $85 million on the disposition of its depreciable assets, reflecting the

difference between the consideration received for those assets (i.e., a portion of its liabilities

that were assumed by Presbyterian) and the Medicare net book value of those assets (A.R.

493, 1470).[3]  In completing their cost reports for the cost year ending June 30, 1997, each

Carolina Medicorp Provider claimed a loss, reflecting the portion of Carolina Medicorp's loss

on statutory merger that related to depreciable assets that the particular Carolina Medicorp

Provider had used and for which Medicare had previously reimbursed the provider

depreciation costs (A.R. 26, 222, 493-94).   The aggregate Medicare loss claim was

approximately $11 million (A.R. 222, 1461, 1464, 1466-67).  See Answer ¶ 34.

---

[3]     A revised calculation reflecting the PRRB's determination requiring elimination of
intercompany transactions decreased the loss by approximately 1% (*See* A.R. 32-37).

IV.    ARGUMENT

      A.    The Administrator's Determination Was Contrary To The Medicare Statute, The Secretary's Regulations, Longstanding Interpretations Of Those Regulations, and Was Otherwise Arbitrary And Capricious

          1.    Standard Of Review

The standard of review is governed by 42 U.S.C. § 1395oo(f)(1), which incorporates the APA, 5 U.S.C. § 706, pursuant to which a reviewing court may set aside final agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or when the action is "unsupported by substantial evidence" when the record is viewed as a whole.

          2.    The Carolina Medicorp Providers Satisfied Regulatory Requirements For Recognition Of A Loss On Statutory Merger

The Medicare statute requires that the reasonable cost of services reimbursed under Medicare be determined in accordance with regulations promulgated by the Secretary. The statute also specifically required Medicare regulations to "provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984." 42 U.S.C. § 1395(v)(1)(O)(ii).

The Statutory Merger Regulation effective June 1, 1984, and at the time of the transaction, required recognition of a gain or loss resulting from a statutory merger between unrelated parties. The Regulation states:

> A statutory merger is a combination of two or more corporations under the corporate laws of the State, with one of the corporations surviving. The surviving corporation acquires the assets and liabilities of the merged corporation(s) by operation of State law. The effect of a statutory merger upon Medicare reimbursement is as follows:
> (i) Statutory merger between unrelated parties. If the statutory merger is between two or more corporations that are unrelated (as specified in §413.17), the assets of the merged corporation(s) acquired by the surviving corporation may be revalued. . . . If the merged corporation was a provider before the merger, then it is subject to the provisions of

paragraph . . . (f) of this section concerning . . . the realization of gains
and losses.

42 C.F.R. § 413.134(l)(2)(i) (A.R. 1846-47).  By use of the phrase "between two . . .
corporations," the regulation is clear – a statutory merger is between unrelated parties if the
corporations that are parties to the transaction are unrelated at the time of the merger.
According to Mr. Michael Maher, a former agency official who had been responsible for the
Statutory Merger Regulation (A.R. 327-28, 349, 504-07, 522), the only requirement for
recognition of a loss on a statutory merger was that the parties be unrelated prior to the
transaction; no other conditions had to be met (A.R. 341, 346, 511-13, 516).[4]

There is no dispute that the transaction was a statutory merger.  See Answer ¶ 28
(A.R. 25, 399, 405, 411-12, 427-28, 433, 465-66, 448-49).  Similarly, it is undisputed that the
transaction was between Carolina Medicorp and Presbyterian.  See Answer ¶ 28 (A.R. 405,
451).  See also A.R. 696 ("This AGREEMENT AND PLAN OF MERGER . . . is made . . .
by and between CAROLINA MEDICORP, INC. . . . and PRESBYTERIAN HEALTH
SERVICES CORP. . . .")  The parties to the PRRB hearing stipulated that the issue was
"whether the Intermediary's adjustments disallowing the losses . . . resulting from the
statutory merger of Carolina Medicorp into Presbyterian Health Services Corporation were
proper" (A.R. 427-28).  The undisputed testimony was that Carolina Medicorp and
Presbyterian were not subject to common ownership or common control prior to and at the

---

[4]   The testimony of Mr. Maher and Mr. Eric Yospe, who testified regarding the MIM, is
entitled to great weight.  *See N. Anna Envtl. Coal v. U.S. Nuclear Regulatory Comm'n,* 533
F.2d 655, 662-62 (D.C. Cir. 1976) (testimony of agency staff members involved in
development of regulations provided substantial support for agency findings).  *See also,
Hayes Int'l Corp. v. McLiecas,* 509 F.2d 247, 261-63 (5th Cir. 1975).  *See generally, United
States v. Exxon Corp.,* 87 F.R.D. 624, 630-33 (D. D.C. 1980) (recognizing value of
contemporaneous construction of agency regulations, including agency employee opinions as
to intent and meaning of regulations).

time of the transaction (A.R. 225, 447, 451, 471, 476).  This leads to the inescapable conclusion that the transaction was a statutory merger between unrelated parties.

Therefore, the Administrator was required to pay the Carolina Medicorp Providers' loss claims in accordance with the Secretary's regulations.  *See AT&T Corp. v. Fed. Commc'n Comm'n*, 448 F.3d 426, 434 (D.C. Cir. 2006) (agency must adhere to own rules and regulations); *S. Cal. Edison Co. v. Fed. Energy Regulatory Comm'n*, 415 F.3d 17, 22-23 (D.C. Cir. 2005) (agency may alter regulations, but "may not keep regulations in place and then disregard them"); *Battle v. Fed. Aviation Admin.*, 393 F.3d 1330, 1335-36 (D.C. Cir. 2005) (agencies may not violate own rules and regulations to prejudice of others).  *See also Maximum Home Health Care v. Shalala*, 272 F.3d 318, 321-22 (6th Cir. 2001) (rejecting Secretary's competitive bidding requirement not provided for in regulation).

> 3.    Creation of Novant Health Management Did Not Make The Transaction A Statutory Merger Between Related Parties

The Administrator's sole basis for finding that the parties were related prior to the merger was their creation of Novant Health Management, LLC ("Novant Management") prior to the merger's consummation (A.R. 26).  Novant Management was created as a vehicle to "enter into letter(s) of intent or confidentiality agreements with other parties interested in becoming part of the new health system created by the merger of [Carolina Medicorp] and Presbyterian" (Id.; see A.R. 355-58, 387-88).  However, the Administrator did not find that Novant Management resulted in Carolina Medicorp and Presbyterian becoming subject to common control or common ownership (A.R. 26), as required for parties to be related under Medicare regulations.  *See Biloxi Reg'l Med. Ctr. v. Bowen*, 835 F.2d 345, 350 (D.C. Cir. 1987) (related party rule "only comes into play when the relation . . . is one of 'ownership' or 'control'"); PRM § 1000 (A.R. 5017).  The undisputed testimony was that Novant Management did not result in common control or ownership over the merging entities (A.R.

455-56, 486-86).  Accordingly, its creation did not provide a basis for the Administrator's determination that Presbyterian and Carolina Medicorp were related parties prior to their merger.

    4.        The Administrator Erred In Finding That The Statutory Merger
                Was Between Related Parties Based On Continuity Of Control

Relying on the 2000 PM, the Administrator found that the parties to the merger were related through control (A.R. 16-18, 26-27).  The Administrator stated that the merger "involved" related parties "because a significant number of [Carolina Medicorp's] board members and senior management executive officers were appointed to [Novant's] board and executive management positions" (A.R. 27).  Therefore, Carolina Medicorp "possessed the power to significantly influence the actions or policies" of Novant after the transaction.  (Id.) However, as discussed below, the Administrator did not apply the standard provided for in the Statutory Merger Regulation, which required comparison of control over the parties to the statutory merger immediately prior to the transaction.  The Administrator relied erroneously on a comparison of control over Carolina Medicorp as it existed prior to the statutory merger with control over Novant, as it existed after the transaction. Moreover, even if the Administrator's standard was consistent with the Regulation, common control did not exist between Carolina Medicorp and Novant.

    a.        The Statutory Merger Regulation Unambiguously
                Refers To The Parties Prior To The Merger, Not The
                Pre-Merger and Post-Merger Corporations

The Administrator's related party determination – based on his finding that the transaction "involved parties that were related" (A.R. 27) – cannot be reconciled with the language of the regulation which provides that a statutory merger is between related parties if, and only if, the merger "is between two or more related corporations . . . ."  42 C.F.R. § 413.134(l)(2)(ii) (A.R. 1846-47).  The merging entities must be subject to common control or

                - 16 -

common ownership at the time of the transaction.  As an example of a statutory merger between related parties, the regulations refer to a merger of two corporations under common ownership at the time of the transaction, i.e., a subsidiary merges into its parent (Id.).  *See generally, Kidney Ctr. of Hollywood v. Shalala*, 133 F.3d 78, 84-86 (D.C. Cir. 1998) (merger determined to be related party transaction because same individuals controlled both parties to negotiations leading to transaction).

By using his "continuity of control" interpretation, the Administrator would effectively rewrite the Statutory Merger Regulation to require that a merger be "between two or more corporations that are unrelated, and that each merged entity be unrelated to the surviving entity resulting from the transaction."  Even if the Secretary might have promulgated such a regulation, he is bound by his regulations as he wrote them.  *See Aspenwood Inv. Co. v. Martinez*, 355 F.3d 1256, 1261 (10th Cir. 2004) ("The agency could easily have drafted language to achieve the result which it now advocates but did not do so. We cannot 'torture the language' to reach the result the agency wishes.") (citations omitted). The Regulation reflected HCFA's determination that requiring the merging parties to be unrelated at the time of the transaction provided the agency with sufficient protection; the results from such a transaction would provide the Medicare program with a better depreciation determination than the previous determination that had reflected estimates (A.R. 343, 507-09, 512-13).  The regulatory language cannot be reasonably interpreted to permit the related party determination to be based on a comparison of control of the merging corporation prior to the transaction and of the surviving corporation after the transaction.  *See Via Christi Reg'l Med. Ctr. v. Leavitt*, 509 F.3d 1259, 1273 (10th Cir. 2007).  *See generally Christensen v. Harris County*, 529 U.S. 576, 588 (2000) (agency may not create de facto new regulation under guise of regulatory interpretation); *Fina Oil and Chemical Co. v. Norton*, 332 F.3d 672,

676-79 (D.C. Cir. 2003) (reversing agency determination basing government royalty on proceeds to entity controlled by lessee, when regulatory definition of "lessees" did not include "and their affiliates").

        b.      The Administrator's Related Party Determination Was
                Contrary To Longstanding HCFA Interpretations

Section 4502.6 of the MIM interpreting the Statutory Merger Regulation confirms that a statutory merger is between unrelated parties when the merging entities are unrelated prior to the transaction.  The MIM provides the following example:

> Corporation A (a non-provider) signs an agreement of merger consistent with the principles of applicable state law with corporation B, the provider, with corporation A surviving.  Corporation A will be operated as a provider.  Corporations A and B were unrelated parties prior to the transaction . . . .
>
>                \*   \*   \*
>
> A gain/loss to the seller and a revaluation of the acquired assets to the buyer are computed.

MIM § 4502.6 (A.R. 1849).  Thus, in determining whether a statutory merger is between unrelated parties, the merging entities' relationship immediately prior to the transaction is determinative; arrangements existing after the statutory merger are immaterial.  The MIM is quite blunt about this and requires only that "Corporations A and B [be] unrelated parties prior to the transaction" (Id.).  Mr. Eric Yospe, who served as chairman of HCFA's committee that developed this provision (A.R. 358-59, 361-62), testified that the committee did not believe that control of the provider after the transaction was relevant to whether a statutory merger was between unrelated parties, and that the only requirement to be satisfied, for recognition of a gain or loss, was that the parties be unrelated prior to the merger (A.R. 362-64, 370).

This policy was reaffirmed seven years later by the director of the responsible HCFA office (A.R. 736-37; see A.R. 332-33, 349). The 1994 Booth Letter, responding to a request concerning a consolidation of non-profit entities (A.R. 738-44), summarized the transaction and the question put to the agency as follows: "Hospital A and Hospital B will merge to form Hospital C. Hospital C will acquire the assets of each organization in exchange for the assumption of all liabilities of each organization. Hospitals A and B will cease to exist concurrent with the consolidation and formation of Hospital C" (A.R. 736). Notwithstanding the stated fact that each consolidating hospital would appoint one-half of Corporation C's governing board (A.R. 739), Director Booth stated that "based on our understanding of the transaction, . . . it appears to be a consolidation as defined in § 413.134(k)(3)(i) ["Consolidation between unrelated parties"] requiring a determination of gain or loss under § 413.134(f) . . . ." (A.R. 736).

Well-established case law requires that great deference be accorded informal regulatory interpretations such as the MIM and Booth Letter, which clearly require recognition of a loss incurred on a statutory merger when parties are unrelated at the time of the merger. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Air Transp. Ass'n of Am., Inc. v. Fed. Aviation Admin.*, 291 F.3d 49, 53 (D.C. Cir. 2002) (letter from agency's deputy counsel and Federal Register notice incorporating letter); *Public Citizens, Inc. v. Lew*, 127 F.Supp.2d 1, 7-8, 10 (D. D.C. 2000) (agency's interpretation set forth in OMB Circular and sworn declaration of agency's deputy administrator). Unlike the 2000 PM, these interpretations were "not advanced by an agency seeking to defend past agency action against attack;" nor is there any "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Auer*, 519 U.S. at 462. *See also, Akzo Nobel Salt v. Fed. Mine Safety & Health Rev. Comm*, 212 F.3d 1301, 1304-05 (D.C. Cir. 2000).

In fact, the Administrator's failure to give effect to the MIM provision providing for recognition of a gain or loss when merging entities are unrelated prior to the transaction requires reversal of his decision. See Battle Creek Health Sys., 2007 Fed. App. 0314P (MIM "often referenced by the courts as an authoritative source") (citations omitted)); *St. Luke's Hosp. v. Thompson*, 224 F.Supp. 2d 1, 8 (D.D.C. 2002) (agency required to abide by own rules as established in its manuals), *aff'd*, 355 F.3d 690 (D.C. Cir. 2004). *See generally Mass. Fair Share v. Law Enforcement Assistance Admin.*, 758 F.2d 708, 711 (D.C. Cir. 1985) (principle requiring agency to adhere to self-adopted rules not limited to formal regulations); *Home Health Care v. Heckler*, 717 F.2d 587, 592-93 (D.C. Cir. 1983) (Secretary's payment determination reversed when intermediary failed to comply with Intermediary Letter); *Shalala v. St. Paul-Ramsey Med. Ctr.*, 50 F.3d 522, 528-29 (8th Cir. 1995) (Secretary can not rely on requirements not included in PRM).

> c.  Administrative And Judicial Case Law Do Not Permit A Statutory Merger Party To Be Deemed A Related Party Transaction Based On Post-Transaction Control Over The Surviving Entity

The Administrator stated that an "overarching principle of Medicare reimbursement" was to reimburse only those costs that were "actually incurred," and that this principle "serve[d] as the basis for the prophylactic related party rule" (A.R. 27). The Court of Appeals has stated that "the rule is prophylactic in the sense that it involves a judgment that the probability of abuse in transactions between related organizations is significant enough that it is more efficient to prevent the opportunity for abuse from arising than it is to try to detect actual incidents of abuse . . . ." Biloxi Reg. Med. Ctr., 835 F.2d at 350. However, it is limited to "types of relatedness" identified in the Secretary's regulations (Id.). The regulations provide that a statutory merger is between related parties only if the merging entities are subject to common control or common ownership prior to the transaction.

In *Buckingham Valley Ctr. v. Aetna Life & Cas. Co.*, PRRB Dec. No. 90-D13, [1990 Transfer Binder] Medicare and Medicaid Guide (CCH) ¶ 38,369 (1990), the PRRB rejected a contention that a merger was between related parties because a merger agreement caused some transaction participants to become under other participants' control. The PRRB determined that the statutory merger was between unrelated parties based on the parties' relationship before they agreed to merge. Id. at 22,092. This decision was upheld by the Secretary and ultimately by the Court of Appeals. *Buckingham Valley Ctr. v. Aetna Life & Cas. Co.*, HCFA Adm'r Dec., [1990 Transfer Binder] Medicare and Medicaid Guide (CCH) ¶ 38,459 (1990), *aff'd sub nom, Nursing Ctr. of Buckingham & Hampden v. Shalala*, 990 F.2d 645 (D.C. Cir. 1993). Most recently, in *Via Christi*, 509 F.3d at 1273-74, the court held that the Secretary's continuity of control theory was contrary to the "plain language" of the regulation governing consolidations, issued as part of the same rulemaking as the Statutory Merger Regulation, as well as other indications of the Secretary's intent at the time of the regulation's promulgation.

Furthermore, even if the Statutory Merger Regulation did not specify that the related party determination was based on the relationship of the merging entities immediately before the transaction, generally, relatedness under the related party regulation is determined at the time of the transaction, not subsequent to the transaction. In *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1192 (3d Cir. 1986), the court determined that a sale of stock was between related parties based on their relationship "at the time of the sale." The court stated that the lower court relied erroneously on the seller's lack of control after the transaction. According to the court, "[s]uch evidence, while interesting, is not material to the legal issue before us: the control [the seller] exercised over the [buyer] at the time of the conversion." Id. at 1194 n.25.

        d.        Even If Continuity Of Control Were A Valid Concept
                    For Mergers, It Did Not Exist In This Matter_____

There were five flaws in the Administrator's determination that Carolina Medicorp could significantly influence Novant after the transaction through former members of Carolina Medicorp's governing board and former Carolina Medicorp executives and management who accepted positions with Novant (A.R. 26-27).

1.      Carolina Medicorp's existence terminated as a result of the statutory merger, so it was unable to control or influence Novant after the transaction by any means whatsoever (A.R. 405, 445, 448-50, 453, 697, 699, 1689, 1691).

2.      The County Commissioners' lack of control over Novant precluded continuity of control. Prior to the transaction, Carolina Medicorp had been subject to the control of the County Commissioners. (*See* p. 10). After the transaction, Novant was not subject to the County Commissioners' control or significant influence. (*See* p. 12). Thus, there was a significant change in control, not a continuation of preexisting control.

3.      In finding continuity of control based on the <u>collective</u> voting powers of Novant board members, the Administrator ignored the undisputed facts and violated the Secretary's own regulations. Under Medicare regulations, "control" exists where "an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution." 42 C.F.R. § 413.17(b)(3). Therefore, for there to be continuity of control, Novant must have come under the control of the same individual or organization that controlled Carolina Medicorp prior to the transaction. There was no factual or regulatory basis for the Administrator to aggregate the voting interests of unrelated individuals to assert their control over Novant on a joint, or collective, basis. Four former members of Carolina Medicorp's nineteen-person governing board were included on Novant's nine-person board (A.R. 451-52, 480, 1031). These individuals became

Novant board members because of its need for a knowledgeable and experienced board (Id.). They were not appointed to advocate any Carolina Medicorp interest (Id.). There was no evidence that any of the four individuals might direct any other board member, or that they would act in a unified manner (Id.). Additionally, Medicare regulations state that control exists only "where an individual or organization" can direct or significantly influence an entity. 42 C.F.R. §413.17(b)(3) (1997) (A.R. 5014). Prior to the statutory merger, no individual had even a six percent (6%) voting interest on Carolina Medicorp's nineteen-person governing board (A.R. 451-52, 480, 1031). After the merger, each board member had a voting interest of approximately eleven percent (11%) on Novant's nine-person governing board (Id.). Accordingly, no individual board member could significantly influence or control either entity, as required for continuity of control.

4.    The four board members represented only approximately twenty-one percent (21%) of Carolina Medicorp's nineteen-person governing board and, even collectively, could not have controlled Carolina Medicorp prior to the transaction as necessary for continuity of control (A.R. 366-67, 451-52, 480, 516, 1031, 2232). A transaction is between related parties when an individual or organization controls both organizations involved in the transaction. 42 C.F.R. § 413.17(b). See PRM § 1004 (A.R. 5017) ("If the elements of common ownership or control are not present in both organizations, the organizations are deemed not to be related to each other"). Even collectively, these four individuals could not have controlled Carolina Medicorp prior to the transaction as necessary for continuity of control, particularly given the County Commissioner's overall control of the board. *See N. Iowa Med. Ctr. v. Sec'y of Health & Human Servs.*, 196 F.Supp.2d 784, 791-92 (N.D. Iowa 2002), appeal dismissed per stipulation (8th Cir. 2002) (22% representation (4 of 18) on post-transaction board held insufficient to establish control). While the PRM includes multiple illustrations of related

party principles, in no example is less than a 40% ownership or voting interest considered sufficient for a "related party" determination. Additionally, documents related to their adoption demonstrate that HCFA recognized that a voting interest of 21% was insufficient to confer substantial control over an entity. In 1981, HCFA proposed to replace PRM examples showing that ownership or voting interests of between 40% and 55% were considered substantial for related party purposes (A.R. 1033-34) with provisions showing that 20%, 25% and 30% interests were substantial (A.R. 779-85). HCFA subsequently elected not to adopt these proposed revisions, recognizing that ownership or control interests of 20%-30% were insufficient to invoke related party principles (A.R. 831-45, 853). Therefore, regardless of the four carryover members' collective control over Novant after the transaction, their lack of control over Carolina Medicorp prior to the transaction prevented continuity of control.

5.      Executive officers and senior management did not have control over either Carolina Medicorp or Novant which were controlled by their governing boards (A.R. 453, 471, 479). The PRM does not include a single example where employed officers and senior management were deemed to control a corporation. In fact, in revising the PRM in 1982, HCFA recognized that control of an entity did not rest with individuals who might make day-to-day operating decisions and determined not to include such a test in one of the examples in PRM § 1004.4 (A.R. 784, 831-33, 839, 871). Accordingly, Novant's employment of individuals who had worked previously for Carolina Medicorp did not serve as a legally sufficient basis for finding common control over Carolina Medicorp before the merger and Novant afterwards.

5.      The Administrator Erred In Relying On Requirements Related
To Bona Fide Sales Of Assets

The Administrator concluded that the Carolina Medicorp Providers were not entitled to payment of their loss claims because the transaction was not a bona fide sale (A.R. 28-30).

He asserted that his related party determination meant "that the transaction was not consummated through an arm's length transaction." Additionally, according to the Administrator, Carolina Medicorp did not receive reasonable consideration for its assets. The Administrator's determination was contrary to both the plain terms of the Statutory Merger Regulation and to Medicare payment policies in effect on June 1, 1984, each of which he was bound to apply. As demonstrated below, the regulatory requirements for bona fide sales did not apply to statutory mergers; "continuity of control" cannot serve as a basis for finding that a transaction is not a bona fide sale; bona fide sale requirements did not require that there be "reasonable consideration," as determined by the agency; and the evidence does not demonstrate that Carolina Medicorp accepted unreasonable compensation for its assets.

a.     A Statutory Merger Is Not Subject To Bona Fide Sale<br>Requirements

Under North Carolina law, Carolina Medicorp's statutory merger was not a sale of assets (A.R. 450, 465-66). It is axiomatic that a statutory merger is fundamentally different from a purchase and sale of assets (A.R. 450; see also A.R. 1036-37, treatise stating that "[p]urchase and transfer of assets to one corporation by (and to) a second corporation is not a consolidation or merger"). *Cf. United States v. Seattle-First Nat'l Bank*, 321 U.S. 583, 590 (1944) (real estate transferred as a result of consolidation could not "be said to have been 'sold' or vested in a 'purchaser or purchasers' within the ordinary meanings of those terms"). The structure of the regulations demonstrates that HCFA recognized these differences and intended for statutory mergers to be governed by different regulatory provisions than those applicable to purchase and sales transactions.

The final rule addressing statutory mergers and consolidations was published on February 5, 1979. 44 Fed. Reg. at 6912-15. Less than one month earlier, on January 19, 1979, the Secretary published regulations providing for recognition of a gain or loss on a bona

fide sale (section (f)(2)).    44 Fed. Reg. at 3982-83 (A.R. 1779-82).    The February rule contains no mention of any requirement that a statutory merger be a bona fide <u>sale</u> before a gain or loss would be recognized.    Significantly, HCFA avoided use of the term bona fide <u>sale</u>, stating instead that revaluation of assets was provided for when "assets are transferred by means of a bona fide transaction between unrelated parties."    44 Fed. Reg. at 6913 (emphasis added).    The Statutory Merger Regulation resulting from the February 1979 final rule provides for recognition of gains and losses from statutory mergers between unrelated parties in accordance with section (f), "Gains and losses on disposal of assets".    It does not require compliance with, or refer to, any particular subsection within section (f), such as (f)(2) addressing "bona fide sale."

The lack of a bona fide sale requirement for statutory mergers was purposeful.    In developing the Statutory Merger Regulation, HCFA recognized that the gain or loss would be computed based on the merged entity's liabilities that were assumed by the surviving corporation, and that those liabilities would not necessarily reflect the assets' fair market value or specifically negotiated values (A.R. 512).    HCFA reasonably determined that a merger between unrelated parties would provide Medicare with a "better" number than that based on previous estimates of depreciation, and thus justified recomputation of depreciation costs without requiring satisfaction of additional requirements (A.R. 328, 341, 343, 347, 349, 507-509, 511-13).

Accordingly, as part of the February 1979 rule, there were no requirements imposed regarding fair market value compensation.    Both Messrs. Maher and Yospe testified – and the Intermediary agreed (A.R. 411-12) – that a statutory merger need not constitute a bona fide sale in order for a gain or loss to be recognized under Medicare regulations, and that Medicare authorities did not require that liabilities assumed as part of a statutory merger reflect the fair

market value of the transferred assets (A.R. 341, 346, 350, 363, 367, 370, 512, 516).  In fact, as of the date of the transaction, HCFA had never required statutory mergers to comply with bona fide sale requirements.  This is confirmed by the Goeller Letter, which makes no mention whatsoever of bona fide sale requirements.  Director Goeller, who had been HCFA's contact "FOR FURTHER INFORMATION" regarding the 1979 statutory merger rule,  44 Fed. Reg. 6912, stated:

> Mergers and consolidations of nonstock, nonprofit providers may give rise to revaluations of assets . . . and/or adjustments to recognize realized gains and losses.
>
> * * *
>
> If the transaction . . . meets the definition of either a statutory merger or consolidation as set forth in the regulations section  . . . , then a revaluation of assets and/or an adjustment to recognize related gains and losses may occur.
>
> * * *
>
> In a situation where the surviving/new corporation assumes liability for outstanding debt of the merged/consolidated corporations, the assumed debt would be viewed as consideration given . . . . [A]n adjustment to recognize any gain or loss to the merged/consolidated corporations would be required . . . . For purposes of calculating the gain or loss, the amount of the assumed debt would be used as the amount received for the assets.

(Emphasis added)  (A.R. 733-34).  Similarly, neither the MIM nor the Booth Letter provides any indication that gains or losses from a statutory merger or consolidation are recognized only if the transaction is a bona fide sale.  Director Booth would require recognition of the loss resulting from a proposed transaction, notwithstanding his express recognition that the "fair market value [of the assets] exceeded the sales price" (A.R. 737).  Director Booth would require recognition of hypothetical Hospital A's loss even though its assets that would pass to the consolidated entity included cash and current assets of $28 million, while the consolidated entity would assume only $26 million of Hospital A's liabilities (A.R. 736-37, 743).

The Administrator has not suggested that a merger is required to satisfy bona fide sale requirements before the surviving entity would be required to "revalue" the assets obtained from the merged entity.  In fact, the Intermediary acknowledged that the transaction was a statutory merger permitting such a revaluation (A.R. 399).  Permitting a revaluation of merged assets upon any statutory merger between unrelated parties, but permitting recognition of a gain or loss only when such a transaction was also a bona fide sale, would destroy the symmetry between the two provisions within the same regulatory section.  *See Richey Manor v. Schweiker*, 684 F.2d 130, 135 (D.C. Cir. 1982) (rejecting regulatory interpretation that would "destroy the symmetry of the regulatory scheme by divorcing a step up in basis [upward revaluation] from depreciation recapture").

Finally, as the Goeller Letter indicates, statutory mergers do not contemplate an exchange of negotiated consideration; instead, the compensation for assets passing by merger is assumption of the merging entity's liabilities (A.R. 450; see also A.R. 344, 512).  It would be mere happenstance if the appraised fair market value of the merged entity's assets were equal to its known liabilities for which the surviving entity would become responsible.  Although the Via Christi court would require a consolidation to provide fair market value compensation for the assets passing to the consolidated entity, 509 F.3d at 1276, it offered no explanation as to how this would occur. Presbyterian could not have paid Carolina Medicorp additional consideration because Carolina Medicorp ceased to exist as a result of the transaction and any such payments to Carolina Medicorp would have passed to Presbyterian as part of the statutory merger.

       b.      Continuity of Control Can Not Serve As A Basis For Finding That The Statutory Merger Was Not A *Bona Fide* Sale

The Administrator's related party determination was based principally on post-transaction control over the surviving entity – not the relationship of the parties at the time they negotiated the terms of the transaction. Even if continuity of control did exist, it does not demonstrate that the merger was not an arm's-length transaction, as the Administrator asserted. The undisputed facts were that two independent entities negotiated and consummated the transaction (A.R. 447-48, 471).

       c.      A *Bona Fide* Sale Does Not Include Requirements Used To Deny The Carolina Medicorp Providers' Loss Claims

Assuming, arguendo, that a statutory merger must meet the requirements of a bona fide sale, then Carolina Medicorp's statutory merger did meet those requirements as they existed at the time of the transaction. In determining that the transaction was not a bona fide sale, the Secretary relied on the disparity between the asset values and the consideration received (A.R. 28-29). Any disparity is irrelevant, however, as to whether the transaction was a bona fide sale as that requirement had been applied prior to the transaction. As demonstrated below, the reasonable consideration standard used by the Administrator was not articulated until a definition of bona fide sale was added to the PRM in May 2000 (A.R. 9, 5262).[5]

The term "bona fide sale" commonly means a "sale made by a seller in good faith, for valuable consideration, and without notice of a defect in title or any other reason not to hold

---

[5] In *Robert F. Kennedy Med. Ctr. v. Leavitt,* 526 F.3d 557, 559 (9th Cir. 2008), the court incorrectly stated that the definition was added to the PRM in 1996. It is unclear whether the court was aware that it was applying the new definition retrospectively. There is also no indication that the court had the benefit of informal agency interpretations and testimony of prior agency officials that demonstrated that the Secretary's position was contrary to previous agency interpretations and regulatory intent.

the sale." BLACK'S LAW DICTIONARY 1337 (7th ed. 1999) (emphasis added) (A.R. 1055-56).

Intermediary Blue Cross Blue Shield Association has relied on this definition in Medicare

reimbursement disputes, finding it a "reliable and acceptable definition []." *See Edgecombe*

*Gen. Hosp. v. Blue Cross Blue Shield Ass'n*, PRRB Dec. No. 93-D87, [1993-2 Transfer

Binder] Medicare & Medicaid Guide (CCH) ¶ 41,704 at 37,400 (1993). This definition had

also been adopted substantially by the PRRB. *See Ashland Reg'l Med. Ctr. v. Blue Cross and*

*Blue Shield Ass'n*, PRRB Dec. No. 98-D32, [1998-1 Transfer Binder] Medicare & Medicaid

Guide (CCH) ¶ 46,109 at 57,585 (1998). When Medicare added the specific regulatory

provision for recognition of gains and losses from bona fide sales on January 19, 1979,

Medicare regulations addressing "establishment of cost basis on purchase of facility as

ongoing operation" permitted a purchaser of an existing facility to claim depreciation based

on the purchase price only if the sale was a bona fide sale and the price did not exceed fair

market value (A.R. 1753). If the agency believed that a bona fide sale required fair market

value compensation, the separate fair market requirement would have been superfluous.

The fact that HCFA had not articulated a reasonable consideration requirement prior

to the transaction is reflected in a memorandum dated January 11, 1989, in which the Acting

Director of HCFA's Bureau of Eligibility, Reimbursement and Coverage stated that "bona

fide sale" "means simply that the parties to the sale are not related . . ." (A.R. 1059).

Likewise, in its June 1997 report, issued the month before the merger occurred, the OIG

stated: "For the most part, a bona-fide sale would be defined as a sale between two unrelated

parties (frequently called 'arms-length transactions')" (A.R. 623). See also, Monsour Med.

Ctr., 806 F.2d at 1191 ("[w]ithout additional guidance from Congress or the relevant agency,

we thus feel constrained to assume – and reasonable in assuming – that a bona fide sale . . . is

one transacted between organizations that are not 'related' . . . .").

Prior to the 2000 PM, the PRRB and Administrator recognized losses incurred on asset sales routinely, even when the sales price was significantly less than the assets' appraised value and/or less than the value of monetary assets transferred as part of the transaction. See generally, Lake Med. Ctr., 243 F.3d at 569-71 (sustaining recognition of loss as determined by HCFA, even though sales price was $14.4 million and assets' appraised value was $17 million). This point was made quite explicitly in *Broadway Unit of Vallejo Gen. Hosp. v. Blue Cross & Blue Shield Ass'n*, HCFA Dep. Adm'r Dec., [1985 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 34,529 (1984), *aff'g*, PRRB Dec. No. 85-D11 (CCH) ¶ 34,435 (1984), where the appraised value of the facility was substantially higher than the sales price ($4.3 million vs. $3.1 million). Nevertheless, the Deputy Administrator found that the hospital sale "was bona fide, i.e., consummated between informed buyer and seller bargaining at arms-length," and stated that regulations addressing allocation of purchase price were not intended "to require an appraiser to document or impute a fair market value when they are set out in the contract. The sale price agreed upon by the parties is the real market value; further documentation is superfluous." ¶ 34,529 at 9581. The Deputy Administrator's decision was affirmed ultimately by the Court of Appeals. *Vallejo Gen. Hosp. v. Bowen*, 851 F.2d 229 (9th Cir. 1998).

In *Lac Qui Parle Hosp. of Madison, Inc. v. Blue Cross and Blue Shield Ass'n*, PRRB Dec. No. 95-D37, [1995-1 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 43,269 (1995), the PRRB held that there was a bona fide sale, and required recognition of the loss, where the seller accepted $330,000 for assets worth more than $1.1 million, including current assets exceeding $500,000. Similarly, in *Edgecombe Gen. Hosp.*, the PRRB upheld a loss claim where the provider sold a hospital that the intermediary claimed was worth approximately $7 million for $2.8 million dollars ($3.6 million dollars less $800,000

liabilities). *See also, Ashland Reg'l Med. Ctr.* (requiring recognition of loss where hospital and nursing facility with appraised value of $2.4 million and $500,000 receivables were sold for $100,000). The PRRB's decision became the Secretary's final decision in each of these matters. The Administrator's election not to review the PRRB's decisions, reflected his determination that they did not reflect an erroneous interpretation of law, regulation, or agency ruling. See 42 C.F.R. § 405.1875(c).

Testimony confirmed that these decisions were consistent with regulatory intent and administration of the Medicare Program – that assets' fair value was not relevant to whether a bona fide sale had occurred under the regulations and that the PRM definition of "bona fide sale" issued in May 2000 was "new policy," not clarification of previous policy (A.R. 367, 370, 377, 516). Mr. Yospe testified that HCFA had never expressed concern about the bona fides of a transaction or whether it reflected fair market value when a transaction resulted in a gain (A.R. 365, 383). In fact, in responding to a question regarding "requirements of the provisions related to fair market value and appraisals," the Intermediary's witness referred only to the regulatory requirement that consideration be assigned among assets sold based on each asset's relative fair market value (A.R. 403).

In short, the reasonable consideration requirement is nothing more than a late-arriving justification to deny losses on mergers and consolidations. In none of the authorities discussed above is there any mention of the reasonable compensation requirement that the Administrator would impose. In concluding that the Secretary only "further clarified" the definition of "bona fide sale in the 2000 PM," the Via Christi court ignored all previous agency interpretations that demonstrated that there had been no such requirement until the PRM was modified in May 2000.

Thus, the Carolina Medicorp statutory merger met bona fide sale requirements as they existed as of the transaction. As found by the PRRB, the statutory merger was a bona fide transaction as the regulatory preamble required (A.R. 227; see also A.R. 367, 449-50, 511). The parties were unrelated. The transaction was entered into in good faith, and good title to Carolina Medicorp's assets passed to Presbyterian (A.R. 447-50). As a result of assumption of its liabilities, Carolina Medicorp received valuable consideration of over $230 million (A.R. 41, 450, 1470). The transaction documents – negotiated by separate attorneys for each party – included provisions typically found in statutory mergers between unrelated parties dealing at arm's-length (A.R. 450-51). Accordingly, if, as the Administrator implies, a merger is a "sale," then this transaction was a "bona fide sale" as that term had been defined by the Secretary as of the date of the transaction.

> d.    The Record Does Not Demonstrate That Carolina Medicorp Received Unreasonable Compensation For Its Assets

The Administrator found that the statutory merger was not a bona fide sale based on a comparison of the consideration assigned to Carolina Medicorp's depreciable assets with their net book value and with their appraised value. The Administrator's determination was flawed in the following five respects:

1.    *The 2000 PM on which the Administrator relied does not provide for disallowance of a loss claim when substantial payments are received for fixed assets.* In the 2000 PM, HCFA recognized that in some situations, the consideration received for an entity's assets may be barely in excess of, or less than, the value of its current assets, as a result of which, there is minimal or no consideration assigned to the entity's fixed assets (A.R. 5388). The 2000 PM provided that, in that event, "a <u>bona</u> <u>fide</u> sale of those assets has not occurred" (Id.). The situation described in the 2000 PM is in stark contrast to the consideration received by Carolina Medicorp. Carolina Medicorp received compensation of approximately $230.6

million (liabilities assumed) for all its assets. Its current assets were worth approximately $19.2 million. Carolina Medicorp assigned more than $54 million compensation to its fixed assets (approximately $17.8 million to land and $36.7 million to depreciable assets) (A.R. 1470). Therefore, this is not a situation where minimal or no consideration was allocated to fixed assets, as in the situation addressed in the 2000 PM, or where the total consideration received was less than the current assets passing as a result of the transaction, as in *Via Christi* or "almost nothing" as in *RFK Med. Ctr.,* 526 F.3d at 563. Carolina Medicorp's compensation exceeded its cash and assets convertible to cash, the amount which the Intermediary's Director stated would be adequate under Medicare regulations (A.R. 413-14).

2. *The disparity between consideration assigned to depreciable assets and their book value on which the Administrator relies is meaningless.* Assets' book values do not reflect their fair market value (A.R. 344, 507). Compare PRM § 104.15 (Medicare definition of fair market value) with PRM § 104.23 (Medicare definition of net book value) (A.R. 5258, 5261). See also, PRM § 102 (Medicare depreciation based on "lesser of fair market value or the net book value" of the asset). A substantial disparity between depreciable assets' net book value and related consideration establishes only that there was a substantial gain or loss; it does not serve as a permissible basis for determining that compensation was unreasonable.

3. *The "alleged appraised value" (A.R. 29) against which the Administrator compared the consideration assigned to Carolina Medicorp's depreciable assets reflected the cost of reproducing the assets (A.R. 1179, 1184, 1268), which is not the same as their fair market value under Medicare regulations.* The Intermediary did not find that Carolina Medicorp received less than the fair market value of its assets (A.R. 413). The appraisal on which the Administrator relied was performed after the transaction for use in determining the gain or loss resulting from the transaction (A.R. 28-29, n.55, 1063, 1075). The appraisers

determined the assets' replacement cost rather than their fair market value under the income approach, the methodology used generally to value hospitals, because Carolina Medicorp merely leased the assets to Medicare providers (Carolina Medicorp's income did not reflect the results of their operation) and because a determination based on the cost of reproducing the facilities was the only valuation method that provided the discrete asset values that were necessary to allocate total consideration among all of Carolina Medicorp's assets, as necessary for each Carolina Medicorp Provider to determine its particular gain or loss (A.R. 1179-80, 1260, 1268). The appraiser's cost determination does not demonstrate that Carolina Medicorp's assets would have brought that amount on the open market. *See generally, Farmers Union Central Exchange v. Fed. Energy Regulatory Comm.*, 734 F.2d 1486, 1520 n. 68 (D.C. Cir. 1984) ("reproduction cost . . . has been called 'an economically meaningless application of up-to-date prices to out-of-date properties'").

Under Medicare regulations, reproduction cost and fair market value are distinctly different concepts. Regulations define "fair market value" at 42 C.F.R. § 413.134(b)(2) and define "current reproduction cost" at 42 C.F.R. § 413.134(b)(6). *See Kaiser Foundation Hosps./Hawaii Med. Ctr. v. Aetna Life Ins. Co.*, PRRB Dec. No. 94-D39, [1994-2 Transfer Binder] Medicare and Medicaid Guide (CCH) ¶ 42,406 (1994) (rejecting valuation made "on a 'Replacement Cost' value basis rather than FMV"). In fact, at the time of the transaction, Medicare regulations limited a hospital's cost basis to "the lower of current reproduction cost adjusted for straight-line depreciation or the fair market value of the asset . . . "42 C.F.R. § 413.134(b)(1)(i). See also PRM § 134 (permitting use of appraisals to determine fair market value or current reproduction costs). *See generally Tenet Health Sys. v. Thompson*, 254 F.3d 238 (D.C. Cir. 2001) (Court upholds PRRB's decision that appraisal reflected acceptable determination of hospital's fair market value, but not its depreciated reproduction cost);

*Hemstead General Hosp. v. Whalen*, 474 F. Supp. 398, 409, n.13 (E.D. N.Y. 1979) *aff'd* 622

F.2d 573 (2nd Cir. 1980) (no suggestion that sale not bona fide although "price is substantially

below replacement cost less depreciation").   See also (A.R. 667-77) (Loss recognized by

Medicare when entity received $7,213,582 for depreciable assets that had been valued at

$19,245,500 under cost approach).

   4. *Economic reasonableness of a statutory merger cannot be fairly evaluated*

*based on the merged entity's known liabilities reflected on its financial statements.*   While

under Medicare accounting principles, Carolina Medicorp received consideration of

approximately $230 million reflecting Presbyterian's assumption of its stated liabilities, under

state corporate laws Presbyterian became responsible for all of Carolina Medicorp's liabilities

and obligations, including those which were unknown, and which were not discoverable

through due diligence (A.R. 450).   The Administrator's failure to recognize the economic

consequences of state law that would make Novant responsible for any future claim that could

have otherwise been made against Carolina Medicorp (for example, an environmental claim)

makes his analysis incomplete and unsound.   See generally, Ashland Reg'l Med. Ctr. (in

evaluating purchase price adequacy, PRRB recognizes that purchaser paid cash plus agreed to

continue hospital's operation at anticipated loss, recognize existing labor unions, and assume

various leases, agreements and contracts).

   6. HCFA Failed To Explain Its Departure From Previous Agency Policy
    As Required, And The Administrator's Decision Was Otherwise
    Arbitrary And Capricious

   As discussed above, without any attempt to reconcile his position with previous

agency interpretations and decisions – the Administrator disallowed the Carolina Medicorp

Providers' loss on merger claims based on post-transaction control over the merger's

surviving entity and because the transaction did not satisfy criteria for bona fide sales.   The

policies set forth in the 2000 PM on which the Administrator relied were in sharp contrast to those that were in effect prior to the transaction and which had permitted Medicare to recoup millions of dollars of depreciation payments from hospitals upon their realization of gains from change of ownership transactions.

An agency may depart from its own policies and precedents only when it has provided a rational explanation for its departure. *Nat'l Fed'n of Fed. Employees v. Federal Labor Relations Auth.*, 412 F.3d 119, 124 (D.C. Cir. 2005) (agency must follow own precedent or provide reasoned explanation for departure); *N.Y. Cross Harbor R.R. v. Surface Transp. Bd.*, 324 F.3d 1177, 1181 (D.C. Cir. 2004) (reasoned analysis required for agency to change course); *Telecomms. Research and Action Ctr. v. Fed. Commc'ns Comm'n*, 800 F.2d 1181, 1184 (D.C. Cir. 1986) (agency that changes or departs from existing policies must articulate reasoned explanation for departure). *See also Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 79-87 (2nd Cir. 2006) (Medicare manual provision held unenforceable when Secretary failed to supply contemporaneous explanation for changed payment practices). This is the case even when the agency's previous articulation of policy would not constitute an "authoritative interpretation" that might be changed only after notice and comment. *See Kidd Commc'ns v. Fed. Commc'ns Comm'n*, 427 F.3d 1, 5-7, n. 4 (D.C. Cir. 2005).

Such a rational explanation for HCFA's change in policy is found in neither the 2000 PM nor the Administrator's decision; neither acknowledged any change in Medicare policy. In requiring recognition of the Carolina Medicorp Providers' losses, the PRRB relied on the MIM provisions addressing statutory mergers (A.R. 227). However, the Administrator made brief reference to the MIM provision only, and ignored its example requiring recognition of a gain or loss when the merging entities were unrelated *prior* to the transaction (A.R 19). The only attempt to reconcile HCFA current policy with contrary previous policy is the

Administrator's assertion that the Statutory Merger Regulation was written to address for-profit providers, and non-profit entities might enter into mergers or consolidations for different reasons (A.R. 16).[6]  However, since 1987, MIM § 4502.1C defined "corporation" as including both for-profit and non-profit entities (A.R. 361, 5220), and HCFA's previous interpretations in the Goeller Letter and the Booth Letter clearly addressed transactions involving non-profit corporations.   While these interpretations no longer served HCFA's financial interest once hospitals increasingly received less than Medicare net book value for their assets, there was no change in the underlying statute or regulations that would permit the same regulatory terms to be given a different meaning. The agency's failure to attempt to reconcile its new policy with previous policy requires reversal of the Administrator's decision.  *See INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1966) (irrational departure from prior policy, as opposed to avowed alteration, may be arbitrary and capricious); *Nat'l Fed'n*, 412 F.3d at 121 (agency acts arbitrarily and capriciously when it ignores relevant precedent).

>    7.    The Administrator's Determination Was Contrary To Statutory Provisions Fixing Medicare Recapture Policy As Of June 1, 1984 _____

DEFRA required Medicare to recapture depreciation under reimbursement policies in effect on June 1, 1984.  See 42 U.S.C. § 1395x(v)(1)(O); H.R. REP. NO. 98-861, at 1338 (1984) (Conf. Rep.), reprinted in 1984 U.S.C.C.A.N. 697, 2026.  See generally *Whitecliff, Inc. v. Shalala*, 20 F.3d 488, 489-90, n.1, 493-94 (D.C. Cir. 1994) (Congress endorsed Secretary's regulations requiring recognition of gain or loss based on comparison of sales price and asset's depreciated book value). *See Flowers Holdings Co. v. Leavitt*, No. 1:01-CV-1239-

---

[6] The Secretary bears a heavy burden in effectively requiring non-profit entities to satisfy additional requirements which for-profit entities are not required to satisfy.  *See generally Diplomat Lakewood, Inc. v. Harris*, 613 F.2d 1009 (D.C. Cir. 1979) (Regulations imposing different cost finding methods on nursing homes compared to hospitals and hospital-nursing home complexes, without support for distinction, were unlawful).  *See also Muwekma Ohlone Tribe v. Kempthorne*, 452 F. Supp. 2d 105, 115-21 (D.D.C. 2006).

WKW, 2008 WL 901189 (M.D. Ala. March 31, 2008) (DEFRA provision requiring Secretary to recapture depreciation in accordance with 1984 regulations prevails over general statutory language defining "reasonable cost" as cost actually incurred).

The Secretary has recognized that the 1984 statutory mandate applies to transactions resulting in both gains and losses. 57 Fed. Reg. 43,906, 43,907, 43,915 (Sept. 23, 1992). See Lake Med. Ctr., 243 F.3d at 570 ("Both parties agree that even though [DEFRA] refers only to 'recapture' it applies not only to transactions resulting in a gain but also a loss"). The policies on which the Administrator relied were contrary to those in effect on June 1, 1984, which required recognition of a gain or loss if the merging entities were unrelated parties at the time of their transaction (see A.R. 373, 517). Therefore, denial of the Carolina Medicorp Providers' loss claims violated the Medicare statute.

B.    The Administrator's Determination Reflected An Impermissible Retroactive Application Of A New Payment Standard

The Secretary is prohibited from changing substantive standards governing which costs could be reimbursed by Medicare after the costs were incurred. *Bowen v. Georgetown*, 488 U.S. 204, 209-16 (1988). *See generally Yale-New Haven Hosp.*, 470 F.3d at 87 n.16 (court will not require Secretary to make Medicare payments based on subsequently-published regulation). The APA prohibits an agency "from retroactively imposing an interpretive rule upon a regulated party." *Beazer East v. E.P.A.*, 963 F.2d 603 (3d Cir. 1992). *See also, Marrie v. Sec. & Exch. Comm'n*, 374 F.3d 1196, 1207 (D.C. Cir. 2004) (rule clarifying that good faith was insufficient defense to SEC administrative charge imposed new legal consequences and duties and could not be applied retroactively). *See generally, Caruso v. Blockbuster-Sony Music Entm't Ctr.*, 193 F.3d 730, 737 (3d Cir. 1999) (agency not allowed

to change legislative rule retroactively through disingenuous interpretation of rule to mean something other than original meaning).[7]

Because the Carolina Medicorp Providers' loss claims were reimbursable under the Medicare payment principles in effect at the time of the transaction, in denying the claims based on principles included in the 2000 PM, such a prohibited substantive change is precisely what occurred in this matter.  Indeed, because few, if any, non-profit entities that merged or consolidated could satisfy the agency's requirements, the Administrator effectively applied the regulation that eliminated recognition of gains and losses as of December 1, 1997 unlawfully to earlier transactions involving non-profit hospitals, including Carolina Medicorp's merger with Presbyterian.

> C.    The Administrator's Determination Was Contrary To Statutory Procedural Requirements
>
> 1.    APA And Medicare Requirements

Substantive rules, and statements of general policy or interpretations, of general applicability, which change existing law or policy require publication in the Federal Register before being given effect.  5 U.S.C. § 552(a)(1)(D).  Additionally, an agency rule must be subject to public notice and comment before issuance.  5 U.S.C. § 553(b), (c).  The Medicare statute also requires notice and comment rulemaking when a substantive legal standard governing Medicare payment is established or changed.  42 U.S.C. §§ 1395hh(a)(2), (b).  The

---

[7] The majority's dicta in *Health Ins. Ass'n of Am. v. Shalala,* 23 F.3d 412, 424-25 (D.C. Cir. 1994) permitting retroactive application of agency policies resulting from adjudicatory proceedings is not to the contrary.  HCFA's new interpretations of the Statutory Merger Regulation did not arise out of an adjudicatory proceeding.  The Administrator merely applied principles set forth in the 2000 PM to a particular statutory merger transaction.  Given the fact that, generally, the exclusive means for a Medicare provider to challenge HCFA's payment policy is through agency adjudication, *see Your Home Visiting Nurse Servs. v. Shalala,* 525 U.S. 449, 456 (1999), a contrary position would provide HCFA with virtually unfettered discretion to develop new  policy statements and to apply them retroactively.  *Cf. Shell Offshore Inc. v. Babbatt,* 238 F.3d 622, 627-28 (5th Cir. 2001) (requiring APA rulemaking when adjudication resulted from agency's previous policy change).

requirement applies to "any policy that had an effect . . . on the payment methodology or amount of payment for services . . ." H.R. REP. NO. 100-391, at 430 (1987), reprinted in 1987 U.S.C.C.A.N. 2313-1, 2313-250. Finally, the Medicare statute requires the Secretary to publish a list of all manual instructions, interpretative rules, statements of policy, and guidelines of general applicability in the Federal Register at least every three months. See 42 U.S.C. § 1395hh(c)(1).

Notwithstanding HCFA's characterization of the 2000 PM as a "clarification," it was not an interpretative rule exempt from APA notice and comment requirements, 5 U.S.C. § 553(b)(3)(A), because it added substantive context – new requirements before a loss on statutory merger would be recognized – it did not restate existing agency policy or clarify any ambiguous regulatory term. *See Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045-46 (D.C. Cir. 1987). *See generally, U.S. Telecom Assoc'n. v. Fed. Commc'ns Comm.*, 400 F.3d 29, 35 (D.C. Cir. 2005) (APA bars courts from permitting agencies to avoid rulemaking requirements "by calling a substantive regulatory change an interpretative rule").

Additionally, even if it might be characterized as interpretive, notice and comment was required because the 2000 PM changed the interpretation of the Medicare regulation addressing statutory mergers as reflected in the MIM and other HCFA guidance. *See Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813-14 (D.C. Cir. 2001). *See also Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2001) ("If a new agency policy represents a significant departure from long established and consistent practice that substantially affects the regulated industry, the new policy is a new substantive rule and the agency is obligated, under the APA, to submit the change for notice and comment"). Even standing alone, the MIM is sufficiently authoritative to require the Secretary to engage in rulemaking before a regulatory interpretation set forth therein can be changed. *See Paralyzed*

*Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579, 587 (D.C. Cir. 1997) (technical assistance manual would be sufficiently "authoritative"); *Ball Mem'l Hosp. v. Leavitt*, 2006 WL 2714920 (D.D.C. 2006) (Medicare Program Memorandum that changed informal regulatory interpretation reflected in CMS form held invalid based on agency's failure to comply with rulemaking requirements); *Iyengar v. Barnhart*, 233 F. Supp. 2d 5, 14 (D.D.C. 2002) (agency's change in regulatory interpretation included in operations manual required notice and comment).

Finally, the 2000 PM was an interpretative rule, a statement of policy, or guideline of general applicability, which was not included in a list of agency issuances published in the Federal Register as required on a timely basis.  See 42 U.S.C. § 1395hh(c)(1).   The 2000 Program Memorandum on which the Administrator's decision was based was issued on October 19, 2000.  However, it was not listed in the Federal Register until June 28, 2002.  67 Fed. Reg. 43,762, 43,784 (June 28, 2002).  Because the 2000 PM was not developed and published in accordance with statutory procedural requirements, the policies set forth therein cannot be used to deny the loss claims at issue.  *See Chippewa Dialysis Services v. Leavitt*, 511 F.3d 172 (D.C. Cir. 2007).

2.    The Small Business Regulatory Enforcement Fairness Act of 1996

The Small Business Regulatory Enforcement Fairness Act of 1996, otherwise known as the Congressional Review of Agency Rule Making Act ("CRA"), was enacted to provide a legislative check on administrative agency actions, particularly agency power to set policy.  5 U.S.C. § 801-808.  See generally Morton Rosenberg, Whatever Happened To Congressional Review of Agency Rulemaking?  A Brief Overview, Assessment, and Proposal for Reform, 51 ADMIN. L. REV. 1051, 1052-74 (1999).  Under CRA, "[b]efore a rule can take effect," the agency must submit a report to the Comptroller General and to Congress, including a copy of

the rule and related information.  5 U.S.C. § 801(a)(1).  *See Alameda County Med. Ctr. v. Leavitt*, No. 08-0422 (JR), 2008 U.S. Dist. LEXIS 40880, at *7-8 (D. D.C. May 23, 2008). Additionally, with limited exceptions, a "major rule" cannot be put into effect until sixty days after Congress' receipt of the report.  5 U.S.C. § 801(a)(3).  CRA defines "rule" by incorporating the APA definition, with limited exceptions.  5 U.S.C. § 804(3).  This includes virtually every statement that an agency may make.  *Avoyelles Sportsmen's League v. Marsh*, 715 F.2d 897, 908 (D.C. Cir. 1983).  The APA's broad definition of rule was selected because Congress recognized that various agencies circumvented APA procedural requirements by attempting to give legal effect to "general statements of policy, 'guidelines,' and agency policy and procedure manuals" that were exempt from those requirements. 142 CONG. REC. E571, E578 (daily ed. Apr. 19, 1996) (Explanatory Statement of House Sponsor).  Thus, CRA applies to "rules" that are otherwise exempt from APA publication or notice and comment requirements. 142 CONG. REC. E571, E578; see also 142 CONG. REC. S3683, S3687 (daily ed. Apr. 18, 1996) (Joint Explanatory Statement of Senate Sponsors).

A rule is considered "major" if the Office of Management and Budget  find that it results in an annual effect on the economy of $100 million or more.  5 U.S.C. § 804(2).  The Secretary's new rule in the 2000 PM requiring disallowance of losses on statutory mergers and consolidations based on continuity of control and bona fide sale requirements is a "rule" and "major rule" under CRA.   Because the Secretary failed to submit to Congress a copy of the rule, as CRA required, the rule never became effective, and its use to deny the Carolina Medicorp Providers' loss claims was impermissible.[8]

---

[8] As reflected in published administrative decisions, the $100 million threshold was clearly satisfied. *Iowa Luth. Hosp. v. BlueCross BlueShield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,629 (2006), *rev'g* PRRB Dec. No. 2007-D1, ¶ 81,616 (FYE 11/21/93; $5,400,000); *Cardinal Cushing Hosp. Goddard Mem'l Hosp. v. Blue Cross and Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 80,975 (2003), *rev'g* PRRB Dec. No. 2003-D6, ¶ 80,950 (FYE 09/30/94;

While the statute precludes judicial review of any related "determination, finding, action, or omission" under CRA, 5 U.S.C. § 805, a court may invalidate agency action based on a rule that the agency failed to submit. *See United States v. S. Indus. Gas & Elec. Co.*, No. IP 99-1692-C-M/S, 2002 WL 31427523 at 4 (S.D. Ind. Oct. 24, 2002) (unpublished). See also 142 CONG. REC. E577 ("The limitation on judicial review in no way prohibits a court from determining whether a rule is in effect . . . . [T]he committees expect that a court might recognize that a rule has no legal effect due to the operation of sections 801(a)(1)(A) or 801(a)(3)"); 142 CONG. REC. S3686 (recognizing court's authority to determine that legal rule was without legal effect based on non-compliance with CRA); Rosenberg at 1071-74.[9]

_____

$3,605,839) (consolidation); *St. Clare's Hosp. v. Blue Cross Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,262 (2004), *rev'g* PRRB Dec. No. 2004-D38, ¶ 81,191 (FY 09/30/94; $34,000,000) (consolidation); *St. Joseph Med. Ctr. v. Blue Cross Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,092 (2003), *rev'g* PRRB Dec. No. 2003-D64, ¶ 81,050 (FYE 9/30/95; $9,700,000) (consolidation); *AHS 96 Related Org. Costs-Group v. Blue Cross Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,083 (2003), *rev'g* PRRB Dec. No. 2003-D34, ¶ 81,020 (FYE 04/30/96; $107,319,029) (consolidation); *Robert F. Kennedy Med. Ctr. v. Blue Cross/Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,363 (2005), *rev'g* PRRB Dec. No. 2005-D9, ¶ 81,277 (FYE 05/30/96; $4,300,000); *Jeanes Hosp. v. Mutual of Omaha Ins. Co.*, CMS Adm'r Dec., CCH ¶ 81,094 (2003), *rev'g* PRRB Dec. No. 2003-D62, ¶ 81,048 (FYE 06/30/96; $16,338,246); *Sewickley Valley Hosp. and Med. Ctr. of Beaver v. BlueCross BlueShield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,727 (2007), *rev'g* PRRB Dec. No. 2007-D19, ¶ 81,693 (FYE 10/31/96; $26,314,000) (consolidation); *Meridian Hosp. Corp. v. Blue Cross Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,082 (2003), *rev'g* PRRB Dec. No. 2003-D35, ¶ 81,021 (FYE 12/31/96; $35,015,745 Medicare; $5,118,328, Medicaid) (consolidation); *Allentown Osteopathic Med. Ctr. v. BlueCrossBlueShield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,947 (2008), *rev'g* PRRB Dec. No. 2008-D15, ¶ 81,877 (FYE 12/31/96; $2,900,000); Univ. *of Pittsburgh Med. Ctr. v. BlueCross Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,546 (2006), *rev'g* PRRB Dec. No. 2006-D23, ¶ 81,529 (FY 02/28/97; $13,244,231); *Carolina Medicorp '97 Claimed Loss Disallowance Group v. Blue Cross and Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,796, *rev'g* PRRB Dec. No. 2007-D42, CCH ¶ 81,739 (2007) (FY 06/30/97; $11,062,753); *Germantown Hosp. and Med. Ctr. v. Mutual of Omaha Ins. Co.*, CMS Adm'r Dec., CCH ¶ 81,263 (2004), *rev'g* PRRB Dec. No. 2004-D36, ¶ 81,189 (FY 08/31/97; $4,800,000); *Mercy Ctr. for Health Care Svcs. v. BlueCrossBlueShield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,945 (2008), *aff'g* PRRB Dec. No. 2008-D18, ¶ 81,883 (FYE 11/30/97; $4,500,000). *See generally* 63 Fed. Reg. at 1381-82 (regulatory amendment eliminating gains and losses considered "major rule") (A.R. 2028-29)

[9] In reaching a contrary conclusion, the *Via Christi* court ignored the legislative history described above which is required to be afforded authoritative weight. *See North Haven Bd. of*

V.    <u>CONCLUSION</u>

Plaintiffs' Motion for Summary Judgment should be granted. This court should reverse the Administration's decision and require the Secretary to reimburse Plaintiffs for their losses as claimed, and award other relief prayed for in their complaint, including interest in accordance with 42 U.S.C. § 1395oo(f)(2).

Respectfully submitted,

_/s/_ *Harold Belkowitz*_____
Harold Belkowitz (D.C. Bar  449800)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005-3324
(202) 408-8400
Fax: (202) 408-0640
E-mail: hgbelkowitz@ober.com

OF COUNSEL:

Robert E. Mazer
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120

_____

*Educ. v. Bell,* 456 U.S. 512, 526-27 (1982) (remarks of sponsor of the [statutory language] . . . are an authoritative guide to the statute's construction").

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of August, 2008, I caused this document to

be filed in this Court's electronic filing system, and that the filing constituted service of the

document on the attorney listed below:

> Joel McElvain
> United States Department of Justice
> Civil Division, Federal Programs Branch
> Room 7130
> 20 Massachusetts Avenue, N.W.
> Washington, D. C. 20001

> /s/   *Harold Belkowitz*
> Harold Belkowitz

**ADDENDUM**

of Section 113(d)(1) of the Clean Air Act, 42 U.S.C. 7413(d)(1). The Order places the City of Independence Power and Light Department on a schedule to bring its Blue Valley Station, Units 1, 2, and 3 at Independence, Missouri into compliance as expeditiously as practicable with Missouri Air Quality Standards and Air Pollution Control Regulations for the Kansas City Metropolitan Area Regulation III (10 CSR 10-2.040), a part of the federally-approved Missouri State Implementation Plan. The Order also imposes interim requirements which meet Sections 113(d)(1)(C) and 113(d)(7) of the Act, and reporting requirements. The inclusion in the Order of emission monitoring requirements would be unreasonable. If the conditions of the Order are met, it will permit the City of Independence Power and Light Department to delay compliance with the SIP regulations covered by the Order until June 30, 1979. The company is unable to immediately comply with these regulations.

EPA has determined that the Order shall be effective upon publication of this notice because of the need to immediately place the City of Independence Power and Light Department on a schedule for compliance with the applicable requirement(s) of the Missouri State Implementation Plan.

(42 U.S.C. 7413(d), 7601)

Dated: January 26, 1979.

DOUGLAS M. COSTLE,
*Administrator.*

In consideration of the foregoing, Chapter I of Title 40 of the Code of Federal Regulations is amended as follows:

## PART 65—DELAYED COMPLIANCE ORDERS

1. By amending § 65.300 to read as follows:

§ 65.300  Federal delayed compliance orders issued under Section 113(d)(1), (3), and (4) of the Act.

* * * * *

| Source | Location | Order No. | Date of FR Proposal | SIP regulation involved | Final compliance date |
|---|---|---|---|---|---|
| City of Independence Power & Light Department. | Independence, Missouri. | VII-78-DCO-17... | Dec. 6, 1978... | Regulation III (10CSR10.2.040). | June 30, 1979 |

[FR Doc. 79-3917 Filed 2-2-79; 8:45 am]

[4110-35-M]

## Title 42—Public Health

## CHAPTER IV—HEALTH CARE FINANCING ADMINISTRATION, DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

### SUBCHAPTER B—MEDICARE PROGRAM

## PART 405—FEDERAL HEALTH INSURANCE FOR THE AGED AND DISABLED

**Subpart D—Principles of Reimbursement for Provider Costs and for Services by Hospital-Based Physicians**

EFFECT OF CAPITAL STOCK
TRANSACTIONS

AGENCY: Health Care Financing Administration (HCFA), HEW.

ACTION: Final rule.

SUMMARY: These final regulations clarify existing Medicare program

policy concerning certain effects of capital stock transactions. Specifically, these rules make clear that if a provider's capital stock is acquired, the provider's assets will not be revalued for purposes of computing depreciation, nor will interest expenses incurred in acquiring the stock be recognized as allowable costs. However, they do allow for assets to be revalued when there is a statutory merger or a consolidation between unrelated corporations. The intent is to ensure clarity and uniform interpretation of these policies.

DATE: Effective on February 5, 1979.

FOR FURTHER INFORMATION CONTACT:

William Goeller, Division of Provider Reimbursement and Accounting Policy Medicare Bureau, Room 405 East Building, Baltimore, Maryland 21235, (301) 594-9820.

SUPPLEMENTARY INFORMATION:

BACKGROUND

Since the inception of Medicare, it has been the policy of the program administrators that: (1) The acquisition

of a provider's capital stock is not in itself a basis for revaluation of the provider's assets for purposes of computing depreciation; (2) interest expenses incurred in acquiring such stock are not allowable costs; and (3) statutory mergers do not justify revaluation of assets. Although no single provision of the Medicare regulations explicitly set forth these policies, our position has been based on the interaction of three regulations: 42 CFR 405.415 concerning allowance for depreciation based on asset costs; 42 CFR 405.427, concerning cost related organizations, and 42 CFR 405.626(c), Concerning change of ownership. We continue to believe that our interpretation and application of these regulations are reasonable and consistent with our statutory mandate to determine the scope of reasonable costs for Medicare providers.

However, the Provider Reimbursement Review Board has not adopted the same view. In several decisions, the Board has considered provider stock transactions to be in substance a purchase of assets and has accordingly allowed revaluation for purposes of computing depreciation. The Commissioner of Social Security and the Administrator of the Health Care Financing Administration have reversed the Board's rulings. The issue is being litigated in various Federal courts. We, therefore, find it necessary to adopt these regulations. Our intent is not to change existing Medicare policy, but merely to state explicitly in the Code of Federal Regulations that which has been stated in the past in less formal settings. (See, for example, Health Care Financing Administration Ruling 78-33, MBR-1(11/78) at page 82; "Wolkstein Letter" of January 24, 1974.)

We have, therefore, amended regulatory provisions in § 405.415 by adding a new paragraph (l), entitled "Transactions involving provider's capital stock," and have amended § 405.419 to indicate that interest expense incurred as a result of transactions described in paragraph (l) are not allowable.

Paragraph (l) of § 405.415 now specifies Medicare treatment of provider capital stock acquisitions, statutory mergers, and consolidations, as they relate to revaluation of assets for purposes of computing depreciation. When the capital stock of a provider is acquired (even if 100% of that stock), the provider's assets may not be revalued. Since assets are properly revalued only if there has been a change of ownership, this rule follows from the basic principle of corporate law that a transfer of corporate stock does not constitute a change of ownership of the corporate assets. A corporation and its stockholders are distinct legal

HeinOnline -- 44 Fed. Reg. 6912 1979

entities, with title to the corporate property vested in the corporation itself, and not in the stockholders. Only if the assets are transferred by means of a bona fide transaction between unrelated parties would revaluation be proper. Medicare regulations are consistent with this view. 42 CFR 405.626(c) states that a transfer of corporate stock does not in itself constitute a change of ownership for purposes of terminating a provider agreement. The existing provider agreement continues in effect and we, therefore, see no valid reason to change the basis for determining Medicare reimbursement to the provider.

With regard to statutory mergers, the new paragraph (l) provides that if the merger is between unrelated parties, the assets of the merged corporation may be revalued. This rule differs from the rule for provider stock transactions because, while the acquisition of capital stock does not affect the legal status of the corporation, in a merger, the merged corporation ceases to exist as a corporate entity. In a merger, the surviving corporation does not become a mere stockholder of the merged corporation but takes over the merged corporation entirely. Since the merged corporation no longer exists, there has indeed been a transfer of ownership and revaluation is proper. Of course, the basis of the assets already owned by the surviving corporation would not be affected by the transaction. The assets of the merged corporation could be revalued regardless of whether the merged corporation was a provider before the merger. The regulation makes clear that if the merged corporation was a provider, it is subject to the provisions of § 405.415(d)(3) and (f) concerning recovery of accelerated depreciation and the realization of gains and losses.

If the statutory merger is between related parties, the rule provides that no revaluation of assets is permitted. This is consistent with § 405.427 which states that costs applicable to facilities furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider *at the cost to the related organization.* Thus, the assets of the merged corporation would be included in the allowable cost of the surviving corporation, but at the cost to the merged corporation, not at a revalued market price. In determining what is a related party, the criteria specified in § 405.427 will be used.

A particularly important example of this form of transaction is one in which one corporation purchases the capital stock of a second corporation and a statutory merger of the two corporations follows. No revaluation of

assets would be allowed. The two parts of the transaction must be viewed separately. In accordance with § 405.415(l)(1), revaluation is not allowed upon acquisition of a provider's stock. With regard to the second part of the transaction, under § 405.415(l)(2)(ii), revaluation is not allowed after statutory merger between related parties. (The parties would be related in that one corporation would be the sole shareholder of the other.)

This rule also provides that assets may be revalued if two or more unrelated corporations consolidate to form a new corporation, but revaluation is not allowed if related corporations consolidate. The reasoning underlying this distinction is the same as our reasons for adopting a like rule with regard to statutory mergers. The rule would apply only if at least one of the consolidating corporations was a provider and would apply only to the assets of those consolidating corporations that have been providers. Assets of non-provider corporations have never been valued for Medicare purposes, so "revaluation" would be impossible.

The rule also amends § 405.419(d) to provide that loans made to finance capital stock acquisitions, mergers, or consolidations for which revaluation of assets is not allowed under § 405.415(l) are not reasonably related to patient care and are not a basis for allowable interest costs.

The final rule does not differ in substance from the proposed rule published in the FEDERAL REGISTER on April 1, 1977 (42 FR 17485). However, we have made the following changes. The part of the rule that pertains to interest expense was transferred from § 405.415, which deals with depreciation, to § 405.419, which properly deals with interest expense. We have deleted that part of the proposed rule that stated, with reference to capital stock transactions, that any excess paid over the book value of the provider's assets may not be included in equity capital. The deleted portion did accurately reflect program policy and we are not changing that policy. However, since no goodwill at all is recognized, under any circumstances, for transactions occurring on or after August 1, 1970 (see 42 CFR 405.429(b)(2)), we do not consider it necessary at this date to adopt a regulation denying goodwill in a specific instance. For those transactions which occurred before August 1, 1970, the program policy of not recognizing goodwill in connection with provider stock transactions is still applicable. That policy, however, is effected through the Bureau's interpretation of regulations effective at that time, not through this regulation.

Clarifying nonsubstantive changes are made in section 405.415 (a), (b), (d), and (g). the date is indicated in each paragraph to eliminate the cross references to paragraph (h), which is vacated. Captions are provided in paragraph (g).

### DISCUSSION OF COMMENTS

Comments on the April 1, 1977 notice of proposed rulemaking were received from a few major provider chain organizations, from the major hospital organizations such as the American Hospital Association and the Federation of American Hospitals, and from a few Medicare intermediaries and independent accountants. None of the comments or recommendations was accepted. A summary of these comments and our responses follow:

1. *Postpone the final rule pending resolution of existing litigation.* This rule clarifies policy and is expected to minimize additional litigation. To postpone the effective date of the rule pending the resolution of existing litigation would unnecessarily extend the period of time during which providers would not have the benefit of this clarification of policy. We have no way of knowing when pending cases will be finally decided and we do not wish to postpone the effective date of this rule for an indeterminate, possibly lengthy, period of time.

2. *Make this policy prospective only.* This rule is effective on the date of publication. The rule itself will not be applied retroactively. However, the policy which this rule clarifies has always been Medicare policy, and we are not changing that policy. Thus, for transactions occurring before the effective date of this regulation, the policy will be based on our interpretation of three related sections of the Medicare regulations, i.e., 42 CFR 405.415, 405.427, and 405.626.

3. *The policy is contrary to generally accepted accounting principles, specifically Accounting Principles Board Opinion No. 16, which calls for the revaluation of assets pursuant to certain business combinations.* Generally accepted accounting principles are considered in the development of Medicare reimbursement policy, but are not the controlling factor. Medicare reimbursement regulations are based on and designed to implement title XVIII of the Social Security Act. The situations referred to in the comment typically involve the purchase of one corporation by another, followed some time later by a liquidation of the assets of the purchased corporation. In our view, the purposes of title XVIII are not served by allowing the purchasing corporation to revalue the assets and, thus, obtain a higher level of Medicare reimbursement. The increased expenditures charged to the

HeinOnline -- 44 Fed. Reg. 6913 1979

## RULES AND REGULATIONS

Medicare program in this instance do not appear to us to be necessary for the efficient delivery of needed health services.

4. *The Medicare program should recognize the substance of the transaction over form and allow revaluation of the assets based on the intent of the parties.* Substance is not being subordinated to form because this policy conforms with the legal principle that a corporation is considered an entity separate and apart from its owners (stockholders), and transactions involving the capital stock of a corporation generally have no bearing upon the operation or assets of the corporation. The assets are owned by the corporation and in turn the stockholders are not responsible for corporate liabilities.

Furthermore, the Medicare program reimburses only those costs related to the furnishing of care to Medicare patients. A transaction involving a provider's capital stock generally has no bearing on the operation of the provider and, therefore, for Medicare program purposes, is not related to patient care.

5. *The phrase "in itself" in § 405.626(c) indicates that there may be exceptions to the general rule that a purchase of stock does not give rise to a revaluation of assets.* Section 405.626(c) provides that a transfer of corporate stock would not, in itself, constitute a change of ownership. This means that a transaction that involves a transfer of stock does not, by virtue of that transfer, constitute a change of ownership. However, a transaction in which a transfer of stock is part of a larger arrangement (e.g., one including a transfer of assets) might constitute a change of ownership. In any case, with the adoption of this rule, reference need no longer be made to § 405.626 to determine Medicare treatment of provider stock transactions.

6. *The rule denies a reasonable rate of return on equity capital.* The rules as adopted concern only the revaluation of assets for purposes of computing depreciation and the recognition of interest expense. No mention is made of return on equity capital. However, these rules will necessarily affect the computation of equity capital, since § 405.429(b)(1)(ii) provides that in computing the amount of equity capital upon which a return is allowable, investment in facilities is recognized on the basis of historical cost, or other basis, used for depreciation and other purposes under the health insurance program. Strictly speaking, the rule affects only the determination of the total amount of equity capital upon which the return is based, not the rate of return itself. (See § 405.429(a)(1), which specifies how the rate itself is determined.) However-

er, we acknowledge that the limitation on revaluation will result in a lower valuation of the equity capital, and accordingly, a lower return. We consider this return to be reasonable since the assets in question have been valued at their full fair market value at the time of their original acquisition.

7. *The rule will discourage business combinations.* It is not clear what effect this rule will have on business combinations, although it is clear the rule will be one of a great number of considerations which businessmen will take into account when making professional judgments. Certainly the rule will not discourage statutory merger and consolidations between unrelated parties, since it allows the revaluation of assets for those transactions. If the rule does serve to discourage, to some extent, the purchase of a corporation through the acquisition of its stock, we consider this result to be a necessary consequence of our implementation of our mandate to reimburse only those costs which are reasonable, necessary, and related to patient care.

42 CFR Part 405 is amended as set forth below:

1. Section 405.415 is amended as follows:

a. Paragraph (a)(3)(ii) is amended by deleting the phrase "the date specified in paragraph (h) of this section" each time it appears and inserting the phrase "August 1, 1970."

b. Paragraph (b)(1) is amended by deleting the phrase "the date specified in paragraph (h) of this section" (lines 5 and 6) and inserting the phrase "July 31, 1970."

c. Paragraph (d)(2) is amended by deleting the phrase "the date specified in paragraph (h) of this section" (line 3) and the phrase "with the date specified in paragraph (h) of this section" (lines 13 and 14) and inserting in both places the phrase "August 1, 1970".

2. Section 405.415 is further amended by revising paragraph (g), vacating paragraph (h), and adding a new paragraph (l) to read as follows:

§ 405.415 Depreciation: Allowance for depreciation based on asset costs.

* * * * *

(g) *Establishment of cost basis on purchase of facility as an ongoing operation.*—(1) *Assets acquired after July 1, 1966 and before August 1, 1970.* The cost basis for the assets of a facility purchased as an ongoing operation after July 1, 1966, and before August 1, 1970, shall be the lowest of:

(i) The total price paid for the facility by the purchaser, as allocated to the individual assets of the facility; or

(ii) The total fair market value of the facility at the time of the sale, as allocated to the individual assets; or

(iii) The combined fair market value of the individually identified assets at the time of the sale.

(2) *Assets acquired after July 31, 1970.* For depreciable assets acquired after July 31, 1970, in addition to the limitations specified in paragraphs (g)(1) of this section, the cost basis of the depreciable assets shall not exceed the current reproduction cost depreciated on a straightline basis over the life of the assets to the time of the sale.

(3) *Transactions other than bona fide.* If the purchaser cannot demonstrate that the sale was bona fide, in addition to the limitations specified in paragraphs (g) (1) and (2) of this section, the purchaser's cost basis shall not exceed the seller's cost basis, less accumulated depreciation.

(h) [Reserved]

* * * * *

(l) *Transactions involving provider's capital stock.*—(1) *Acquisition of capital stock of a provider.* If the capital stock of a provider is acquired, the provider's assets may not be revalued. For example, if Corporation A purchases the capital stock of Corporation B, the provider, Corporation B continues to be the provider after the purchase and Corporation A is merely the stockholder. Corporation B's assets may not be revalued.

(2) *Statutory merger.* A statutory merger is a combination of two or more corporations under the corporation laws of the State, with one of the corporations surviving. The surviving corporation acquires the assets and liabilities of the merged corporation(s) by operation of State law. The effect of a statutory merger upon Medicare reimbursement is as follows:

(i) *Statutory merger between unrelated parties.* If the statutory merger is between two or more corporations which are unrelated (as specified in § 405.427), the assets of the merged corporation(s) acquired by the surviving corporation may be revalued in accordance with paragraph (g) of this section. If the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses. The basis of the assets owned by the surviving corporation are unaffected by the transaction. An example of this type of transaction is one in which Corporation A, a nonprovider, and Corporation B, the provider, are combined by a statutory merger, with Corporation A being the surviving corporation. In such a case the assets of Corporation B acquired by Corporation A may be revalued in accordance with paragraph (g) of this section.

HeinOnline -- 44 Fed. Reg. 6914 1979

6915

(ii) *Statutory merger between related parties.* If the statutory merger is between two or more related corporations (as specified in § 405.427), no revaluation of assets is permitted for those assets acquired by the surviving corporation. An example of this type of transaction is one in which Corporation A purchases the capital stock of Corporation B, the provider. Immediately after the acquisition of the capital stock of Corporation B, there is a statutory merger of Corporation B and Corporation A, with Corporation A being the surviving corporation. Under these circumstances, at the time of the merger the transaction is one between related parties and is not a basis for revaluation of the provider's assets.

(3) *Consolidation.* A consolidation is the combination of two or more corporations resulting in the creation of a new corporate entity. If at least one of the original corporations is a provider, the effect of a consolidation upon Medicare reimbursement for the provider is as follows:

(i) *Consolidation between unrelated parties.* If the consolidation is between two or more corporations which are unrelated (as specified in § 405.427), the assets of the provider corporation(s) may be revalued in accordance with paragraph (g) of this section.

(ii) *Consolidation between related parties.* If the consolidation is between two or more related corporations (as specified in § 405.427), no revaluation of provider assets is permitted.

3. Section 405.419 is amended by revising paragraph (d) to read as follows:

§ 405.419  Interest expense.

(a) *Principle.* Necessary and proper interest on both current and capital indebtedness is an allowable cost. However, interest cost incurred as a result of judicial review by a Federal court (as described in § 405.454(l)) is not an allowable cost.

(b) *Definitions.* * * *

(2) *Necessary.* Necessary requires that the interest be:

(i) Be incurred on a loan made to satisfy a financial need of the provider. Loans which result in excess funds or investments would not be considered necessary.

(ii) Be incurred on a loan made for a purpose reasonably related to patient care.

* * * * *

(d) *Loans not reasonably related to patient care.* (1) The following types of loans are not considered to be for a purpose reasonably related to patient care:

(i) For loans made to finance acquisition of a facility, that portion of the cost that exceeds:

(A) Historical cost as determined under § 405.415(b); or

(B) The cost basis determined under § 405.415(g); and

(ii) Loans made to finance capital stock acquisitions, mergers, or consolidations for which revaluation of assets is not allowed under § 405.415(l).

(2) In determining whether a loan was made for the purpose of acquiring a facility, we will apply any owner's investment or funds first to the tangible assets, then to the intangible assets other than goodwill and lastly to the goodwill. If the owner's investment or funds are not sufficient to cover the cost allowed for tangible assets, we will apply funds borrowed to finance the acquisition to the portion of the allowed cost of the tangible assets not covered by the owner's investment, then to the intangible assets other than goodwill, and lastly to the goodwill.

* * * * *

(Secs. 1102, 1814(b), 1833(a), 1861(v), and 1871 of the Social Security Act (42 U.S.C. 1302, 1395(b), 1395(a), 1395x(v) and 1395hh)).

(Catalog of Federal Domestic Assistance Program No. 13.773, Medicare—Hospital Insurance)

Dated: December 22, 1978.

LEONARD D. SCHAEFFER,
*Administrator, Health Care Financing Administration.*

Approved: January 28, 1979.

JOSEPH A. CALIFANO, JR.,
*Secretary.*

[FR Doc. 79-3911 Filed 2-2-79; 8:45 am]

[1505-01-M]

Title 49—Transportation

CHAPTER I—RESEARCH AND SPECIAL PROGRAMS ADMINISTRATION, MATERIALS TRANSPORTATION BUREAU, DEPARTMENT OF TRANSPORTATION

[Docket No. HM-22; Amdt. Nos. 171-43, 173-126]

PART 171—GENERAL INFORMATION, REGULATIONS, AND DEFINITIONS

PART 173—SHIPPERS—GENERAL REQUIREMENTS FOR SHIPMENTS AND PACKAGINGS

Matter Incorporated by Reference

*Correction*

In FR Doc. 79-1482 appearing at page 3707 in the issue of Thursday, January 18, 1979, in the first column of page 3708, under "Effective Date",

instead of the words "Upon publication in the FEDERAL REGISTER" insert the date "January 18, 1979".

———

[4910-59-M]

CHAPTER V—NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION

PART 571—FEDERAL MOTOR VEHICLE SAFETY STANDARDS

Corrections of Safety Standard No. 208 and Safety Standard No. 215

AGENCY: National Highway Traffic Safety Administration (NHTSA).

ACTION: Correction

SUMMARY: The purpose of this notice is to make several corrections to Safety Standard No. 208, *Occupant Crash Protection,* and Safety Standard No. 215, *Exterior Protection,* as they are currently codified in 49 Code of Federal Regulations at Part 571. The corrections include the additon of § 7.1.3 and its accompanying chart to Standard No. 208 and the addition of section headings for S7 of Standard No. 208 and S5.3 of Standard No. 215. These corrections were made in the May 9, 1972, issue of the FEDERAL REGISTER (37 FR 9322), but were never codified in subsequent publications of Title 49 of the Code of Federal Regulations.

DATES: These corrections are effective immediately.

FOR FURTHER INFORMATION CONTACT:

Hugh Oates, Office of Chief Counsel, National Highway Traffic Safety Administration, 400 Seventh Street, S.W., Washington, D.C. 20590, (202-426-2992).

In consideration of the foregoing, the following corrections are made to Safety Standard No. 208 (49 CFR 571.208) and Safety Standard No. 215 (49 CFR 571.215):

§ 571.208  [Amended]

1. In Safety Standard No. 208, the following heading is added between the end of the text of S6.4 and S7.1: "S7. *Seatbelt assembly requirements—passenger cars.*"

2. In Safety Standard No. 208, the following section and its accompanying chart are added following the text of S7.1.2: "S7.1.3. The weights and dimensions of the vehicle occupants specified in this standard are as follows:

HeinOnline -- 44 Fed. Reg. 6915 1979

6916                                        RULES AND REGULATIONS

| | 50th-percentile 6-year-old child | 5th-percentile adult female | 50th-percentile adult male | 95th-percentile adult male |
|---|---|---|---|---|
| Weight | 47.3 | 102 pounds | 164 pounds | 215 pounds. |
| Erect sitting height | 25.4 inches | 30.9 inches | 35.7 inches | 39 inches. |
| Hip breadth (sitting) | 8.4 inches | 12.8 inches | 14.5 inches | 16.5 inches. |
| Hip circumference (sitting) | 23.9 inches | 36.4 inches | 42 inches | 47.2 inches. |
| Waist circumference (sitting) | 20.8 inches | 23.6 inches | 33 inches | 42.5 inches. |
| Chest depth | | 7.5 inches | 9 inches | 10.5 inches. |
| Chest circumference: | | | | |
| (nipple) | | 30.5 inches | | |
| (upper) | | 29.8 inches | 37.7 inches | 44.5 inches. |
| (lower) | | 26.8 inches | | |

§ 571.215  [Amended]

3. In Safety Standard No. 215, the following heading is added between the text of S5.2.3 and S5.3.1: "S5.3. *Protective criteria.*"

(Secs. 103, 119, Pub. L. 89-563, 80 Stat. 718 (15 U.S.C. 1392, 1407); delegation of authority at 49 CFR 1.50).,

Issued on January 29, 1979.

JOAN CLAYBROOK,
*Administrator.*

[FR Doc. 79-3618 Filed 2-2-79; 8:45 am]

[7035-01-M]

CHAPTER X—INTERSTATE
COMMERCE COMMISSION

SUBCHAPTER A—GENERAL RULES AND
REGULATIONS

[Amendment No. 2 to Service Order No.
1340]

PART 1033—CAR SERVICE

Atlanta and West Point Rail Road
Co., Clinchfield Railroad Co., Georgia Railroad, Seaboard Coast Line
Railroad Co., and Western Railway
of Alabama To Deliver Locomotives
to Louisville and Nashville Railroad
Co.; Regulations for the Use of Locomotives

AGENCY: Interstate Commerce Commission.

ACTION: Emergency Order. Amendment No. 2 to Service Order No. 1340.

SUMMARY: On September 22, 1978, the Commission ordered the Seaboard Coast Line Railroad and other lines members of its system collectively to furnish 100 locomotives to the Louisville and Nashville Railroad Company, also a system railroad. Amendment No. 2 allows the LN to return fifty locomotives to the SCL subject to immediate return to the SCL should the LN in any week furnish less than forty percent of the cars ordered for coal

loading by its single-car shippers located in Eastern Kentucky and Eastern Tennessee. The order is printed in full in Volume 43 of the FEDERAL REGISTER at page 44536. Amendment No. 2 of the order extends the expiration date of the order until April 30, 1979.

DATE: Expires 11:59 p.m., April 30, 1979.

FOR FURTHER INFORMATION CONTACT:

Charles C. Robinson, Chief, Utilization and Distribution Branch, Interstate Commerce Commission, Washington, D.C. 20423, Telephone (202) 275-7840, Telex 89-2742.

SUPPLEMENTAL INFORMATION:

Decided January 30, 1979.

Upon further consideration of Service Order No. 1340 (43 FR 44536, 44606; 44 FR 874 and 3717), and good cause appearing therefor:

On August 3, 1979, the Commission entered an order requiring the six railroads named above (collectively known as the Family Lines), all of which are owned or controlled by the Seaboard Coast Line Railroad Company (SCL), to show cause why the Commission should not issue two proposed service orders. One proposed service order, entitled *Regulations For The Use Of Locomotives*, would have ordered the other five members of the Family Lines collectively to deliver 100 locomotives to the Louisville and Nashville Railroad Company (LN). The other proposed service order, entitled *Regulations For The Distribution Of Hopper Cars*, would have ordered the LN to supply weekly each coal mine ordering cars for single-car or non-unit-train shipments a minumum of forty percent of its daily mine rating multiplied by the number of working days in the week. The order to show cause was entered as a result of the Commission's conclusion that an acute shortage of locomotives and hopper cars for transporting single-car shipments or coal originating at stations on the LN in Eastern Kentucky existed.

Numerous responses to the show cause order were filed by the Family Lines, by producers and receivers of coal and other commodities, and by

public officials in the States served by the Family Lines. The Commission held oral argument on the show cause order on September 7, 1978.

In a decision served September 22, 1978, the Commission ordered that the proposed service order entitled *Regulations For The Use Of Locomotives* be issued in modified form. The Commission deferred issuance of the proposed service order entitled *Regulations For The Distribution Of Hopper Cars.*

On October 11, 1978, the Commission denied an appeal of the Family Lines railroads seeking a stay of the order.

A subsequent appeal of the Family Lines seeking revocation of the order and of Tesoro Coal seeking broadening of the reporting requirements imposed upon the Family Lines by the order were denied on December 27, 1978. In that order the Commission stated that it would accept additional pleadings at any time up to ten days prior to the January 15, 1979, expiration date of the order.

Five such pleadings have been received. However, because of holiday delays in the distribution of the order dated December 27, 1978, and in the publication of that order in the FEDERAL REGISTER (Publication in the FEDERAL REGISTER was not accomplished until the issue date January 3, 1979), all petitions in this proceeding received in the Commission's offices on or before January 10, 1979, will be accepted.

To provide sufficient time to evaluate the varied opinions expressed in these petitions the Commission, on January 12, 1979, ordered a brief extension until January 31, 1979, of Service Order No. 1340.

The Family Lines request that Service Order No. 1340 either be vacated or allowed to expire. A similar request is made by The Fertilizer Institute (TFI). Tesoro Coal Company requests the extension of Service Order No. 1340. A group of petitioners comprising both of Kentucky's United States Senators, its two Congressmen from Eastern Kentucky, the governor of the Commonwealth of Kentucky and the Hazard and Harlan Coal Operators Association, hereafter described as the joint petitioners, seek both extension and modifications of the order.

In its pleading, the Family Lines stated that the fifty locomotive units which the parent SCL has leased from the Southern Pacific Transportation Company (SP) and sub-leased to LN will remain on LN through March 1979, by which time LN will have received approximately forty of seventy new locomotives scheduled to be delivered by the builders during February, March and April. LN argues that it can return fifty locomotives to SCL during the month of January and Feb-

HeinOnline -- 44 Fed. Reg. 6916 1979

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FORSYTH MEMORIAL HOSPITAL, INC., *et al.*  *

        Plaintiffs,      *

      v.         *  CASE NO.:  1:07-CV-1828-RBW

MICHAEL O. LEAVITT, as Secretary of   *
Health and Human Services,

                *

        Defendant.     *

        *  *  *  *  *  *  *

[PROPOSED] ORDER

    Upon consideration of the parties' contentions, it is hereby

    ORDERED that:

    1.  The Plaintiffs' Motion for Summary Judgment is granted, and that the

Defendant's Motion for Summary Judgment is denied;

    2.  The decision of the Secretary is reversed and set aside;

    3.  The case is remanded to the Secretary with direction that Plaintiffs be paid the

following amounts for the losses incurred on its statutory merger:

        Forsyth Memorial Hospital, Inc.    $9,629,765

        Memorial Park Hospital, Inc.    $ 900,235

        Foundation Health Systems Corp.   $ 430,067

    4.  The Plaintiffs receive interest on the amount in controversy, as provided by 42

U.S.C. § 1395oo(f)(2);

    5.  The costs of this suit incurred by Plaintiffs shall be reimbursed by the

Secretary; and

6.      The Plaintiffs receive such other and further relief as the Court may deem just and proper under the circumstances.


Dated:_____, 2008

_____
Reggie B. Walton
United States District Judge