IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FORSYTH MEMORIAL HOSPITAL, INC., *et al.*    *

     Plaintiffs,    *

     v.    *    CASE NO.:  1:07-CV-1828-RBW

MICHAEL O. LEAVITT, as Secretary of    *
Health and Human Services,

          *

     Defendant.    *

          *

  *  *  *  *  *  *  *

STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE

  Plaintiffs, Forsyth Memorial Hospital, Inc., Medical Park Hospital, Inc. and Foundation Health Systems Corp. d/b/a The Oaks at Forsyth and as successor in interest to Carolina Medicorp Enterprise, Inc. d/b/a Edwin H. Martinat Outpatient Rehabilitation Center, hereby file this statement of material facts as to which there is no genuine issue.

PARTIES

  1. During the relevant time period, Forsyth Memorial Hospital, Inc. ("Forsyth Memorial Hospital") was a non-profit hospital located in Winston-Salem, North Carolina. Forsyth Memorial Hospital was certified as a "provider of services" participating in the Medicare Program within the meaning of 42 U.S.C. § 1395x(u).  Answer to Amended Complaint ("Answer") ¶ 1. (Administrative Record ("A.R.") 221).

  2. During the relevant time period, Medical Park Hospital, Inc. ("Medical Park Hospital") was a non-profit hospital located in Winston-Salem, North Carolina.  Medical Park Hospital was certified as a "provider of services" participating in the Medicare Program within the meaning of 42 U.S.C. § 1395x(u).  Answer ¶ 2 (A.R. 221).

3.      During the relevant time period, Foundation Health Systems Corp d/b/a The Oaks at Forsyth ("Oaks at Forsyth"), was a non-profit skilled nursing facility located in Winston-Salem, North Carolina.  Oaks at Forsyth was certified as a "provider of services" participating in the Medicare Program within the meaning of 42 U.S.C. § 1395x(u).  Answer ¶ 3 (A.R. 221).

4.      During the relevant time period, Carolina Medicorp Enterprises, d/b/a Edwin H. Martinat Outpatient Rehabilitation Center ("Martinat") was a non-profit comprehensive outpatient rehabilitation facility located in Winston-Salem, North Carolina.  Martinat was certified as a "provider of services" participating in the Medicare Program within the meaning of 42 U.S.C. § 1395x(u); Answer ¶ 4 (A.R. 221).  Foundation Health Systems Corp. is the successor in interest to Carolina Medicorp Enterprises.  Answer ¶ 4.

5.      Effective January 1, 2001, assets and liabilities of Martinat were transferred to Foundation Health Systems Corp.  Foundation Health Systems Corp. became the successor in interest to Martinat's Medicare claim.  Answer ¶ 31.

<u>ARRANGEMENTS PRIOR TO STATUTORY MERGER</u>

6.      Prior to the statutory merger described in paragraphs 16-19 ("Statutory Merger"), Forsyth Memorial Hospital, Medical Park Hospital, Oaks at Forsyth and Martinat (collectively, Carolina Medicorp Providers") were subject to the control of Carolina Medicorp, Inc. ("Carolina Medicorp").  Answer ¶ 25  (A.R. 23, 441-43, 461-64, 902-09, 922-29, 931-36, 941-42).

7.      Prior to the Statutory Merger, Carolina Medicorp and the Carolina Medicorp health system of which the Carolina Medicorp Providers were a part were subject to the control of the Forsyth County Board of County Commissioners ("County Commissioners").  Answer ¶ 25 (A.R. 23, 222, 441-44, 457, 460, 467-68, 483, 889-93).

8.      Prior to the Statutory Merger, Carolina Medicorp was not subject to the control of the four (of nineteen) board members who subsequently became members of Novant's governing

board (*see* paragraph 33) individually or collectively (A.R. 366-67, 451-52, 480, 516, 1031, 2232).

9.    Prior to the Statutory Merger, Carolina Medicorp was not subject to the control of its executive officers and senior management (A.R. 453, 471, 479).

10.    Prior to the Statutory Merger, Carolina Medicorp owned the land, buildings and fixed equipment that was used by the Carolina Medicorp Providers to provide health care services pursuant to lease arrangements.  Answer ¶ 26 (A.R. 23-24, 221, 444, 446, 454-55).

11.    Prior to the Statutory Merger, each Carolina Medicorp Provider received reimbursement for depreciation costs related to Carolina Medicorp's depreciable assets that the particular Carolina Medicorp Provider used to furnish services to Medicare patients in accordance with Medicare related party principles (A.R. 222, 360, 491-92, 497-98, 503, 506).

12.    Prior to the Statutory Merger, Presbyterian Health Services Corporation ("Presbyterian") served as the "parent" corporation for a health care delivery system that included hospitals and a long-term care facility (A.R. 221, 446-47, 476).

13.    Prior to the Statutory Merger, Presbyterian and Carolina Medicorp were independent entities that had separate governing boards, and were not subject to common control or common ownership (A.R. 25, 221, 447, 451, 471, 476).

14.    Prior to the Statutory Merger, Carolina Medicorp and Presbyterian created Novant Management (A.R. 24; *see* A.R. 355-58, 387-88).

15.    Creation of Novant Management did not result in common control or ownership over Carolina Medicorp and Presbyterian (A.R. 455-56, 486-86).


STATUTORY MERGER

16.    Effective July 1, 1997, Carolina Medicorp statutorily merged into Presbyterian

(A.R. 25, 221, 448-49, 451; *see* A.R. 692-731, 1688-1700, 3666-80).

17.    The Statutory Merger was a statutory merger under North Carolina law, and was between Carolina Medicorp and Presbyterian.  Answer ¶ 28.  (A.R. 25, 221, 399, 405, 411-12, 427-28, 433, 451, 465-66, 448-496).

18.    As a result of the Statutory Merger, and pursuant to state law (i) Carolina Medicorp, the merged entity, ceased to exist; (ii) Presbyterian assumed Carolina Medicorp's liabilities; and (iii) Presbyterian obtained good title to all of Carolina Medicorp's assets, including the buildings and other real property used by the Carolina Medicorp Providers. Answer ¶ 28 (A.R. 25, 221-22, 405, 445-50, 453, 462, 697).

19.    As a result of the Statutory Merger, Carolina Medicorp's leases with the Carolina Medicorp Providers transferred to Presbyterian.  Answer ¶ 28 (A.R. 25, 422, 446).

20.    The Statutory Merger was a *bona fide* transaction entered into by the parties in good faith (A.R. 227; *see also* A.R. 367, 449-50, 511).

21.    The Statutory Merger transaction documents were negotiated by separate attorneys for each party and included provisions typically found in documents for statutory mergers between unrelated parties dealing at arm's-length (A.R. 450-51).

22.    As a result of the Statutory Merger, Presbyterian assumed liabilities of Carolina Medicorp in excess of $230 million (A.R. 28, 41, 450, 1470).

23.    As a result of the Statutory Merger, under state corporate law, Presbyterian became responsible for all of Carolina Medicorp's liabilities and obligations, including those which were unknown, and which were not discoverable through due diligence (A.R. 450).

24.    Presbyterian could not have paid Carolina Medicorp additional consideration for Carolina Medicorp's assets as part of the Statutory Merger because Carolina Medicorp ceased to exist as a result of the Statutory Merger and because any such payments to Carolina Medicorp

would pass to Presbyterian along with Carolina Medicorp's other assets (A.R. 25, 405, 445, 449-50, 453, 697, 699, 1689, 1691).

25.    The Intermediary did not find that, as a result of the Statutory Merger, Carolina Medicorp received less than the fair market value of its assets (A.R. 413).

26.    Upon completion of the Statutory Merger, Presbyterian became known as Novant Health, Inc. ("Novant").  Answer ¶ 29 (A.R. 25, 449, 722, 728).

27.    An appraisal was performed after the Statutory Merger for use in determining each Carolina Medicorp Provider's gain or loss resulting from the transaction (A.R. 28-29, n.55, 1063, 1075).

28.    The "appraised value" of Carolina Medicorp's depreciable assets reflected the cost of reproducing the assets (A.R. 1179, 1184, 1268).

29.    The appraisers relied on the assets' replacement cost because Carolina Medicorp did not operate the assets as health care facilities (and its income did not reflect the results of their operation) and because a determination based on the cost of reproducing the facilities was the only valuation method that provided the discrete asset values that were necessary for each Carolina Medicorp Provider to determine its particular gain or loss (A.R. 1179-80, 1260, 1268).

<u>SUBSEQUENT TO STATUTORY MERGER</u>

30.    After the Statutory Merger, Novant controlled each Carolina Medicorp Provider (A.R. 222, 452-53, 462, 930-44, 1001-1006, 1020-29).

31.    After the Statutory Merger, Novant was controlled by its nine-person governing board (A.R. 450-52).

32.    After the Statutory Merger, Novant was not subject to the control of its executive officers and senior management (A.R. 453, 471, 479).

33.     Novant's governng board included four former members of Carolina Medicorp's nineteen-person governing board (A.R. 451-52, 480, 1031).

34.     There is no evidence that any of these four individuals might direct any other board member, or that the four individuals would act in a unified manner as members of Novant's governing board (A.R. 452, 480).

35.     After the Statutory Merger, Novant was not subject to the control of the County Commissioners (A.R. 464-65).

<u>MEDICARE LOSS CLAIMS</u>

36.     Each Carolina Medicorp Provider claimed a loss on statutory merger on its Medicare cost report for the cost year ending June 30, 1997 (A.R. 26, 222, 493-94).

37.     Carolina Medicorp assigned more than $54 million of the compensation that it received as a result of the Statutory Merger to its fixed assets, including approximately $17.8 million to its land and $36.7 million to its depreciable assets (A.R. 29, 1470).

38.     Each Carolina Medicorp Provider's loss claim reflected the portion of Carolina Medicorp's loss that related to depreciable assets that the particular Carolina Medicorp Provider had used and for which Medicare had previously reimbursed the Carolina Medicorp Provider depreciation costs (A.R. 26, 222, 493-94).

39.     The aggregate Medicare loss claim was approximately $11 million (A.R. 222, 1461, 1464, 1466-67).

40.     The Medicare fiscal intermediary ("Intermediary") disallowed the Carolina Medicorp Providers' loss claims asserting that the Statutory Merger was not a change of ownership for Medicare certification purposes (A.R. 222, 384-85, 408).

41.     The Carolina Medicorp Providers timely appealed the Intermediary's determination to the Provider Reimbursement Review Board ("PRRB") (A.R. 5502-5504, 5604-5606).

42.     On June 15, 2007, the PRRB reversed the Intermediary's determination, and required payment of the Carolina Medicorp Providers' losses (A.R. 219-29).

43.     On August 10, 2007 the Administrator of the Centers for Medicare and Medicaid Services, formerly known as the Health Care Financing Administration ("HCFA"), reversed the PRRB's decision and disallowed the loss claims (A.R. 2-31).

APPLICATION OF MEDICARE REGULATIONS

44.     From the start of Medicare until the early 1990s, hospitals frequently realized gains when they were sold, merged, or consolidated, and the Medicare program routinely recovered depreciation payments as a result of such transactions (A.R. 368, 383). *See, e.g., St. Mark's Charities Liquidating Trust v. Shalala,* 141 F.3d 978 (10th Cir. 1998).

45.     Starting in the 1990s, hospitals begin receiving less than net book value for their assets as part of change of ownership ("CHOW") transactions, resulting in frequent Medicare claims for losses (A.R. 628-30).

46.     As of the date of the Statutory Merger, HCFA had never determined that a statutory merger transaction was between related parties based on a comparison of control over the merged entity prior to the transaction and control of the surviving entity after the transaction (A.R. 347, 361-63, 370, 511-14, 517).

47.     As of the date of the Statutory Merger, HCFA had never required statutory mergers to comply with *bona fide* sale requirements. (A.R. 341, 346, 367, 370, 373, 733-34, 1849).

48.   On October 19, 2000, HCFA issued a Program Memorandum requiring disallowance of loss claims resulting from mergers and consolidations involving non-profit providers (A.R. 5386).

49.   The Program Memorandum resulted in an annual effect on the economy of $100 million or more. *Iowa Luth. Hosp. v. BlueCross BlueShield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,629 (2006), *rev'g* PRRB Dec. No. 2007-D1, CCH ¶ 81,616 (FYE 11/21/93; $5,400,000); *Cardinal Cushing Hosp. Goddard Mem'l Hosp. v. Blue Cross and Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 80,975 (2003), *rev'g* PRRB Dec. No. 2003-D6, CCH ¶ 80,950 (FYE 09/30/94; $3,605,839) (consolidation); *St. Clare's Hosp. (Dover) v. Blue Cross Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,262 (2004), *rev'g* PRRB Dec. No. 2004-D38, CCH ¶ 81,191 (FY 09/30/94; $34,000,000) (consolidation); *St. Joseph Med. Ctr. v. Blue Cross Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,092 (2003), *rev'g* PRRB Dec. No. 2003-D64, CCH ¶ 81,050 (FYE 9/30/95; $9,700,000) (consolidation); *AHS 96 Related Org. Costs-Group v. Blue Cross Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,083 (2003), *rev'g* PRRB Dec. No. 2003-D34, CCH ¶ 81,020 (FYE 04/30/96; $107,319,029) (consolidation); *Robert F. Kennedy Med. Ctr. v. Blue Cross/Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,363 (2005), *rev'g* PRRB Dec. No. 2005-D9, CCH ¶ 81,277 (FYE 05/30/96; $4,300,000); *Jeanes Hosp. v. Mutual of Omaha Ins. Co.*, CMS Adm'r Dec., CCH ¶ 81,094 (2003), *rev'g* PRRB Dec. No. 2003-D62, CCH ¶ 81,048 (FYE 06/30/96; $16,338,246); *Sewickley Valley Hosp. and Med. Ctr. of Beaver v. BlueCross BlueShield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,727 (2007), *rev'g* PRRB Dec. No. 2007-D19, CCH ¶ 81,693 (FYE 10/31/96; $26,314,000) (consolidation); *Meridian Hosp. Corp. v. Blue Cross Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,082 (2003), *rev'g* PRRB Dec. No. 2003-D35, CCH ¶ 81,021 (FYE 12/31/96; $35,015,745 Medicare; $5,118,328, Medicaid) (consolidation); *Allentown Osteopathic Med. Ctr. v. BlueCrossBlueShield Ass'n*, CMS Adm'r

Dec., CCH ¶ 81,947 (2008), *rev'g* PRRB Dec. No. 2008-D15, ¶ 81,877 (FYE 12/31/96; $2,900,000); *Univ. of Pittsburgh Med. Ctr. – St. Margaret Hosp. v. BlueCross Blue Shield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,546 (2006), *rev'g* PRRB Dec. No. 2006-D23, CCH ¶ 81,529 (FY 02/28/97; $13,244,231); *Carolina Medicorp '97 Claimed Loss Disallowance Group v. Blue Cross and Blue Shield Ass'n – N.C.*, PRRB Dec. No. 2007-D42, CCH ¶ 81,739 (2007) (FY 06/30/97; $11,062,753) (action here at issue); *Germantown Hosp. and Med. Ctr. v. Mutual of Omaha Ins. Co.*, CMS Adm'r Dec., CCH ¶ 81,263 (2004), *rev'g* PRRB Dec. No. 2004-D36, CCH ¶ 81,189 (FY 08/31/97; $4,800,000); *Mercy Ctr. for Health Care Svcs. v. BlueCrossBlueShield Ass'n*, CMS Adm'r Dec., CCH ¶ 81,945 (2008), *aff'g* PRRB Dec. No. 2008-D18, ¶ 81,883 (FYE 11/30/97; $4,500,000). *See generally* 63 Fed. Reg. at 1381-82 (regulatory amendment eliminating gains and losses considered "major rule") (A.R. 2028-29)

50.    Notice of the proposed terms of the Program Memorandum were not published in the Federal Register prior to issuance of the Program Memorandum.  The final terms of the Program Memorandum have never been published in the Federal Register.

51.    The Program Memorandum was not submitted to Congress on or before the date on which it was issued.

52.    The Program Memorandum was listed in the Federal Register on June 28, 2002, more than one year after it was issued.  67 Fed. Reg. 43,762, 43,784 (June 28, 2002).

Respectfully submitted,

/s/   *Harold Belkowitz*_____
Harold Belkowitz (D.C. Bar #449800)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005-3324
(202) 408-8400
Fax: (202) 408-0640
E-mail: hgbelkowitz@ober.com

OF COUNSEL:

Robert E. Mazer
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 8th day of August, 2008, I caused this document to be filed in this Court's electronic filing system, and that the filing constituted service of the document on the attorney listed below:

Joel McElvain
United States Department of Justice
Civil Division, Federal Programs Branch
Room 7130
20 Massachusetts Avenue, N.W.
Washington, D. C. 20001

____/s/___*Harold Belkowitz*_____
Harold Belkowitz