**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| FORSYTH MEMORIAL HOSPITAL INC., et al. | : : : | |
| v. | : : | |
| KATHLEEN SEBELIUS, as Secretary of Health and Human Services | : : : | Civil Action No. CCB-07-1828 |

...o0o...

**<u>MEMORANDUM</u>**

Now pending before the court are cross motions for summary judgment. Plaintiffs

Forsyth Memorial Hospital, Inc. ("Forsyth"), Medical Park Hospital, Inc., and Foundation Health

Systems, Corp. d/b/a The Oaks at Forsyth and as successor in interest to Carolina Medicorp

Enterprises, Inc. d/b/a Edwin H. Martinat Outpatient Rehabilitation Center (collectively

"plaintiffs") have sued Kathleen Sebelius, as Secretary of Health and Human Services

("Secretary"), seeking reimbursement for the alleged loss that occurred on their depreciable

assets upon merging into Presbyterian Health Services Corporation ("Presbyterian"). The issues

in this case have been fully briefed and no oral argument is necessary.  For the reasons stated

below, the Secretary's motion will be granted and the plaintiffs' motion will be denied.

**<u>BACKGROUND</u>**

Prior to the merger, plaintiffs, all non-profit medical facilities, were certified as Medicare

"providers of services" under 42 U.S.C. § 1395x(u). Carolina Medicorp, Inc. ("CMI") controlled

each of the plaintiffs at this time, owning title to all of the providers' land, buildings, and land

improvements and fixed equipment, which the providers leased from CMI. Each of the plaintiffs

owned its own movable equipment. When CMI was created in 1983 to take title to Forsyth's

assets from the Forsyth County Government, the Forsyth County Board of Commissioners

("Commissioners") placed certain restrictions on CMI. The Commissioners were to retain final

control over Forsyth and would be allowed to appoint 12 of 19 members on CMI's board of

trustees. Furthermore, CMI had to maintain Forsyth as a community hospital in which no county

resident would be turned away for lack of ability to pay.

After negotiations that began in December 1996, CMI and Presbyterian merged on June

30, 1997, using Novant Health Management Company, LLC ("Novant") as a vehicle for the

merger. Novant later dissolved on December 31, 1998. Because of CMI's special relationship

with Forsyth County, it had to seek the Commissioners' approval before merging into

Presbyterian. The Commissioners conditioned their consent on receiving one position on

Novant's governing board, retaining their majority rights on Forsyth's governing board, being

assured Forsyth would remain a community hospital, and on CMI contributing $10 million, to be

managed by the Commissioners, for improving health care in Forsyth County. CMI complied,

and the Commissioners allowed the merger to proceed.

Through the merger, Presbyterian received all of CMI's assets in exchange for assuming

its liabilities. At the time, CMI's liabilities totaled approximately $230 million. Medicare had

valued the assets at approximately $399 million, of which $122 million consisted of depreciable

assets and $17 million was attributed to the land. Neither CMI nor Presbyterian conducted an

independent appraisal of CMI's assets prior to the merger. In addition, the plaintiffs never placed

their assets for sale in the open market. According to the findings of the Administrator for the

Centers for Medicare and Medicaid Services ("CMS")[1], the amount of consideration from the

---

[1] CMS formerly was known as the Health Care Financing Administration. It will be referred to
as CMS throughout this opinion.

merger that the plaintiffs allocated towards land and depreciable assets equaled 25 percent of the alleged appraisal value (conducted post-merger). (J.A. 29.)

As Medicare providers, the plaintiffs are eligible to receive payments from Medicare for the "reasonable cost of [Medicare] services." 42 U.S.C. § 1395f(b)(1). "Reasonable" costs are those "actually incurred…[as] determined in accordance with regulations." 42 U.S.C. § 1395x(v)(1)(A). The Secretary's regulations classify "depreciation on buildings and equipment used in the provision of patient care" as a reasonable cost. 42 C.F.R. § 413.134(a). Thus Medicare reimburses providers annually for these depreciation costs. The costs are calculated by dividing the asset's purchase price by its "estimated useful life" and then prorating this amount by the percentage of the asset's use dedicated to Medicare services. § 413.134(a)(3), (b)(1). After depreciation costs are deducted, the remaining value of the asset is called its "net book value." § 413.134(b)(9).

Because these depreciation costs are merely estimates of the decline in an asset's value, the regulations in effect at the time of the merger granted providers the opportunity to adjust this estimate upon disposing of the asset. Entities that were Medicare providers prior to statutorily merging with an unrelated party were able to recoup gains and losses from the merger subject to 42 C.F.R. § 413.134(f). *See* § 413.134(k)(2)(i) (formerly § 413.134(l)). Subsection (f) allows providers to request reimbursement for the difference between the net book value and the compensation actually received in exchange for assets disposed of prior to December 1, 1997, depending on the method of disposition.[2] § 413.134(f)(1). Subsection (f)(2) permits the inclusion

---

[2] Congress eventually ended this reimbursement practice due to changes in the health care industry in the 1990s that proved costly to Medicare. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4404(a); *see also Provena Hosps. v. Sebelius*, --F. Supp. 2d –, No. 08-1054, 2009

of "gains and losses realized from the bona fide sale…of depreciable assets" in the determination

of allowable cost. § 413.134(f)(2).

CMS issued Program Memorandum A-00-76 on October 19, 2000 to help clarify the

application of § 413.134(k) to mergers and consolidations involving non-profit providers. (J.A.

2467.) The Memorandum explained that these mergers required special consideration, given that

non-profit providers are not driven by the same profit-maximizing goals as for-profit

corporations (*id.* at 2468), and described the "related organizations" and "bona fide sale"

standards under which mergers between non-profit organizations should be analyzed. (*Id.* at

2469-72.)

As to "related organizations," the Memorandum noted that consideration should be given

to continuity of control, or the degree to which the management teams of the pre-merged

organizations continue to exercise control over the post-merger organization. (*Id.* at 2469.)

Therefore, parties that were completely unrelated prior to the merger would nonetheless be

considered related if they both continued to exert influence over the newly merged organization.

(*Id.*) The Memorandum also defined "bona fide sale" under § 413.134(f)(2) as "an arm's-length

business transaction between a willing and well-informed buyer and seller." (*Id.* at 2470.) It

further specified that an arm's-length transaction is one "negotiated by unrelated parties, each

acting in its own self interest in which objective value is defined after selfish bargaining." (*Id.*)

Furthermore, the Memorandum explained that "a large disparity between the sales price

(consideration) and the fair market value of the assets sold indicates the lack of a *bona fide* sale"

---

WL 3286145, at * 5 (D.D.C. Oct. 13, 2009) (discussing historical context of revision to
Medicare reimbursement policy).

(*Id.* at 2471.) The Memorandum recommended reviewing "the allocation of the sales price among the assets sold" to help determine whether a bona fide sale had taken place. (*Id.*)

The Memorandum concluded by stating that its effective date was not of consequence because it clarified, rather than changed, existing policy. (*Id.* at 2472.) Therefore, it should be applied to "all cost reports for which a final notice of program reimbursement has not been issued and to all settled cost reports that are subject to reopening…" (*Id.*)

The plaintiffs submitted their annual cost reports to Medicare for the fiscal year ending June 30, 1997, claiming a loss from the disposal of depreciable assets through the merger. The total loss claimed equaled $11,069,753, not including losses on individually owned movable equipment that never changed ownership. Cost reports are first submitted to private fiscal intermediaries that make initial reimbursement determinations pursuant to a contract with the Secretary. *See* 42 U.S.C. § 1395h. In this case, the plaintiffs submitted their reports to the Blue Cross Blue Shield Association ("BCBSA").  After the BCBSA denied the reimbursement request, the plaintiffs requested a group hearing before the Provider Reimbursement Review Board ("PRRB"), which reversed the BCBSA's decision. The PRRB concluded that CMI and Presbyterian were not "related parties" under the Medicare statute and regulations by looking to their relationship prior to the merger. (J.A. 227.) Furthermore, the PRRB found that the merger was a bona fide transaction under North Carolina corporate law. (*Id.*)

The Administrator subsequently notified the parties that he would review the PRRB's decision. BCBSA and Center for Medicare Management submitted comments requesting reversal. The Administrator ultimately reversed the PRRB's decision, denying Medicare reimbursement for the plaintiffs' losses from the merger. In reaching his decision, the Administrator relied in part upon Program Memorandum A-00-76's interpretation of "related

5

organizations" and found that CMI and Presbyterian were indeed related. (J.A. 26-27.) In

addition, the Administrator concluded that the merger was not a bona fide transaction because of

the great disparity between the consideration received in the merger and the fair market value of

CMI's assets. (*Id.* at 28.) The fact that CMI did not seek an appraisal prior to the merger or place

its assets for sale in the open market convinced the Administrator that there had been no good

faith bargaining between CMI and Presbyterian to establish the fair market value of CMI's

assets. (*Id.* at 29.) The plaintiffs have now filed a complaint for judicial review of the

Administrator's final decision.

### STANDARD OF REVIEW

The court reviews the Administrator's decision under the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 701 *et seq*. *See* 42 U.S.C. § 1395oo(f)(1). Under the APA, a court may set

aside final agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A),

(2)(E). When an agency interprets its own regulations, the interpretation has "controlling weight

unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v.*

*Shalala*, 512 U.S. 504, 512 (1994) (internal quotations omitted).  Therefore, the court "must

defer to the…interpretation unless an 'alternative reading is compelled by the regulation's plain

language or by other indications of the Secretary's intent at the time of the regulation's

promulgation.'" *Id.* (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

The Court has noted that in the case of Medicare regulations, "[t]his broad deference is

all the more warranted" because "the regulation[s] concern[] 'a complex and highly technical

regulatory program,' in which the identification and classification of relevant 'criteria necessarily

require significant expertise and entail the exercise of judgment grounded in policy concerns.'"

*Id*. (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)).

## ANALYSIS

The crux of the plaintiffs' argument for overturning the Administrator's decision is that

the Administrator incorrectly relied on Program Memorandum A-00-76's definitions of "related

organizations" and "bona fide sale," because those definitions, according to the plaintiffs, are

contrary to the regulations. In addition, the plaintiffs argue that the Administrator applied the

Memorandum to the 1997 merger retroactively, in violation of the APA. Every court that has

considered these arguments, however, has determined that the Memorandum's interpretation of

"bona fide sale" is reasonable and consistent with Medicare regulations and not inconsistent with

prior agency statements. *See Albert Einstein Med. Ctr. v. Sebelius*, 566 F.3d 368, 376-77 (3d Cir.

2009); *Robert F. Kennedy Med. Ctr. v. Leavitt*, 526 F.3d 557, 562 (9th Cir. 2008); *Via Christi

Reg'l Med. Ctr. v. Leavitt*, 509 F.3d 1259, 1274-75 (10th Cir. 2007);  *Provena*, 2009 WL

3286145, at * 11; *St. Luke's Hosp. v. Sebelius*, --F. Supp. 2d--, No. 08-0883, 2009 WL 3127185,

at *3-4 (D.D.C. Sept. 30, 2009); *see also North Iowa Med. Ctr. v. Dep't of Health & Human

Servs.*, 196 F. Supp. 2d 784, 787 (N.D. Iowa 2002) (explaining that a sale of depreciable assets is

"bona fide" under 42 C.F.R. § 413.134(f) if "(a) fair market value is paid for the assets, and (b)

the sale is negotiated (i) at arms' length (ii) between unrelated parties"). As Judge Robertson

recently noted in *St. Luke's*, this "consensus is not surprising: the Secretary's interpretation is

supported by the text of the regulations and by common sense." 2009 WL 3127185, at *3.

The plaintiffs first argue that under North Carolina law, CMI's statutory merger was not a

sale of assets and is therefore not subject to the bona fide sale requirement under 42 C.F.R. §

413.134(f)(2). Although the plaintiffs acknowledge that § 413.134(k)(2)(i), governing statutory mergers between unrelated parties, states that such mergers are "subject to the provisions of paragraph[]…(f) of this section," they claim that "[i]t does not require compliance with, or refer to, any particular subsection within section (f), such as (f)(2) addressing 'bona fide sale.'" (Pls.' Mot. for Summ. J. 26.)

Yet § 413.134(f)(1) explicitly states that the treatment of a gain or loss "depends on the manner of disposition of the asset, as specified in paragraphs (f)(2) through (6) of this section." Of the matters of disposition listed in subsection (f), the only one that could reasonably apply to a merger is a sale. *See Albert Einstein*, 566 F.3d at 377 (agreeing with the district court below that "[o]f all the circumstances listed [under 42 C.F.R. § 413.134(f)], the disposition most applicable to the present case [involving a statutory merger] is the bona fide sale requirement"); *St. Luke's*, 2009 WL 3127185, at *3 (explaining that "[o]f the types of disposal specified in [§ 413.134(f)], the only one that could arguably apply to a merger is a sale"). Gains and losses realized from a sale may only be treated as allowable Medicare costs, however, if they are the result of a "bona fide sale." *See* § 413.134(f)(2).

Holding statutory mergers to the "bona fide sale" requirement is a logical method of ensuring that Medicare only reimburses providers for actual losses resulting from the depreciation of assets. *See Via Christi*, 509 F.3d at 1275 (noting that "[e]ven if a…statutory merger is not a 'sale' per se, treating it as a sale pursuant to § 413.134(f)(2) ensures that any depreciation adjustment will represent economic reality, rather than mere 'paper losses'"). The plaintiffs, however, claim that depreciation costs must be recomputed whenever *any* amount of consideration is exchanged for the providers' depreciable assets, whether or not the consideration reflects the assets' fair market value. They reason that the consideration received in a statutory

8

merger between unrelated parties "would provide Medicare with a 'better' number than that based on previous estimates of depreciation, and thus justif[y] recomputation of depreciation costs without requiring satisfaction of additional requirements." (Pls.' Mot. for Summ. J. 26.) Yet the plaintiffs also admit that it would be "mere happenstance" if the consideration received in a merger equaled the fair market value of the merged entity's assets. (*Id.* at 28.) It is unclear, however, why the consideration received in a merger would provide a better estimate of the value of depreciable assets than the net book value, when the amount of consideration has no relation to the assets' fair market value. The plaintiffs' interpretation of the Medicare regulations is far less plausible than that of the Administrator.

The plaintiffs argue that their interpretation is supported by CMS's previous informal interpretations of the Medicare regulations. In particular, they cite 1987 and 1994 letters from former CMS Directors William Goeller and Charles R. Booth respectively, claiming that the letters reveal prior interpretations of 42 C.F.R. § 413.134(k) that do not subject statutory mergers between unrelated parties to the bona fide sale requirement of § 413.134(f)(2). (*See id.* at 7, 26-28.) Yet the letters are merely silent on this question; neither precludes a bona fide sale analysis. (*See* J.A. 733-37.) To the contrary, the Goeller letter states that "an adjustment to recognize any gain or loss to the merged/consolidated corporations would be required in accordance with regulations section 42 CFR 413.134(f)." (*Id.* at 734.) Thus the Administrator's decision to subject the merger to a bona fide sale analysis, pursuant to § 413.134(f)(2), is hardly at odds with prior agency interpretations. *See Albert Einstein*, 566 F.3d at 378 (concluding that "the agency's requirement that a bona fide sale be one in which 'reasonable consideration is exchanged is not inconsistent with the agency's previous statements"); *Via Christi*, 509 F.3d at 1275-76 (same); *Provena*, 2009 WL 3286145, at *10 (same).

Furthermore, contrary to the plaintiffs' arguments, the Administrator did not retroactively apply a new definition of "bona fide sale" by relying on Program Memorandum A-00-76. The plaintiffs claim that CMS had previously adopted a definition of "bona fide sale" that simply required a "good faith" sale, for "valuable," rather than reasonable, consideration, between unrelated parties. (Pls.' Mot. for Summ. J. 29-32.) Yet such a lenient standard would negate the very purpose of the bona fide sale requirement: to ensure an accurate valuation of a provider's depreciable assets. *See Albert Einstein*, 566 F.3d at 378 (noting that "requiring 'reasonable consideration' is in keeping with the underlying and long-standing purpose of the Medicare Act, i.e., to reimburse for only actual and reasonable costs"). Furthermore, 42 C.F.R. § 413.134(b)(2) connects the concepts of "bona fide sale" and "fair market value":

> Fair market value is the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition. Usually the fair market price is the price that bona fide sales have been consummated for assets of like type, quality, and quantity in a particular market at the time of acquisition.

The Memorandum's definition of "bona fide sale," therefore, does not stray far from the regulation itself. As the interpretation announced in the 2000 Program Memorandum did not represent a change in agency policy, the Administrator's reliance on the Memorandum did not constitute a retroactive application of new policy.

In addition, the Secretary and a Tennessee district court announced that a bona fide sale requires reasonable consideration prior to both the 2000 Program Memorandum and the 1997 merger. *See Hosp. Affiliates Int'l., Inc. v. Schweiker*, 543 F. Supp. 1380, 1389 (D. Tenn. 1982). In *Schweiker*, the court upheld the PRRB's decision to deny a hospital's reimbursement request arising from the sale of depreciable assets, holding that the sale was between related parties. *Id.* at 1388-89. The court also noted that it could not

find the sale to be a bona fide transaction because there was no evidence that the "purchase price bore any relation to the actual value of the property." *Id.* at 1389. Thus the plaintiffs had notice prior to the 2000 Program Memorandum that whether a transaction qualifies as a bona fide sale depends upon the reasonableness of the consideration received. *See also Via Christi*, 509 F.3d at 1276 (explaining that prior to its consolidation, the provider-plaintiff "was on notice that § 413.134(f) and its 'bona fide sale' requirement would be more than a nullity").[3]

The plaintiffs also argue that the policy announced in the 2000 Memorandum should have been published in the Federal Register and undergone public notice and comment before public issuance.[4] Under the APA, however, notice and comment is not required for "interpretive rules" or "general statements of policy." 5 U.S.C. § 553(b)(3)(A). Program Memorandum A-00-76 is an interpretation of an existing regulation and thus does not require notice and comment. *See Albert Einstein*, 566 F.3d at 381; *St. Luke's*, 2009 WL 3127185, at *5. Furthermore, the plaintiffs have failed to demonstrate any prejudice that resulted from the Secretary's failure to timely file the

---

[3] Even if the 2000 Program Memorandum did in fact represent a shift in existing policy, agencies are not prohibited from announcing interpretive changes. *See FCC v. Fox Television Stations, Inc.*, 129 S. Ct.  1800, 1811 (2009) (explaining that an agency may change its policy without "demonstrat[ing] to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one" as long as "the new policy is permissible under the statute,…there are good reasons for it, and…the agency *believes* it to be better").  The 2000 Memorandum's explanation for subjecting mergers between non-profit providers to the bona fide sale analysis provides adequate justification for any change in policy that might have occurred. (*See* J.A. 2467-72.) *See also St. Luke's*, 2009 WL 3127185, at *4 (finding the Program Memorandum's rationale for applying the bona fide sales requirement to statutory mergers sufficient—post-hoc or not—to support the interpretation at issue here").

[4] Program Memorandum A-00-76 was listed in the Federal Register on June 28, 2002. *See* 67 Fed. Reg. 43,762.

Memorandum in the Federal Register. Failure to disclose for public comment is subject to the rule of prejudicial error, which prevents courts from setting aside an agency rule absent a showing of prejudice. *See* 5 U.S.C. § 706; *see also American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) (concluding that "the court will not set aside a rule absent a showing by the petitioners that they suffered prejudice from the agency's failure to provide an opportunity for public comment") (internal quotations omitted).

The plaintiffs' final two arguments in favor of invalidating the Secretary's "bona fide sale" requirement are similarly without merit. The fact that the Secretary did not submit the new interpretation to Congress for review, in alleged violation of the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. §§ 801 *et seq*., is not a basis for overturning the Administrator's decision because the Act precludes judicial review. *See* 5 U.S.C. § 805 ("No determination, finding, action, or omission under this chapter shall be subject to judicial review."); *see also Montanans for Multiple Use v. Barbouletos*, 568 F. 3d 225, 229 (D.C. Cir. 2009) (holding that "[t]he language of § 805 is unequivocal and precludes review of this claim"). Finally, there is no case law or statutory authority in support of the plaintiffs' contention that the Deficit Reduction Act of 1984 prevented the Secretary from issuing new regulatory interpretations after 1984. *See St. Luke's*, 2009 WL 3127185, at *5 (finding this argument without any legal support).

Given the validity of the regulatory interpretation relied upon by the Administrator, the only remaining question is whether the Administrator's finding that the CMI-Presbyterian merger was not a bona fide transaction was supported by substantial evidence. The Administrator based its decision, in part, on the large discrepancy between the consideration received for CMI's

assets and the appraised value of the assets. CMI allocated $54 million of the consideration it

received in the merger towards depreciable assets and land. (*See* J.A. 29.) Yet these assets had an

appraised value of $215 million and a net book value of $139 million. (*See id.*) Thus the

consideration CMI received in the merger for these assets accounted for only 25 percent of their

appraised value. (*See id.*)

Additional evidence that the parties did not engage in arms-length, self-interested

bargaining supported the Administrator's finding as well. CMI appeared uninterested in

maximizing the amount of consideration it would receive in the merger. For example, CMI failed

to obtain an appraisal of its assets prior to the merger. (*See id.*) CMI also declined to place its

assets for sale on the open market, so as to encourage competitive bidding. (*See id.*) Instead, CMI

was motivated by its desire to continue the availability of non-profit community health services.

(*Id.*) Indeed, CMI made explicit promises to this effect and agreed to contribute $10 million for

improving health care in Forsyth County to gain the Forsyth County Government's consent to

the merger. (*See* J.A. 24-25.) Although this may be an important and worthwhile goal, it is not

indicative of parties engaged in self-interested bargaining with a focus on maximizing financial

compensation. Thus, CMI's non-monetary motivations may not form the basis of a bona fide

sale. Accordingly, the Administrator's conclusion that the merger did not result in a bona fide

sale was supported by substantial evidence.

The Administrator's finding that the CMI-Presbyterian merger was not a bona fide sale

serves as an adequate basis for denying the plaintiffs' reimbursement claims; therefore, the court

need not examine the validity of the Secretary's interpretation of "related organizations." *See*

*Albert Einstein*, 566 F.3d at 376 (limiting its analysis to the bona fide sale issue because it is a

"sufficient independent basis on which to deny Einstein's claim"); *Robert F. Kennedy Med. Ctr.*,

526 F.3d at 563 (finding that because the "['bona fide sale'] issue is dispositive in this case, we do not reach the 'related parties' issue"); *Provena*, 2009 WL 3286145, at *1, n.1 (same).

## <u>CONCLUSION</u>

For the foregoing reasons, the Secretary's motion for summary judgment will be granted and the plaintiffs' motion will be denied. A separate Order follows.

<u>November 5, 2009</u>                    _____/s/_____
Date                                                 Catherine C. Blake
                                                        United States District Judge